UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

BISON CAPITAL CORPORATION,

                          Plaintiff,

           - against -

ATP OIL & GAS CORPORATION

                        Defendant.

-------------------------------------------------------------- X

: Civil Action No. 10 CV 714
: (SHS) (AJP)

RECEIVED
FEB 1 1 2010
U.S.D.C. S.D. N.Y.
CASHIERS

## FIRST AMENDED COMPLAINT

Plaintiff, Bison Capital Corporation ("Bison Capital" or "Bison") for its First Amended Complaint in this action states as follows:

### INTRODUCTION

1.    This is an action for breach of contract brought by Bison Capital against ATP Oil & Gas Corporation ("ATP" or "the Company") for $102,654,774.49.

2.    In February, 2004, ATP was a small, struggling oil and gas company on the brink of Chapter 11 bankruptcy, caught in the predatory clutches of a "vulture" fund Cerberus Capital Management, L.P. ("Cerberus").[1] To prevent a default under ATP's loan agreement with Cerberus which could trigger an imminent takeover, asset seizure, or massive dilution or elimination of its managements' and other existing stockholders' equity interests in the Company, ATP needed many millions of dollars that it did not have and that its management had not been able to obtain.

---

[1] Denoting the firm's predatory reputation, its name "Cerberus" was copied from the name of the monstrous beast with three heads, a backside covered with snakes, and the tail of a dragon, that guards the entrance to Hades, the Underworld in Greek mythology.

3.      To solve its problems, ATP sought the assistance of Bison Capital and its President Edwin E. Wells, Jr. ("Wells"), who has more than 35 years of experience advising major oil and gas companies such as Exxon, Mobil, BP, Shell, Chevron, Amoco, Conoco, Phillips, and Sunoco on complex financing and strategic matters.

4.      ATP asked Bison to devise a financing plan to (a) provide ATP with immediate access to the funds needed to pay off the predator and cure a working capital deficit so large it was making ATP's accountants question whether ATP was still a "going concern," and (b) provide ATP with continuing access to the very large and growing amounts of funds needed to enable ATP to implement its business plan for multi-year growth through continuing acquisition and development of oil and gas properties.

5.      To induce Bison to save this struggling company from financial failure and make available the large amounts of funding ATP needed for future success, when others had refused to provide such financing, ATP contracted to pay _continuing_ compensation to Bison of 1% of the aggregate value of _each_ financing _to be arranged_ by any of ten specified banking firms approached by Bison through which the needed funds were made available to ATP.  The contract specified "such fees _in each case_ to be paid on the date such funds are made available" and "_no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees._"

6.      In reliance on ATP's contractual promises and obligations, Bison provided the services ATP requested – providing access, through financings arranged by Bison's financing source Credit Suisse First Boston, to $8.705+ billion of funding that enabled ATP to escape from the predator and _completely_ _transform_ the Company's operations, prospects, and value – funding a _six-fold_ increase in its oil and gas production, a _fifteen-_

*fold* increase in production revenues, and an *eleven-fold* rise in ATP's stock price, from $5.01 per share to $57.58 per share, enriching ATP stockholders, especially management whose stock increased in value by hundreds of millions of dollars. (Exhibit 1)

7.    However, while enjoying the benefits of Bison's extraordinarily valuable services – and despite _admitting_ ATP owed Bison "something more" in compensation under the engagement contract – ATP has breached the contract and failed and refused to pay Bison $86,638,468.75 in fees which it had promised to gain Bison's services.

<u>SUMMARY OF BISON'S CLAIMS AGAINST DEFENDANT ATP</u>

8.    Defendant ATP Oil & Gas Corporation is an oil and gas company that has focused on acquiring and developing – that is, bringing to production – oil and gas properties which it believes to have proved *undeveloped* reserves, in particular, properties whose original owners view them as "non-core" or "non-strategic."

9.    ATP's very existence and its opportunities for success are dependent upon its ability to make large and _continuing_ capital expenditures to acquire and develop such undeveloped properties, which in turn is dependent upon ATP's ability to _finance_ those large expenditures, _on a continuing basis_.

10.    To finance its business, ATP relied upon *commercial bank loans* under a *"borrowing base" structure* and selling common stock.  As ATP experienced difficulties under this financing structure, finding its needs for borrowed funds growing larger than that structure permitted and having difficulties complying with loan covenants imposed by the banks, ATP moved from one bank to another.  ATP's primary lender in 2001 and early 2002 was BNP Paribas (a commercial bank).  Its primary lenders later in 2002 and in early 2003 were Union Bank and Guaranty Bank (both commercial banks).

11.    By mid–2003, ATP was in violation of its existing loan agreement and needed greater financing than it could obtain from its existing commercial bank sources. To solve its funding problems, ATP turned to Cerberus through its lending arm Ableco Finance, which charged high rates, high fees, and imposed onerous financial covenants on ATP under a "borrowing base" financing structure. ATP failed repeatedly to satisfy the covenants and received two default notices from the "vulture" lender, for which ATP managed to obtain only a temporary reprieve by paying millions to the predator.

12.    By January 2004, ATP was facing financial disaster. ATP's revenues from oil and gas production, which had declined sharply, were only *$13.6 million* for the fourth quarter of 2003. Most costly of ATP's problems was the failure to complete a well in the UK North Sea on schedule and within budget. That failure required ATP to find millions of dollars of additional funds management had not provided for and delayed for many months production – and revenues from production – on that property, which management had relied upon to fund ATP's ongoing operations. Those troubles left ATP with a working capital *deficit* of *$46.4 million* at year-end 2003. (Exhibit 4, pages 15, 35, F-8)

13.    ATP was faced with the very real possibility that its independent auditors would qualify their opinion of ATP's 2003 financial statements, stating they were unable to conclude ATP was a "going concern" – thereby notifying investors ATP could fail.

14.    A "going concern" qualification would also trigger default provisions under which the predatory "event-driven" lender could be entitled to seize ATP's oil and gas properties or force a financial restructuring that could give it a major equity interest in ATP, substantially diluting or wiping out the existing stockholders' interests and allowing the "vulture" lender to seize control of ATP and liquidate its valuable assets.

15.    ATP's management began actively planning for a potential Chapter 11 bankruptcy to try to avoid losing their own control over the Company and prevent the loss of their own equity stakes in the Company. ATP also began urgently seeking ways to raise sufficient funds to resolve the existing crisis and fund its ongoing operations.

16.    ATP consulted with a number of financing advisors and others, including Merrill Lynch, a little-known California entity referred to as a "Scottish investment trust," a person or entity calling itself "Guggenheim," others claiming to represent "Middle East investors," and a financial restructuring firm. In addition, ATP's CFO Albert Reese was pursuing financing alternatives with several regional investment firms and others.

17.    In early February 2004, ATP met and discussed its financing needs with Bison's President Edwin Wells, who has extensive experience advising major energy companies regarding financing. ATP described not only its immediate need for $35-$40 million of additional funds to satisfy the auditors' concerns and its desire to obtain new financing to replace the "vulture" lender's loans, but also ATP's _continuing_ needs for large and growing amounts of external funding _in future years_ in order to carry out ATP's ambitious business plan to grow the Company and make it more valuable.

18.    ATP admitted that it had relied previously – and would continue in future years to rely – upon financing. ATP emphasized that carrying out its _business plan_[2] would require even larger amounts of external funds in future years so that ATP could acquire, retain and develop _large_ ownership interests in properties such as "Gomez" and "the

---

[2]    ATP wanted to acquire, develop and become operator of high-potential oil and gas projects in which it retained _large interests_, to generate very large revenues from production, making ATP a much more valuable company and _generating higher values for stockholders_. In past years, ATP typically retained _smaller interests_, being compelled to sell off substantial interests in its properties to _decrease_ its need for external funding and _to provide funds_ needed to develop the smaller interests retained. See Exhibit 3, pages 27, F-12 Note 3; Exhibit 4, pages 30, F-8 Note 2.

Tors," high-potential properties of ATP's that required huge amounts of external funds for development – huge amounts that management of the struggling and financially unstable ATP had _not_ been able to obtain.

19.     Recognizing that its previous financing practices had contributed to ATP's problems and also imposed constraints on its _future_ growth and development, ATP asked Bison's Wells to help develop a _new financing structure_ for ATP and to help obtain a _major new financing source_ which could provide the external funding ATP needed, then, so that ATP could extract itself from the existing financial crisis, and in future years, to fund the Company's ongoing operations and enable ATP to carry out its business plan.

20.     ATP admitted its management lacked expertise needed to solve its financing problems and represented to Wells that ATP believed his assistance was essential, both for ATP's survival and its future success. ATP's compensation promises to induce Wells to provide the assistance that ATP needed were consistent with that representation.

21.     To ensure ATP gained Wells' expert assistance during this crucial period – especially his assistance in approaching, and helping ATP form a relationship with, a _major new financing source_ that could provide funds to enable ATP to extract itself from the existing financial crisis and _continue_ to provide large amounts of external funds for ATP in the future – ATP promised _continuing_ compensation to Bison, fees for _each_ financing arranged by any of several listed financial institutions approached by Bison on ATP's behalf through which funds were _to be made_ available to ATP in the future.

22.     In reliance upon ATP's promises, Bison agreed to assist ATP develop a new financing structure and to approach and help ATP form a relationship with a new financing source which could provide the funding ATP needed, then and in the future.

23.     Wells moved right away to provide the assistance ATP needed. Taking into account ATP's history of financing problems and its continuing needs for large amounts of external funds, Bison recommended major changes in the structure of ATP's potential financing arrangements, recommending that ATP cease its exclusive reliance upon *commercial bank loans* under a "borrowing base" structure and sales of common stock. Bison recommended a *multiple-financing* plan for *capital markets* financings (the "Bison Financing Plan" or "Bison Plan") that included *multiple debt financings* in the capital markets with no "borrowing base" limits and *occasional preferred stock sales*, to broaden ATP's potential investor pool, minimize dilution from common stock sales, and eliminate or minimize constraints on ATP's future growth about which it had complained.

24.     Under the Bison Plan, ATP could quickly raise the funds needed to satisfy the auditors' concerns and replace loans provided by the "vulture" lender, and then *return* to the capital markets, *repeatedly*, *in the future* to consummate *improved* financings with lower interest rates, more flexible covenants, or increased funding amounts.

25.     Bison advised ATP that the best way to raise funds quickly was in the "junk bond" capital markets and advised ATP to enlist the resources of a major *investment bank* with "junk bond" capabilities, identifying several firms with those capabilities, including Credit Suisse First Boston[3] ("CSFB").   Bison approached CSFB on ATP's behalf in early February 2004, and after meetings with CSFB in February and March 2004, ATP enlisted CSFB to arrange financings for ATP in the capital markets.

26.     Since Bison approached CSFB on ATP's behalf, ATP has utilized CSFB to make funding arrangements in the capital markets for *each* of its ten debt financings, *each*

---

[3]     On January 16, 2006 this investment bank's name was shortened to "Credit Suisse."

of its three preferred stock financings, and a common stock financing – fourteen different financing arrangements with an aggregate value exceeding $8.705 billion.

27.     Although ATP paid Bison the $1.85 million fee it owed for the first of those financings, ATP still owes Bison $86,638,468.75 with respect to the other thirteen financings arranged by CSFB, the major new financing source Bison obtained for ATP. Despite ATP's *admission* that ATP still owes Bison additional compensation for Bison's professional services, ATP has refused and failed to pay Bison the additional fees that ATP owes, fees that ATP promised to gain Bison's extraordinarily valuable assistance.

28.     ATP repeatedly utilized the potential financing arrangements structured by Bison and repeatedly utilized Bison's new financing source – a financing source which ATP admitted it *did not know*, it *had no relationship with*, and, *without* Wells' assistance, professional credibility and strong backing, it had *no other way* to immediately capture the high-level attention and commitment of during ATP's financial crisis – to provide the funds that saved ATP from the ravages of a lender which ATP Chairman Bulmahn described as "predatory" and made it possible for ATP to carry out its business plan.

29.     Bison's work providing ATP with potential financing arrangements – both Bison's new financing structure and ATP's *continuing* access to huge amounts of external funding *to be made* available by Bison's new financing source – have proved essential for ATP's success, as ATP admitted it would be when it sought Bison's assistance. Bison's expert assistance was the indispensable catalyst that *completely transformed* ATP's very existence, its possibilities for success, and, most importantly, its value to stockholders.

30.     The external funds made available as a result of Bison's work fueled a remarkable increase in ATP's *oil and gas production*, raising it from *3.25 Bcfe* for the

fourth quarter of 2003, the last quarter before ATP hired Bison, to *21.57 Bcfe* by the first quarter of 2008, and raising ATP's *revenues from production* from only *$13.6 million* for the fourth quarter of 2003 to *$226.0 million* for the first quarter of 2008. (Exhibit 1)

31.     Bison's work also fueled a spectacular increase in ATP's *value,* propelling its stock to rise from *$5.01* per share when ATP hired Bison in early February 2004, to highs of *$39.10* in 2005, *$49.26* in 2006, *$57.58* in 2007, and *$47.35* in 2008. (Exhibit 1) At its 2007 high, ATP's market value had risen from *$123 million* to *$1.764 billion*.

32.     The Bison Plan, and Bison's work approaching and helping ATP form a relationship with its new financing source CSFB, made ATP management – who were at risk of losing their ATP equity stakes before Bison agreed to assist ATP – very rich men.

33.     When ATP hired Bison, ATP CEO Bulmahn's stake in ATP had a value of *$44 million*.  At the price reached in 2007, that stake[4] was worth a stunning *$505 million*. The rise in ATP's stock price resulting from Bison's work – which has proved to be extraordinarily valuable, by *any* measure – also enriched others in ATP management, many of whom used opportunities to sell some of their ATP stock at high prices.

34.     Wells had concerns about ATP.  To ensure ATP lived up to the promises of *continuing* compensation it made to induce Bison to provide its valuable services, and not attempt to renege on its obligations in the future, *after* Bison had provided its services to ATP, Bison requested ATP enter into a written agreement with Bison documenting those promises. (Exhibit 2) Attached to that agreement dated February 1, 2004 (the "Bison Contract") was the list of major banking firms which ATP and Bison agreed were capable of satisfying ATP's *continuing* needs for external funds, a list that included CSFB.

---

[4]     Bulmahn sold some of his stock since that time, after the price of ATP common stock rose greatly, and he also acquired additional ATP stock subsequently.

35.     Paragraph 2 of the Contract was specific in providing ATP must pay Bison

"for *each* Capital Transaction through which funds are made available to or for the benefit of ATP, its affiliates or lenders as a result of arrangements made or *to be made* by investment or commercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A . . .cash fees equal to one per cent (1%) of the aggregate Value of such funds, such fees *in each case* to be paid on the date such funds are made available. . . ." (Exhibit 2, Paragraph 2(b), emphasis added.)[5]

36.     By specifying in Paragraph 2 that ATP must pay Bison for "*each* Capital Transaction" and by specifying the timing of payment "*in each case*", the Bison Contract clearly and unequivocally contemplated and applied to *multiple* Capital Transactions.

37.     By specifying in Paragraph 2 that ATP pay Bison "for *each* Capital Trans-action through which funds are made available to or for the benefit of ATP…as a result of arrangements made or *to be made*" by a listed bank approached by Bison on ATP's behalf (Exhibit 2, Paragraph 2(b), emphasis added) and defining "Capital Transactions" as "*potential* financing arrangements" (Exhibit 2, Paragraph 1(b), emphasis added), the Contract clearly and unequivocally contemplated and applied to *future* ATP financings.

38.     Paragraph 7 reinforced the continuing compensation requirements of Paragraph 2, providing that ATP could not dodge its payment obligations to Bison by attempting to terminate its obligations under the Contract *after* Bison had already provided its services to ATP – stating "*no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses*" (Exhibit 2, Paragraph 7, emphasis added) – or by delaying until after April 1, 2004, the scheduled "termination date," to *start* utilizing a listed bank approached by Bison on ATP's behalf.

---

5     For funds made available through equity financings, fees would be 1.25% of the aggregate Value of funds available.  Id.

39.     When Bison raised the matter of possible delays, ATP denied that it would ever seek to deprive Bison of the continuing compensation which ATP had promised with respect to such a bank.  ATP stated there could be many reasons for delay in utilizing a listed bank approached by Bison on ATP's behalf, such as a bank's unwillingness to provide financing to ATP for some period of time, ATP's inability to satisfy requirements of such a bank's proposals, ATP's desire to work with one such bank to the exclusion of others, or ATP's preference for a different financial institution's proposals.

40.     ATP reaffirmed its promises, asserting it would pay Bison for _each_ Capital Transaction carried out as a result of arrangements _to be made_ by any listed bank approached by Bison on ATP's behalf, as set forth in Paragraph 2, if ATP _started_ utilizing such bank for _a_ potential financing arrangement (i.e., _a_ Capital Transaction) on or prior to the Contract's termination date or within a twelve month period thereafter.

41.     ATP agreed that consummation of _a_ Capital Transaction _or_ entry into an agreement or arrangement providing for _a_ Capital Transaction would, for these purposes, mark the _start_ of ATP's utilization of such a bank.

42.     That objective test was stated in Paragraph 7, which provides:

"_Notwithstanding_ [a stated termination date of April 1, 2004] Bison shall be entitled to the fees set forth in Paragraph 2 above in the event the Company consummates _or_ enters into an agreement or arrangement providing for _a_ Capital Transaction … at any time within twelve months following termination of this Agreement; and _no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided herein_…."
(Exhibit 2, paragraphs 7, emphasis added.)

43.     That objective test was satisfied: _agreeing_ in March (and again in May) 2004 to implement the Bison Plan for potential financing arrangements _to be made_ by CSFB, ATP consummated _a_ Capital Transaction on March 29, 2004, _another_ on Septem-

ber 24, 2004, and entered into an agreement or arrangement providing for *yet another* Capital Transaction before April 1, 2005, within twelve months following the termination date – *all* with CSFB, the major new financing source Bison obtained for ATP.

44.     Despite the huge gains for ATP, its management and shareholders resulting from Bison's extraordinarily valuable work saving ATP from financial disaster and providing it with access to $8.705+ billion of funds for continuing acquisition and development operations, funds available from potential financing arrangements that ATP *chose*, *repeatedly,* to consummate with CSFB – ATP has breached the Bison Contract, refusing to pay $86,638,468.75 of fees that ATP owes to Bison pursuant to that Contract.

### PARTIES, JURISDICTION AND VENUE

45.     Plaintiff Bison is incorporated under the laws of Delaware and has its principal place of business in Greenwich, Connecticut.  Wells is the President of Bison.

46.     Defendant ATP is an oil and gas company incorporated under the laws of Texas with its principal place of business in Houston, Texas.

47.     This Court has jurisdiction of the claims in this action pursuant to 28 U.S.C. §§ 1332.

48.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) & (c) because a substantial part of the events giving rise to the claim occurred in this district and because the defendant has consented to the exclusive jurisdiction of this district.

49.     Jurisdiction and venue also are proper in this court because ATP has consented to the exclusive jurisdiction and venue of the federal and state courts in New York.

ATP'S DEPENDENCE UPON EXTERNAL FINANCING

50.     ATP's business has focused on acquiring and bringing to production oil and gas properties it believes to have proved *undeveloped* reserves ("PUDs"), reserves viewed as "non-core" or "non-strategic" by their existing owners. These include properties perceived by their owners to have insufficient potential, or to be too costly and provide an insufficient economic return, to justify the spending required to produce those reserves, when they could generate operating revenues, and other properties which owners are unwilling or unable to develop before expiration of their lease rights.

51.     ATP's focus on <u>*developing*</u> proved reserves – i.e., oil and gas deposits which have already been found by the exploration efforts of another company and whose "recoverable" amounts have been estimated – and <u>*not*</u> *exploration* (Exhibit 12, page 30, Exhibit 43, Exhibit 44 page 26) makes ATP <u>*very different*</u> from the typical exploration and development ("E&P") company, whose goal is to generate very large <u>*internal*</u> cash flows by spending limited amounts of funds to *explore*, *find*, and then bring to production, large *undiscovered* deposits of oil and gas.

52.     This strategy has important implications for ATP. Although it allows ATP to avoid the costs of hiring and supporting a large staff of skilled exploration specialists and of sophisticated seismic and other technical work needed to *explore*, *find*, assess and quantify prospects that might have "recoverable" reserve potential, ATP's strategy also <u>*limits*</u> ATP's ability to generate *internal* cash flows from its operations, by depriving ATP of the possibility of discovering large new oil or gas fields that can generate very large operating revenues through exploration success.  This makes ATP dependent on <u>*external*</u> sources of funding its business, sources more accustomed to financing a company that focuses on *both* exploration and development activities, <u>*not*</u> a company like ATP.

53.    Since ATP does not use exploration to generate "recoverable" reserves and operating cash flows, ATP must *continually* acquire from other companies new properties with "proved" reserves and develop those and its existing properties to survive. Oil and gas development is self-liquidating: while the oil and gas deposits in its existing property inventory are being exhausted through production, ATP must acquire and develop *other* properties or else ATP will not generate operating cash flows and will fail.

54.    Development costs – the costs of drilling multiple development wells, constructing a production base offshore in the Gulf of Mexico or North Sea and linking production from its wells to existing or newly constructed pipelines to transport production from the offshore wells back onshore to refineries or gas transmission systems – can be very large. These costs are even larger[6], and more difficult to finance, for a company that wants to acquire and retain *large* interests in its properties and *grow* at a rapid rate.

55.    Thus, ATP's existence and its opportunities for success are dependent upon its ability to make large and *continuing* capital expenditures to acquire from others and develop – i.e., bring to production – undeveloped properties, which in turn is dependent upon ATP's ability to *finance* those large expenditures, *on a continuing basis*.

56.    ATP has also needed financing for working capital, to pay management and employees' salaries, office rent and other operating and overhead costs. As ATP admitted in its Form 10-K Report for 2003 "Because we have experienced a negative working capital position in past years, *we have depended on debt and equity financing* to meet our working capital requirements." (Exhibit 4, page 15, emphasis added.)

---

[6]    ATP has already spent $1.2+ billion on its Telemark development in the Gulf of Mexico, with an installed cost for the production platform of $600 million, in preparation for increases that are expected to at least double ATP's annual oil and gas production in 2010. The production platform alone for its Cheviot development, now under construction, will also be $600 million or more. (Exhibit 45).

57.    ATP's failure to complete a North Sea well on schedule and within budget required it to find millions of dollars management had not provided for and delayed for months production, and production revenues, on that property, thereby depriving ATP of internal funds needed, and counted on by management, to help fund ongoing operations.

58.    Historically, as the major source of external funds to finance its business, ATP relied upon *bank loans* from one or two *commercial banks* at a time under a *"borrowing base" financing structure* and selling common stock.  ATP moved from one commercial bank to another, as ATP found its needs for funds growing larger and as ATP experienced difficulties complying with loan covenants. ATP's primary lender in 2001 and early 2002 was BNP Paribas (a commercial bank).  Its primary lenders later in 2002 and in early 2003 were Union Bank and Guaranty Bank (both commercial banks).

59.    By mid–2003, ATP was in violation of its existing bank loan agreement and needed much greater financing than it could obtain from its existing sources.[7]  In an effort to solve its funding problems, ATP turned to the predatory "event-driven" hedge fund Cerberus Capital through Cerberus' lending arm Ableco Finance.

60.    An "event-driven" lender may provide financing to a distressed borrower on a secured basis with covenants that, if violated, trigger default provisions allowing the lender to seize the borrower's assets or institute a debt-for-equity swap or other process which gives the lender a large equity position, eliminating or diluting substantially the interests of existing stockholders, and to take control of the borrower and its assets.

---

[7]    ATP's difficulties dragged down its common stock price from its 2001 high of $14.56 per share.  During 2002, ATP stock traded at $5.00 to $1.47 per share. On May 13, 2003, the stock closed at *$3.50 per share*. On May 14, ATP sold four million shares of heavily discounted stock. To attract buyers, the stock had a gross price of *$2.95 per share* and net proceeds, after expenses, of *only $2.725 per share*. (Exhibit 5, page 13, Note 8 – Issuance of Common Stock") ATP obtained *only $10.9 million* from that stock offering and *diluted interests of ATP existing stockholders by almost 20%.*

61.     On or prior to August 13, 2003, ATP entered into "borrowing base" loan arrangements with the "vulture" lender Cerberus providing for up to $110 million of loans at high interest rates reflecting ATP's troubled financial condition, secured by substantially all of ATP's U.S. oil and gas properties and two-thirds of the stock of its foreign subsidiaries and guaranteed by the subsidiary ATP Energy. To obtain these loans, ATP subjected itself to a series of restrictive financial and operating covenants.

62.     Within three months, ATP failed to comply with several of the covenants. As a result, ATP had to negotiate and execute amendments to its loan documents on November 17 and December 3, 2003 waiving ATP's covenant failures, adding ATP properties in the U.K. North Sea as additional security for the Cerberus loans, subjecting ATP to new covenants and events of default, and temporarily increasing ATP's permitted borrowings.  ATP incurred fees of $2.4 million in connection with these amendments.

<u>ATP'S POTENTIAL FINANCIAL DISASTER</u>

63.     By letter dated December 30, 2003, Cerberus' lending arm Ableco notified ATP that it was in *<u>default</u>* under its loan documents as a result of a judgment rendered against ATP in excess of $8,100,000 in an arbitration arising out of a lawsuit against ATP for *<u>breach of contract</u>* (Exhibits 6, 4 page 24, 8 page 97). ATP received a *<u>second default notice</u>* from the "vulture" lender, dated January 8, 2004 based on the breach of contract.

64.     This default could result in both management's loss of control over the Company and a massive destruction of stockholder value, with the Cerberus affiliate seizing ATP's valuable oil and gas properties and/or gaining a major equity stake in the Company and diluting very substantially, if not wiping out entirely, any remaining equity interests of the existing stockholders, including ATP's management stockholders.

65.    ATP's management, including its Chairman and CEO T. Paul Bulmahn ("Bulmahn"), Senior Vice President Gerald W. Schlief ("Schlief") and Chief Financial Officer Albert L. Reese, Jr. ("Reese") owned more than 50% of ATP's outstanding common stock in early 2004. Bulmahn owned approximately 35.8% (8,775,267 shares), Schlief owned approximately 12.9% (3,155,433 shares), and Reese owned approximately 2.0% (489,676 shares) of ATP's outstanding common stock. (Exhibit 7, page 6)

66.    They believed ATP's assets were very valuable, especially "Gomez" and the "Tors", high-potential properties in which ATP had _large_ interests. ATP wanted to retain those large interests and operate those and other high-potential properties in which it acquired _large_ interests, if ATP could find a way to finance those activities.

67.    Bulmahn, Schlief and Reese believed that, even after taking into account claims on ATP assets represented by the Ableco liabilities, ATP's assets were worth much more than the market value of ATP's stock, which traded from $5.50 to $6.50 per share in January 2004 (i.e., an overall ATP market value of $135 million - $159 million).

68.    ATP did _not_ want to lose the large revenues from developing its valuable oil and gas properties and bringing them to production. ATP did _not_ want to have valuable ATP assets taken by the "vulture" lender, _nor_ did management want to have their own personal equity interests in ATP wiped out or diluted substantially. And ATP management did _not_ want disclosure of the fact that ATP had received the two default notices from its principal lender _nor_ disclosure of the _basis_ cited by the predator for ATP's defaults.

69.    ATP management was concerned about the impact of disclosing that the Cerberus affiliate had delivered the two default notices to ATP, not only because of the detrimental impact that disclosure could have on ATP's business, but also because of the

negative impacts such disclosure could have on the value of management's *personal* ATP stock interests and on the ability of ATP management to obtain or maintain *personal* loans secured by their ATP stock.

70.     Moreover, the *basis* for the default cited by the predator in its default notices also presented management with a serious problem: management had no convenient excuse that it could use to explain away these defaults. These could *not* be blamed on unexpected (and unplanned for) financial problems arising from unexpected technical problems in completing a North Sea well, as ATP stockholders or others in the investment community could well have thought from ATP's public statements.

71.     Instead, this ATP default – which management recognized could trigger actions by the predator Cerberus that resulted in the destruction of the preponderance of ATP's value to its existing stockholders – was caused by *management* actions that resulted in the breach of a contract ATP entered into with another oil and gas company, Legacy Resources Co., LP.  In the event ATP stockholders suffered substantial losses on their investments in the Company as a result of actions taken by Cerberus in response to this default, disgruntled stockholders who knew the basis for the defaults would almost certainly hold management legally and financially responsible for their losses.

72.      ATP management elected to conceal – and *not* disclose publicly – the fact that ATP received default notices from the predator and the basis cited for the default.

ATP'S ATTEMPTS TO AVOID THE FINANCIAL DISASTER

70.     ATP, extremely concerned about the remedies available to Cerberus and the possible outcomes of potential Cerberus actions, prepared for various financial disaster scenarios, including Chapter 11 bankruptcy.  The Company retained at least three law

firms, and a consulting firm experienced in financial restructuring, "workout," and bankruptcy, to help ATP deal with the financial crisis and ATP financing matters.

71. After weeks of negotiating, ATP convinced Cerberus' lending arm Ableco to withdraw the default notices and give waivers for ATP's failure to comply with certain financial covenants as of December 31, 2003 in exchange for 750,000 warrants to purchase ATP stock and ATP's agreement to new restrictive covenant obligations (amendments to loan documents effective February 16, 2003 and March 10, 2004).

72. Even with the latest amendments, ATP would only have until early April 2004 to solve its problems, when ATP would have to deliver to the "vulture" lender audited financial statements for the year ended December 31, 2003, together with an independent auditors' report and opinion certifying those financials that was required to be "unqualified."[8]

73. That posed a serious problem for ATP, which realized that – unless it could solve its financial problems by early April 2004 – there was a likelihood the auditors would state a "going concern" qualification to their opinion on ATP's 2003 financial statements, giving notice to investors that ATP could fail financially.

74. Such a qualification would trigger other default provisions under the loan documents, allowing the Cerberus affiliate to force a financial restructuring that could give it a major equity interest in ATP, substantially diluting or wiping out the existing stockholders' interests and allowing Cerberus to take control of ATP and its assets.

---

[8]    Section 7.01(a)(ii) of the Ableco Financing Agreement required ATP to deliver audited financial statements for the 2003 fiscal year within 95 days following the end of that fiscal year, together with an auditors' "opinion [which] shall be *without … a 'going concern' or like qualification or exception*…."   (Exhibit 8, page 68) Thus, ATP's auditors would have to be satisfied as to the adequacy of ATP's working capital and other financial issues by early April 2004, when ATP would file its Form 10-K Report with the SEC, which 10-K was also required to contain audited financial statements for ATP's fiscal year ended December 31, 2003.

75.    ATP CFO Reese, aided by investment boutiques and other entities or persons that Reese contacted, appeared to focus during early 2004 on trying to put together some kind of deal to obtain $35-$40 million or so to enable ATP to avoid the "going concern" qualification by the accountants that would trigger a default. However, even if such a partial solution were possible, it would only provide a temporary reprieve. It would _not_ provide enough funds to repay and replace the "vulture" lender and would leave ATP still under the sway of Cerberus, subject to onerous covenants and Cerberus' aggressive oversight, coercive tactics and predatory desires.

76.    ATP also discussed potential financings with others, including a very dilutive convertible preferred stock deal with Merrill Lynch, a financing described as "very unusual" with a little-known California entity that provided a personal loan to Bulmahn secured by his ATP stock that both Bulmahn and Schlief falsely told Mr. Wells was a "Scottish investment trust", an unspecified financing with a person or entity calling itself "Guggenheim," an unspecified financing with unidentified "Middle East investors," and other possibilities with a financial restructuring firm.

77.    However, as Bulmahn and Schlief admitted, ATP did not know whether any of those potential financing sources would be able to quickly provide the funds needed to rescue ATP from the existing crisis or make available the large and increasing amounts of funds needed in future years for ATP's continuing operations.

ATP'S <em>CONTINUING</em> FINANCING NEEDS AND<br>ATP'S <em>CONTINUING</em> COMPENSATION OBLIGATIONS

78.    In early February 2004, ATP's Bulmahn and Schlief met with Bison, whose President Edwin Wells has 35+ years of experience providing advice and assistance for all major sectors of the petroleum and power generation industries, such as independent

20

exploration and production companies, major integrated international oil companies, refiners and marketers, electric and gas utilities, pipeline and shipping companies, energy joint ventures and investment groups. He has advised Exxon, Mobil, Royal Dutch Shell, Shell Oil, BP, Chevron, Amoco, Conoco, Phillips Petroleum, Sunoco, Suncor, Texaco, Agip Petroli, Elf Acquitaine, Petrobras, Petroleos de Venezuela, Total Petroleum, Veba Oel, Belridge Oil, Canadian Arctic Gas Limited, Charter Oil, Citgo Petroleum, Gulf States Oil, Hill Petroleum, Hunt Oil, Magellan Midstream, Ogle Petroleum, Oryx Energy, Pacific Gas and Electric, Pacific Lighting, Public Service Electric and Gas, Ramco Energy, Trans-Alaska Pipeline System, Union Texas Petroleum, Valero and others.

79.    Mr. Wells has provided advice regarding hundreds of financings and potential financings, including secured and unsecured commercial bank loans from individual banks and multi-bank syndicates and public offerings, private placements and exchange offers of debt, equity, mezzanine securities, options and warrants, in the capital markets.

80.    These have ranged from a $25 million private placement of Conoco limited partnership interests for an exploration project in Texas and Oklahoma and a $100 million public stock offering for London-based Ramco Energy to fund its participation in a major oil venture in Azerbaijan with SOCAR, the State Oil Company of Azerbaijan Republic, to a commercial bank financing commitment from a single major international bank for a $3.6 billion secured commercial bank loan facility that included both term loans and revolving credit facilities for the proposed acquisition of a natural gas pipeline transportation system linking the Midwestern United States with the US Gulf Coast.

81.    Mr. Wells' experience also includes groundbreaking financings, including the innovative financing for a $2.3 billion offer that enabled Sunoco to win a competitive

auction for the Dallas-based exploration and production company Texas Pacific Oil, while competing with Mobil, Texaco and other large well-financed companies during a credit crunch which limited the availability of commercial bank acquisition financing in the United States. Sunoco was able to satisfy the seller's desire for liquidity by issuing $1.8 billion of unsecured debt, $900 million structured with floating interest rates linked to commercial paper rates to permit placement with traditional buyers of short-term paper in the US capital markets and $900 million structured with floating interest rates based on the London interbank rate, to permit placement with European financial institutions, leaving an equity requirement of $500 million, the maximum amount that Sunoco could provide.

82.    Bulmahn and Schlief told Bison's Mr. Wells that ATP needed to quickly raise $35-$40 million of funds to satisfy the auditors' concerns regarding ATP's lack of adequate working capital and prevent occurrence of a default under the financing documents with the "vulture" lender.  They also stated ATP would, however, prefer raising $115 million or so to pay off Cerberus, if feasible, *plus* additional funds to satisfy the auditors' concerns and to continue ATP's ongoing oil and gas development activities.

83.    ATP emphasized that, as important as its existing problems were, it had *even greater financing needs* that also had to be addressed. Bulmahn and Schlief admitted ATP would continue to rely upon external funds *in the future,* if the existing crisis were resolved, emphasizing that ATP had attractive oil and gas properties which it wanted to develop, including *large* interests in the "Gomez" and "Tors" projects; that acquiring, retaining and developing *large* interests in high-potential projects such as those was an important part of its business plan, that ATP was skilled in acquiring properties for development and it would continue to do so, if ATP could obtain the needed funding.

84.    Bulmahn and Schlief complained the "borrowing base" financing structure, including the "too-tight" loan covenants, utilized in the previous commercial bank loans to ATP had resulted in serious problems and was inadequate to provide the external funding needed for ATP's ongoing operations, including pursuit of its business plan.

85.    Bison recognized that the external funds needs of ATP were very substantial, would increase greatly in future years, and included *both*:

(a)    a *near-term need* over the next 60 days for at least $35-$40 million of funds from new financing sources to satisfy the auditors' working capital concerns *or,* if feasible, $150 million or more, consisting of $115 million or so to repay and replace the loans provided by "vulture" lender Ableco *plus* the $35-$40 million of additional working capital funds to satisfy the auditors' concerns, *and*

(b)    a *further need* for hundreds of millions of dollars, or even more, of additional funds from new financing sources *in the future* to develop ATP's existing oil and gas properties, including the high-potential "Gomez" and "Tors" projects, *plus* very large additional amounts of funds *in future years* to enable ATP to carry out its business plan, including continuing an active property acquisition program and developing additional oil and gas properties acquired through that program.

86.    Bulmahn and Schlief told Wells that, to satisfy ATP's large and increasing funding requirements, ATP needed to develop a *new structure for its financings* and a relationship with a *major new financing source* that could provide the funds ATP needed, then and in future years. They admitted ATP management itself lacked the expertise to develop such a new structure, or to form a reliable relationship with such a new source of financing, and told Wells they realized ATP needed outside professional assistance.[9]

87.    Schlief told Wells that ATP had a "falling out" with Lehman Brothers, the investment bank which had led ATP's 2001 common stock offering, and stated that Lehman would no longer arrange financings for ATP.  He also admitted that UBS, another

---

[9]    ATP's CFO had limited financing experience in the *capital markets*, including very limited experience, if any, in structuring debt financing arrangements in such markets and very limited experience or success in building a reliable financing relationship for ATP with *major investment banks* capable of providing the substantial funding that ATP needed, then and in the future.

major investment bank, had rejected ATP as a financing client in early 2004 because ATP failed to disclose financial information requested by UBS.

88.    Bulmahn and Schlief admitted Wells had greater financing experience than any member of ATP management, with the expertise needed to help develop a new structure for ATP financings and help ATP form a relationship with major banks which they admitted ATP *did not know*, *had no relationship with*, *and no other way to quickly capture the attention of in the existing crisis,* major banks which could provide the large funding amounts ATP needed, then and in future years. They represented that ATP believed Wells' professional assistance was essential, both for ATP's survival and for its future success.

89.    To induce Wells to devote his attention right away to assisting ATP – and especially to provide strong motivation for Wells to help ATP form a financing relationship with one of the major banking firms on a list that ATP discussed with Bison, banks which could do even *more* than provide the funds needed then to satisfy the auditors' concerns and repay Cerberus – ATP promised *continuing* compensation to Bison.

90.    ATP promised to pay Bison for *each* financing transaction to be arranged in the future by any listed bank approached by Bison on ATP's behalf, with the fee for *each* financing transaction through which funds were *to be made* available to ATP to be equal to 1% of the aggregate value of the related transaction[10].

91.    Thus, as Bulmahn and Schlief emphasized, ATP's *continuing* compensation structure would provide very valuable rewards for Bison if Bison helped ATP form a financing relationship with a listed bank that *continued* to make arrangements in future years for the large amounts of external funding which ATP wanted.  As Bulmahn stated,

---

[10]    For each equity (i.e., common or preferred stock) financing transaction arranged by any such listed bank through which funds were *to be made* available, ATP promised to pay Bison a fee equal to 1.25% of the aggregate value of the related transaction.

Bison's fees would not only be larger if such a bank would provide larger amounts of financing to ATP than it had obtained in the past, but they could increase _even more_ if a bank would "stick with" ATP and arrange _multiple_ financings to allow ATP to carry out its plan of continuing to acquire and develop properties with large interests.

92.    In reliance upon ATP's promises, Bison agreed to help ATP, serving as:

"financial advisor for the purpose of….advising the Company with respect to potential financing alternatives and assisting the company in _structuring_ and negotiating the terms of _potential financing arrangements_ ("Capital Transactions")" (Exhibit 2, Paragraphs 1(a), emphasis added),

and _also_ agreed to approach on ATP's behalf any of the listed banks requested by ATP.

93.    Bison realized that ATP's situation was difficult and its needs challenging, but Bison believed it could provide the assistance ATP needed. However, ATP was a troubled company with a history of operating and financial problems and was facing potential Chapter 11 bankruptcy, run by management Bison did not know well, and with a CFO who was competing with Bison to solve ATP's financing problems; ATP was not disclosing to Bison either the specifics or the results of the CFO's separate efforts; ATP had admitted a "falling out" with one major investment bank for reasons it would not explain and had been rejected by another for ATP's failure to disclose financial information; ATP was continuing to explore potential financings with unidentified or questionable sources of funds and other arrangements which were being described to Bison only in the vaguest of terms, if at all[11]; and ATP had been sued by two different oil and gas companies for breach of contract[12] – conduct by ATP that was _not_ reassuring to Bison.

---

[11]    Wells later discovered that Bison's work for ATP would be complicated by ATP Chairman Bulmahn's repeated focus on trying to find some way to work the so-called "Scottish investment trust" into a financing for ATP, thereby seeking to use his high-level corporate position to bolster his personal relationship with an "unusual" and obscure entity with mysterious sources of funds which provided a personal loan to Bulmahn secured by some of his ATP stock.

94.     Thus, Bison requested, and ATP agreed to, a written engagement agreement documenting ATP's promises of continuing compensation for Bison, as Bison sought to ensure that ATP lived up to its promises and not attempt to renege on its obligations in the future, *after* Bison had already provided its valuable services to ATP, by using a listed bank approached by Bison on ATP's behalf to arrange funding for ATP in the future without compensating Bison as promised.

95.     Paragraph 2 of the Bison Contract specified that ATP must pay Bison

 "for *each* Capital Transaction through which funds are made available to or for the benefit of ATP, its affiliates or lenders as a result of arrangements made or *to be made* by investment or commercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A ... cash fees equal to one per cent (1%) of the aggregate Value of such funds, such fees *in each case t*o be paid on the date such funds are made available ...." (Exhibit 2, Paragraph 2(b), emphasis added.)[13]

96.     By specifying in Paragraph 2 that ATP must pay Bison for "*each* Capital Transaction" and specifying the timing of payment "*in each case*", the Contract clearly and unequivocally contemplated and applied to *multiple* Capital Transactions.

97.     By specifying that ATP must pay Bison "for *each* Capital Transaction through which funds are made available to or for the benefit of ATP ...as a result of arrangements made or *to be made"* by a listed bank approached by Bison on ATP's behalf (Exhibit 2, Paragraph 2(b), emphasis added) and defining "Capital Transactions"

---

[12]     The outcome of *both* lawsuits was unfavorable for ATP.  ATP was required to pay $8.2 million to Legacy Resources, in addition to $3.0 million paid by ATP earlier, for ATP's breach of contract.  ATP settled the other litigation, a $1.1 million suit by highly regarded E&P company Burlington Resources, for what ATP has characterized as "an inconsequential amount." ATP Form 10-K for years ended December 31, 2003 (Exhibit 4, pages 24-25).

[13]     Paragraph 2(b) provided that, for funds made available through the sale of equity securities, the fees would be 1.25% of the aggregate Value of such funds.

as "*potential* financing arrangements" (Exhibit 2, Paragraph 1(a), emphasis added), the Contract clearly and unequivocally contemplated and applied to *future* ATP financings.

98.     Paragraph 7 reinforced Section 2's continuing compensation requirements, dealing with the possibility ATP might seek to dodge its compensation obligations to Bison by attempting to terminate its obligations under the Contract *after* Bison had already provided its valuable services – stating *"no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses"* (Exhibit 2, Paragraph 7, emphasis added) – or by delaying until after April 1, 2004, the scheduled "termination date," to *start* utilizing a listed bank that Bison had approached on ATP's behalf.

99.     When Bison raised the matter of possible delays, Bulmahn denied that ATP would ever seek to deprive Bison of the continuing compensation ATP had promised with respect to such a listed bank.  He and Schlief stated there could be many reasons for delay in utilizing a listed bank approached by Bison on ATP's behalf, such as a bank's unwillingness to provide financing to ATP for some period of time, ATP's inability to satisfy requirements of such a bank's proposals, ATP's desire to work with one such bank to the exclusion of others, and ATP's preference for a different financial institution's proposals.

100.    ATP reaffirmed its promises of continuing compensation for Bison and represented that it would pay Bison for *each* Capital Transaction in the future carried out as a result of arrangements *to be made* by any listed bank approached by Bison on ATP's behalf, as set forth in Paragraph 2 of the Contract, in the event ATP *started* utilizing such listed bank for *a* potential financing arrangement (i.e., *a* Capital Transaction) prior to the termination date or within twelve months thereafter.

101.    ATP agreed that consummation of _a_ Capital Transaction or entry into an agreement or arrangement providing for _a_ Capital Transaction would, for these purposes, mark the _start_ of ATP's utilization of such a bank.

102.    That objective test was incorporated in Paragraph 7 of the Contract:

> "_Notwithstanding_" [a stated termination date of April 1, 2004,] Bison shall be entitled to the fees set forth in Paragraph 2 above in the event the Company consummates _or_ enters into an agreement or arrangement providing for _a_ Capital Transaction … at any time within twelve months following termination of this Agreement; and _no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided herein_...." (Exhibit 2, paragraphs 7, emphasis added.)

103.    That objective test was important to Bison – it ensured that ATP could not dodge its continuing compensation obligations to Bison for potential financing arrangements _to be made_ in the future by a listed bank approached by Bison on ATP's behalf by delaying until after April 1, 2004 the _start_ of ATP's utilization of such a bank, waiting until after such date to consummate _a_ Capital Transaction _or_ to enter into an agreement or arrangement providing for _a_ potential financing arrangement (i.e., Capital Transaction).

104.    As Bulmahn and Schlief reminded Wells, this test also provided important protections for ATP:  in the event that, for _any_ reason, ATP did _not_ _start_ its utilization of a listed bank approached by Bison on ATP's behalf – either by consummating _a_ Capital Transaction _or_ by entering into an agreement or arrangement providing for _a_ Capital Transaction – at any time on or prior to April 1, 2004 or within twelve months thereafter, ATP would _not_ be required to pay Bison for any ATP financings arranged in the future by that listed bank, _even_ an ATP financing arranged by that bank structured in accordance with financing structure recommendations made by Bison pursuant to the Bison Contract.

105.   The Bison Contract also provided an important clarification for calculating the *amount* of fees to be paid to Bison, defining "Value" broadly to "mean the *aggregate value* of all cash, securities, joint venture interests or any contract rights or other property or assets involved in the Transaction .... *Value shall be deemed to include the face amount of any indebtedness for borrowed money* ...." (Exhibit 2, Paragraph 3, emphasis added).

106.   "Value" was defined broadly as "*aggregate value*" and as the "*face amount*" specifically to, among other things, encompass the "aggregate" and "face amount" of any subsequent financing arrangements *as opposed to* only the "increased amount" of any subsequent financing arrangements.

107.   Paragraph 3 of the Contract further reinforced ATP's obligations to Bison, providing "*No fees or expenses payable to any other investment banking, commercial banking or other financial or business or legal advisor either by the Company or by any other entity shall reduce or otherwise adversely affect the fees and expense reimbursement to be paid hereunder to Bison.*" ( Exhibit 2, Paragraph 3, emphasis added.)

BISON IDENTIFIES PROBLEMS IN "BORROWING BASE" FINANCINGS

108.   Bison began work right away on satisfying ATP's financing needs. Wells, who lives in Connecticut, moved to Houston and spent each week from February 3, 2004 through the end of March 2004, in Houston, working full time in ATP's offices to advise ATP regarding potential financing alternatives, structure potential financing arrangements for ATP that were feasible, given ATP's history of operating and financial problems and the crisis in which ATP was then entangled, to satisfy both ATP's immediate and future financing needs, and help ATP form a relationship with a major new financing source.

109.   After analyzing the "borrowing base" structure of ATP's previous bank loans, Bison identified a number of major problems inherent in that structure, including:

(a)   the concentration of power in *just one or two principal lenders*,

(b)   the lenders' use of their concentrated power to insist upon *very substantial amortization* of the outstanding loans prior to maturity, *commencing in the very first year* the loans were outstanding and *continuing* each year thereafter,

(c)   the lenders' use of their concentrated power to insist upon *covenants which were too restrictive* for ATP's operations and which forced it to return to the same lenders to seek costly waivers or consents to deal with adverse developments, *and*

(d)  the *very substantial uncertainties* in the "borrowing base" structure itself.

110.   Under the banks' "borrowing base" structure, the maximum amount of borrowings was constrained by limits on *the so-called "estimated value"* of ATP's *so-called "proven" reserves*, both of which are subject to different and conflicting views. The *bank lender's* view was controlling as to the "estimated value" of such "reserves" and, thus, controlling as to the amount of ATP bank loans outstanding.

111.   Moreover, the "borrowing base" provisions mandated *periodic redeterminations* of the "borrowing base," not only on scheduled dates (e.g., quarterly) but also on such other dates as the commercial bank might specify.  Depending on the outcome of such redeterminations – again, controlled by the bank lender – and the particular loan arrangements, ATP could be required to *accelerate amortization* of its loans and, in some cases, forced to repay loans in excess of the *redetermined* "borrowing base" immediately.

112.   The uncertainties inherent in being subjected to such "borrowing base" provisions made it difficult for ATP to plan and carry out its development activities or make acquisitions, and those uncertainties left ATP financially vulnerable – and subject to the powerful lender's discretion as to the outcome – in the event of a "borrowing base" redetermination that forced ATP to repay financing it needed to fund ongoing operations.

113.   Moreover, commercial banks had insisted on *substantial early amortization* of ATP loans, commencing the first year the loan was outstanding.  The banks also

imposed a requirement of _continuing amortization_ of the outstanding balance each year thereafter, such that a small portion of the original principal amount was left outstanding by the loan's final year. That feature of the commercial bank loan structure increased the financial pressures on ATP and inhibited ATP's ability to carry out its acquisition and development activities.

114.    ATP had repeatedly experienced difficulties complying with covenants imposed by the banks. ATP complained that the banks' covenants had been "too tight" and "unrealistic," preventing ATP from taking advantage of opportunities to acquire and develop valuable additional properties that could result in growth of the Company's asset base and generate increased values for ATP shareholders, as well as leaving ATP vulnerable to the discretion of its bank lenders when it faced adverse developments.[14]

115.    As for equity financing, Bison discovered that, when ATP had utilized equity financing in 2003, it had sold common stock to individual investors – Houston athletes, attorneys and businessmen – and a limited number of other investors, on terms that resulted in _very large dilution_ (i.e., almost 20%) to its existing common stockholders.

THE HIGHLY SUCCESSFUL BISON FINANCING PLAN

116.    Recognizing that ATP would remain dependent upon financing – even if the existing crisis could be resolved successfully – and that ATP's financing needs would grow very substantially in the future, especially to facilitate ATP's business plan, Bison recommended the Bison Financing Plan, a _multiple-financing plan_ marked by major changes in the structure of ATP's potential financing arrangements.

---

[14]    Commercial banks – whose lending practices are based on their ability to closely monitor a borrower's operating and financial results, as compared with its apparent prospects and its management's plans – often deliberately structure their loans with covenants "tight" enough to provide early indications of a borrower's potential financial difficulties.

117.    Instead of relying upon *loans* from one or two *commercial banks* at a time and common stock sales, Bison recommended that ATP turn to the <u>*capital markets*</u> to obtain external funding, with future financings structured to consist primarily of a <u>*series of debt financings*</u> *in the capital markets* and, when equity financings became necessary, placements of <u>*preferred stock*</u>, to the extent feasible, thereby broadening and diversifying the potential investor pool and <u>*minimizing*</u>[15] dilutive common stock sales.

118.    ATP could <u>*return*</u> to the capital markets, <u>*repeatedly*</u>, *in the future* as ATP increased its production and production revenues, to replace an initial financing with subsequent financings structured to have lower interest rates, more flexible covenants, increased funding amounts or, when necessary, to sell preferred or common stock.

119.    The Bison Plan for capital markets financings was structured to rescue ATP from the existing crisis and thereafter, in the future, to provide ATP with access to the increasing amounts of funds needed to grow its business and build equity values for ATP stockholders.  The Plan was crafted to eliminate problems in ATP's previous bank loans:

- The Bison Plan called for each of the Capital Transactions to be arranged with <u>a *substantial number of investors*</u>, to <u>*prevent*</u> one or two <u>*investors from using their financing power to impose overly restrictive covenants*</u> on ATP and thereby create a situation they could exploit to take control of ATP or its assets or extract compensation for covenant waivers, as the "vulture" Ableco had done.

- Under the Bison Plan, there would be <u>*no "borrowing base" limits or related "redeterminations"*</u> imposed on ATP.

- The Bison Plan called for potential financing arrangements to have much less early amortization than required by the commercial

---

[15]    Bison recommended that ATP sell new common stock when <u>*dilution*</u> could be <u>*minimized*</u> by selling such stock only after the price of ATP common stock had risen substantially or, alternatively, when the additional fixed charges from new preferred stock dividends would put ATP at risk of violating debt covenants, jeopardize or preclude ATP's ability to engage in additional debt financing, or otherwise be burdensome or imprudent.  In such situations, the sale of new ATP common stock could be preferable to new preferred stock.

banks' loan structure. Instead, under the Bison Plan, ATP capital markets debt would require _only minimal amortization before the final year_ of such debt and, in almost all instances, would have a _scheduled maturity date three to five years or more_ from closing.

- ▪ The Bison Plan provided that, after ATP was able to show increased oil and gas production and increased production revenues, ATP would _return_ to the debt capital markets, _repeatedly_, to obtain improved financing arrangements, including _more flexible covenants, increased funding amounts and/or lower cost financing_.

120. To implement the Bison Plan, ATP would need to enlist the resources of a major _investment bank_ with "junk bond" financing capabilities in the capital markets as a new financing source for ATP. Exhibit A to the Bison Contract (Exhibit 4) listed ten banks with capital markets capabilities. At ATP's request, Bison approached three of the _investment banks_ with "junk bond" expertise capable of providing the financing that ATP needed, then and in the future: CSFB, Deutsche Bank and Goldman Sachs.

121. Bison's Wells called the Co-Head of CSFB's Global Energy Group, Thomas Hassen, and immediately arranged for a senior CSFB team led by Hassen to meet with ATP. CSFB followed up again within a five day period in February 2004, with even more discussions among ATP, Bison and CSFB to take place as ATP might request.

122. Wells gave ATP management, and later its Board of Directors, a strong endorsement of CSFB's qualifications; pointed out benefits of having funding arrangements _to be made_, then and in the future, by this highly respected and experienced firm, whose sponsorship could give ATP credibility in the markets that ATP lacked; expressed a high degree of confidence CSFB could provide the funds ATP needed, both during the existing financial crisis and in future years, and Bison recommended that ATP utilize CSFB to carry out ATP's existing and future funding arrangements in the capital markets.

123.    ATP requested CSFB join Bison in working on ATP's potential financing arrangements. Bison assisted ATP in structuring and negotiating the terms of ATP's potential financing arrangements.  Bison and CSFB recommended a debt financing in the capital markets as the fastest and surest way to raise funds for ATP right away. To expand the pool of potential investors and enlarge the total amount of funds, the debt would be consist of two tiers, senior secured (first lien) debt and second lien debt, all of which would mature in five years, with a fixed repayment schedule that deferred amortization obligations for all but a small amount until the final year that debt was to be outstanding. The debt would be placed with a substantial number of investors, with no "borrowing base" limits or related "redeterminations" that could compel accelerated debt amortization.

124.    Bison and CSFB recommended that structure for the following reasons:

- Debt financing would not dilute ATP stockholders equity interests.

- The debt capital markets were capable of providing large amounts of debt financing to distressed credits such as ATP quickly.

- The covenants in that initial debt financing would have sufficient flexibility so that ATP should not have difficulty meeting them.

- A substantial number of investors would participate in the proposed debt capital markets financing, enough so that no one or two would be in a position to pressure ATP, either initially or thereafter.

- While that initial capital markets debt financing would require a relatively high interest rate, ATP could _return_ to the debt capital markets, _repeatedly_, as ATP increased its oil and gas production and production revenues, _to consummate improved financings with lower interest rates, more flexible covenants, and/or increased funding amounts_.

125.    Bison and CSFB explained that a relatively high interest rate would be required on ATP's initial debt capital markets financing because:

- ATP did not have a strong or extensive track record in the major non-bank debt capital markets,

- ATP's "PUDs" business strategy, focused on *developing undeveloped* properties, *differed substantially* from the strategy of many other, more typical oil *exploration* and production companies,

- ATP had experienced *operating difficulties and financial problems* for several years, which raised *questions about the credibility* of management's plans and whether ATP could deliver more successful operating and financial performance in the future, and

- ATP's *urgent need* for the financing – and inability to delay the financing to wait for a better rate – was obvious to the market.

126.    Bison and CSFB pointed out to ATP that – with such an initial financing in place to replace the Ableco loans and provide funding for ATP's ongoing activities, with five years until that initial financing matured and almost no amortization of the debt until the final year before maturity – ATP would not be under time pressure to refinance.

127.    They advised ATP it could *return* to the capital markets, *repeatedly, in the future,* and consummate improved debt financing arrangements based on successful operating and financial performance, after ATP could show increased oil and gas production and increased production revenues, *to lower ATP's financing costs, gain additional operating or financial flexibility through modifications of covenants, and/or obtain larger amounts of external funding for ATP's continuing acquisition and development activities*.

128.    ATP *agreed* in March 2004 to carry out the Bison Plan for potential financing arrangements and directed CSFB to proceed with the initial debt financing in the capital markets. This would enable ATP to satisfy the auditors' working capital concerns by early April, repay and replace the "vulture" lender Ableco and obtain needed operating funds.  In accordance with the Bison Plan, ATP consummated on March 29, 2004 that initial debt financing with funding arrangements made by CSFB.

129.    In May 2004, ATP *confirmed* it would continue implementing the Bison Plan with CSFB, alerting CSFB that it would return to the capital markets for improved

debt financing arrangements _to be made_ by CSFB after ATP could report increased production and increased production revenues.

130.    Since then, ATP has _continued_ to utilize CSFB to consummate _each_ of _thirteen_ additional Capital Transactions in the capital markets: _nine_ debt financings, _three_ placements of preferred stock, and a common stock offering, to fund ATP's continuing acquisition and development activities. The additional Capital Transactions arranged by CSFB, Bison's new financing source, have an aggregate Value exceeding $7.225 billion.

<u>ATP'S FIRST CAPITAL TRANSACTION</u>

131.    In accordance with the Bison Plan, on March 29, 2004 ATP consummated a financing _in the debt capital markets_ that included senior secured debt and second lien debt, with a scheduled maturity five years from closing and minimal scheduled amortization until the final year the debt was to be outstanding, by which CSFB made available an aggregate Value of $185 million of funds to ATP ("First Capital Transaction"). The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated debt amortization.

132.    ATP used the proceeds of the First Capital Transaction to repay the Ableco credit facility, repurchase the 750,000 common stock warrants previously issued to Ableco, pay fees for the transaction, and provide funding for its ongoing operations, including working capital funds and funding for oil and gas development activities.

133.    That same date, March 29, 2004, ATP's auditors released an unqualified audit opinion on ATP's financial statements for the year ended December 31, 2003.[16]

---

[16] Those same financials, included in ATP's Form 10-K for 2003, showed how dire its situation was before the First Capital Transaction. ATP's Consolidated Balance Sheets showed as of December 31, 2003 ATP had _shareholders' equity of only $4.332 million_, with long-term debt of _$115.409 million_, other long-term obligations of _$27.696 million_, and a _working capital deficit of_

134.    A March 30, 2004 ATP press release entitled "ATP Oil & Gas Corporation Enters into $185 Million Term Loan" announcing the First Capital Transaction stated "The $185 million term facility, net of fees and expenses, has improved the Company's liquidity and working capital position by approximately $56 million, allowing it to comfortably execute its 2004 capital program…. In addition, the long-term nature of the facility coupled with the new liquidity will allow ATP to focus on its next major project, Mississippi Canyon 711 ["Gomez"] with gross proved reserves over 100 Bcfe."

135.    In that same March 30, 2004 ATP press release, ATP Chairman Bulmahn admitted, "This term facility… represents an *important change in the Company's debt structure, as borrowings and scheduled amortization were set at closing and will not be subject to the periodic redeterminations associated with traditional revolving credit facilities.*" (Emphasis added.)  A true and correct copy of ATP's March 30, 2004 press release entitled "ATP Oil & Gas Corporation Enters into $185 Million Term Loan" is attached hereto as Exhibit 9.

136.    The statements made by or on behalf of ATP in Exhibit 9 were true statements.

137.    ATP paid Bison the one per cent fee ($1.85 million) of the $185 million aggregate Value of the funds made available through the First Capital Transaction, as required by the Bison Contract, plus the required $25,000 monthly advisory fees.

138.    ATP paid substantial fees to CSFB for the First Capital Transaction.  On information and belief, ATP paid CSFB $6.75 million or 3.6% of the aggregate Value of the $185 million of funds made available through the First Capital Transaction.

_$46.423 million_. ATP's Consolidated Statements of Operations reported a _net loss_ for the fiscal year ended December 31, 2003 of _$50.801 million_, after losses of $4.7 million and $21.383 million for the years ended December 31, 2002 and 2001, respectively. (Exhibit 4, pages F-3, F-4, F-8)

ATP'S SECOND CAPITAL TRANSACTION

139.    Bison's financing plan resolved ATP's financial crisis and the First Capital Transaction provided sufficient funds for ATP to increase its oil and gas production and production revenues over the next six months and put ATP in a position to carry out subsequent, more favorable, financing arrangements with CSFB in the debt capital markets in the future, as provided in the Bison Financing Plan.

140.    In accordance with the Bison Plan, ATP consummated a second Capital Transaction with CSFB *in the debt capital markets* on September 24, 2004 – *within twelve months following the April 1, 2004 expiration of the Bison Contract* – a Capital Transaction through which an aggregate Value of $220 million of funds were made available for ATP's benefit ("Second Capital Transaction"). That financing included senior secured debt and second lien debt with a scheduled maturity of four and a half years and minimal scheduled amortization until the final year the debt was to be outstanding.  The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" to compel accelerated amortization.

141.    To facilitate successful consummation of the Second Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community during July, August and September 2004 emphasizing increased production and increased production revenues during the first half of 2004.

142.    In the September 27, 2004 ATP press release entitled "ATP Lowers Interest Rate and Expands Credit Facility" in which ATP announced the $220 million financing transaction that constituted the Second Capital Transaction, ATP admitted the transaction "amended and *improved* the terms" of its secured credit facility and "*covenants* within the

facility were amended to provide *more flexibility* to ATP," and ATP Chairman Bulmahn admitted this transaction had *lowered ATP's cost of capital*, improved its liquidity and *reduced dilution to existing stockholders*, thereby "*substantially improve[ing]* ATP's financial and operating capabilities." (Emphasis added.) In that same press release ATP admitted that CSFB "acted as sole lead arranger for the financing." A true and correct copy of the September 27, 2004 ATP press release entitled "ATP Lowers Interest Rate and Expands Credit Facility" is attached hereto as Exhibit 10.

143.   The statements made by or on behalf of ATP in Exhibit 10 were true statements.

144.   In the ATP press release attached hereto as Exhibit 10 and in the ATP Form 8-K Report filed with the SEC on September 30, 2004, ATP admitted that the terms of the Second Capital Transaction were materially different – and much more beneficial to ATP – than the financing that constituted the First Capital Transaction, effectively replacing the funding of the First Capital Transaction. The key items in the Second Capital Transaction included:

- *Making available an aggregate of $220 million of funds* to or for the benefit of ATP through the Second Capital Transaction, consisting of $185 million of first lien borrowings and $35 million of second lien borrowings, which was $35 million more than through the First Capital Transaction;

- Establishing a *much lower interest rate on first lien borrowings* through the Second Capital Transaction[17], thereby providing an interest rate for Second Capital Transaction borrowings that was *a full 325 basis points (3.25%) lower* than the comparable rate on first lien borrowings through the First Capital Transaction;

---

[17]    Decreasing the margin on any base rate loan from 8.5% to 5.25% and the margin on any LIBOR loan from 9.5% to 6.25%.

- *Eliminating the interest rate floor* previously established for LIBOR (i.e., the 2% floor for LIBOR) on *all* first lien borrowings through the Second Capital Transaction;

- *Loosening a total of five financial covenants* that had been imposed on ATP in the First Capital Transaction, for *both* first lien and second lien borrowings, thereby giving ATP significantly greater operating and financial flexibility through the Second Capital Transaction;

- *Waiving compliance* with certain provisions of the First Capital Transaction; and

- Under *both* the first lien and second lien facilities, permitting ATP to repurchase 79% of the outstanding warrants granted to lenders in connection with the second lien portion of the first Capital Transaction.

That same ATP Form 8-K Report also included copies of the Amendment No. 1, Consent, Waiver and Agreement dated as of September 24, 2004 *to the First Lien Agreement* dated as of March 29, 2004 (Exhibit 10.1) and Amendment No. 1, Consent, Waiver and Agreement dated as of September 24, 2004 *to the Second Lien Agreement* dated as of March 29, 2004 (Exhibit 10.2). A true and correct copy of the ATP Form 8-K Report filed with the SEC on September 30, 2004 is attached hereto as Exhibit 11.

145. The statements made by or on behalf of ATP in Exhibit 11 were true statements.

146. In ATP's Form 10-K Annual Report for the year ended December 31, 2004, under the heading "Item 7. Executive Overview – Review of 2004," ATP admitted that the financings that constituted the First and Second Capital Transactions consummated pursuant to the Bison Plan were "*instrumental* in providing the funds needed to complete our 2004 developments and provide us the initial financial resources for our 2005 program," and were the "catalysts in achieving such a productive year," which was ATP's "most active development year since becoming a publicly traded company in February

2001." A true and correct copy of ATP's Form 10-K report for the year ended December 31, 2004 is attached hereto as Exhibit 12.

147. The statements made by or on behalf of ATP in Exhibit 12 were true statements.

148. In the ATP Form 8-K Report attached hereto as Exhibit 11, ATP admitted that it paid "fees and expenses of $5.0 million," of which "$4.9 million [were] paid to the Lender." The $4.9 million ATP admitted paying CSFB is equal to approximately 2.2 % of the $220 million in aggregate Value of funds made available through the Second Capital Transaction.

149. Without Bison's work on ATP's behalf – developing and recommending the Bison Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate this much improved Second Capital Transaction with CSFB, through which an aggregate Value of $220 million of funds were made available for ATP's benefit.

150. The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $220 million Capital Transaction.

151. After May 2004, ATP failed to inform Bison of ATP's communications with CSFB regarding potential financing arrangements, including ATP's various communications regarding the Second Capital Transaction.

152. Upon discovering the public announcement of the existence of the Second Capital Transaction, subsequent to the consummation of that ATP financing with CSFB, Bison requested payment of the $2.2 million fee that ATP owes Bison for that $220 million Second Capital Transaction.

153.   However, in breach of its contract, ATP has refused and failed to pay the $2.2 million fee for the Second Capital Transaction that ATP owes to Bison, despite ATP's admission to Bison's President Wells that ATP still owes Bison "something more" under the Bison Contract.

154.   At the face-to-face meeting in ATP's Houston offices at which ATP Senior Vice President Schlief, who signed the Bison Contract on behalf of ATP, made that admission, Wells reminded Schlief of the language in the Bison Contract requiring ATP to pay for _each_ Capital Transaction in the event ATP started utilizing a listed bank approached by Bison on ATP's behalf within twelve months following April 1, 2004 and also reminded Schlief that, when Bison and ATP were negotiating the Contract, ATP Chairman Bulmahn had denied that ATP would ever seek to deprive Bison of the continuing compensation which ATP had promised with respect to such a listed bank.

155.   In response, Schlief told Wells that Bulmahn "does not want to pay you any more because he thinks you have made enough money for what you did and we don't need you any more to get CSFB to work with us." Wells told Schlief that both Bulmahn and Schlief should read the Bison Contract again and think about the promises which ATP had made to induce Bison to work for ATP, and Wells put ATP on notice that Bison expected to be paid by ATP not only for the $220 million Second Capital Transaction but also for _each_ future ATP financing to be arranged by CSFB.

156.   Following that meeting, ATP failed to pay Bison the additional fees which ATP then owed Bison. When Wells sought to meet with either Bulmahn or Schlief to follow up on the matter, ATP stalled at first, promising a meeting at a later date. Then, some weeks later, when Wells persisted in seeking a meeting with Bulmahn or Schlief to

obtain payment of the additional fees which ATP then owed Bison, ATP refused to meet with Wells, or even to have ATP representatives meet with Bison representatives, and cut off communications with Bison.

157.   Subsequently, ATP has consistently failed to inform Bison of commencement of work on other potential financing arrangements to be made by CSFB, the major new financing source which Bison obtained for ATP, or of ATP's entry into further agreements or arrangements providing for additional Capital Transactions that might be pursued with CSFB, or even of the consummation of additional ATP Capital Transactions with CSFB, thereby forcing Bison to learn of additional ATP financing arrangements made by CSFB through after-the-fact public announcements of their consummation.

## ATP'S THIRD CAPITAL TRANSACTION

158.   The funding obtained by ATP *in the debt capital markets* pursuant to Bison's multiple-financing plan enabled ATP to continue to increase its oil and gas production and operating revenues and put ATP in the position to consummate subsequent, more favorable, financings with CSFB in the debt capital markets.

159.   In accordance with the Bison Plan, ATP entered into an agreement or arrangement with CSFB before April 1, 2005 providing for another potential financing arrangement *in the debt capital markets*. An April 14, 2005 ATP press release entitled "ATP Improves Credit Facility" announced consummation of a new financing package and significantly lower interest rates recently obtained by the Company, through which an aggregate Value of $350 million of funds were made available for ATP's benefit through a financing consummated with CSFB ("Third Capital Transaction"). In that same press

release, ATP admitted that CSFB "acted as sole lead arranger for the financing." (Emphasis added.) A true and correct copy of the April 14, 2005 ATP press release entitled "ATP Improves Credit Facility" is attached hereto as Exhibit 13.

160. The statements made by or on behalf of ATP in Exhibit 13 were true statements.

161. To facilitate successful consummation of the Third Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with investors in January, February and March 2005 regarding ATP's increased production and increased production revenues in 2004, and plans for further development and for production increases during 2005, and in March 2005, ATP provided information from reserve reports by third-party petroleum engineers regarding increased proved reserves and increased proved developed reserves. ATP made that information available to, and discussed it with, CSFB, which assisted ATP in communicating news of ATP's increased production, increased production revenues, reserves and development plans to potential investors and engaged in other activities preparing for the Third Capital Transaction.

162. These activities helped strengthen the continuing ATP-CSFB financing relationship and helped prepare for and facilitate successful consummation of additional potential financings *to be arranged* by CSFB in the future as a result of which funds were made available to ATP, *including the Third Capital Transaction* that ATP consummated with CSFB.

163. As ATP admitted in the ATP press release attached hereto as Exhibit 13 and in the ATP Form 8-K filed with the SEC on April 20, 2005, the $350 million financing that constitutes the Third Capital Transaction had numerous benefits for ATP, including:

A.   *Making available an aggregate of $350 million of funds* to or for the benefit of ATP through the Third Capital Transaction, which was *$130 million more* than through the Second Capital Transaction;

B.   Paying off and *eliminating the $35 million secured second lien facility* that carried an *interest rate of LIBOR plus 10%;*

C.   *Decreasing the overall interest rate* of the first lien facility from LIBOR plus 6.847% to LIBOR plus 5.500% (spread reduction of 20%);

D.   *Amending covenants* within the first lien facility to provide a substantially *more flexible covenant package*;

E.   *Extending the maturity* of the first lien facility by one year to April 2010.

A true and correct copy of the ATP Form 8-K filed with the SEC on April 20, 2005 is attached hereto as Exhibit 14.

164.   The statements made by or on behalf of ATP in Exhibit 14 were true statements.

165.   ATP Chairman Bulmahn admitted in the ATP press release attached as Exhibit 13, "ATP's performance over the past year has allowed us to *expand our facility while also significantly improving its terms*.…The added liquidity will enable us to *continue our expanded development and acquisition program* in the Gulf of Mexico as well as provide the financial strength to accelerate our activities in the North Sea, particularly at The Tors and at Cheviot. *Lowering our cost of capital and eliminating our second lien tranche* should provide *added equity returns to our shareholders*." (Emphasis added.)

166.   The Third Capital Transaction was much improved financing that provided funding for ATP on terms that were materially different – and much more beneficial to ATP and its stockholders – than the Second Capital Transaction, effectively replacing the funding of the Second Capital Transaction.

167.   The April 20, 2005 ATP Form 8-K Report attached hereto as Exhibit 14 admitted that ATP paid "$10.7 million for fees and expenses." This $10.7 million paid largely to CSFB is equal to approximately 3.1% of the aggregate Value of funds made available through the Third Capital Transaction.

168.   Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate this much improved Third Capital Transaction with CSFB, by which an aggregate Value of $350 million of funds was made available for ATP's benefit.

169.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate value of that $350 million Capital Transaction (i.e., $3.5 million).

170.   In breach of its contract, ATP has not paid the $3.5 million fee for the Third Capital Transaction that ATP owes to Bison.

<u>ATP'S FOURTH CAPITAL TRANSACTION</u>

171.   In accordance with the Bison Financing Plan, ATP and CSFB consummated a fourth Capital Transaction *in the capital markets* on August 2, 2005, through which an aggregate Value of $175 million of funds were made available for the benefit of ATP ("Fourth Capital Transaction").

172.   In the August 3, 2005 ATP press release entitled "ATP Oil & Gas Corporation Expands Offering and Closes $175 Million Private Placement of Preferred Stock" and in the ATP Form 8-K Report filed with the SEC on August 8, 2005, ATP announced that the Company had closed a private placement of $175 million of *perpetual preferred stock*, the Series A Cumulative Perpetual Preferred Stock carrying a non-cash dividend. This perpetual preferred had no scheduled maturity date and no scheduled amortization.

The preferred stock was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated amortization. A true and correct copy of the August 3, 2005 ATP press release entitled "ATP Oil & Gas Corporation Expands Offering and Closes $175 Million Private Placement of Preferred Stock" is attached hereto as Exhibit 15. A true and correct copy of ATP's Form 8-K Report filed with the SEC on August 8, 2005 is attached hereto as Exhibit 16.

173. The statements made by or on behalf of ATP in Exhibit 15 were true statements.

174. To facilitate successful consummation of the Fourth Capital Transaction, ATP made press releases, SEC filings and presentations to and other communications with the investment community during May, June and July 2005 emphasizing ATP's increased production and production revenues during the first quarter of 2005, and anticipating further production increases before year end 2005, after announcing an increase in ATP's proved developed reserves earlier in the year.

175. In the ATP press release attached hereto as Exhibit 15, ATP stated that:

- The preferred stock issue has "*no stated maturity,*";

- "There is *no common share dilution* to existing shareholders as the issue is not convertible into common shares of the Company";

- "There is *no added debt to impact lenders*"; and

- "The issue can be redeemed *at the Company's option* after February 2006."

176. As ATP admitted in Section 2 of the Subscription Agreement included as Exhibit 4.3 to the ATP Form 8-K Report attached hereto as Exhibit 16, CSFB, Bison's new financing source for ATP, acted as the sole Placement Agent for the placement of the $175 million Series A Cumulative Perpetual Preferred Stock financing which constitutes

the Fourth Capital Transaction. A true and correct copy of ATP's Form 8-K Report filed with the SEC on August 8, 2005 is attached hereto as Exhibit 16.

177.    The statements made by or on behalf of ATP in Exhibit 16, including in the Subscription Agreement included as Exhibit 4.3 to Exhibit 16, were true statements.

178.    As ATP admitted in ATP's Form 10-Q for the quarterly period ended June 30, 2005 under the heading "Note 11 – Subsequent Event," ATP paid "$5.25 million in placement agent commissions and approximately $0.25 million of related expenses" in connection with the Fourth Capital Transaction. The $5.50 million in fees and expenses paid to CSFB is equal to 3.14% of the $175 million aggregate Value of this preferred stock issue. A true and correct copy of ATP's Form 10-Q Report for the quarterly period ended June 30, 2005 is attached hereto as Exhibit 17.

179.    The statements made by or on behalf of ATP in Exhibit 17 were true statements.

180.    Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate this much improved Third Capital Transaction with CSFB, by which an aggregate Value of $175 million of funds was made available for the benefit of ATP.

181.    The Bison Contract requires ATP to pay Bison a cash fee equal to 1.25% of the aggregate Value of that $175 million Capital Transaction (i.e., $2.1875 million)

182.    In breach of its contract, ATP has not paid the $2.1875 million fee for the Fourth Capital Transaction that ATP owes to Bison.

ATP'S FIFTH CAPITAL TRANSACTION

183.    In accordance with the Bison Financing Plan, ATP and CSFB consum-mated a fifth Capital Transaction *in the capital markets* on March 20, 2006, through which an aggregate Value of $150 million of funds were made available to or for the benefit of ATP ("Fifth Capital Transaction").

184.    In the March 20, 2006 ATP press release entitled "ATP Oil & Gas Corpora-tion Expands Offering and Closes $150 Million Private Placement of Preferred Stock" and in the ATP Form 8-K Report filed with the SEC on March 21, 2006, ATP announced that the Company had closed a private placement of $150 million of *perpetual preferred stock*, the Series B Cumulative Perpetual Preferred Stock carrying a non-cash dividend. This perpetual preferred had no scheduled maturity date and no scheduled amortization.  The preferred stock was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated amortization. A true and correct copy of the ATP press release dated March 20, 2006 entitled "ATP Oil & Gas Corporation Expands Offering and Closes $150 Million Private Placement of Preferred Stock" is attached hereto as Exhibit 18.  A true and correct copy of the ATP Form 8-K Report filed with the SEC on March 21, 2006 is attached hereto as Exhibit 19.

185.    To facilitate successful consummation of the Fifth Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community during the second half of 2005 regarding progress on "Gomez" and "Tors", and in March 2006 providing information regarding "Cheviot's" proved reserves and reserve reports prepared by third-party petroleum engineers showing a substantial increase in ATP's proved developed reserves and total proved reserves, first production at

"Gomez," and increased production revenues during fourth quarter 2005 and for the full year 2005.

186.   In the ATP press release attached as Exhibit 18 announcing consummation of the $150 million preferred stock financing that constitutes the Fifth Capital Trans-action, ATP stated that:

- The preferred stock issue has "*no stated maturity*";

- "There is *no common share dilution* to existing shareholders as the issue is not convertible into common shares of the Company";

- "There is *no added debt to impact lenders*"; and

- "The issue can be redeemed *at the Company's option at any time*."

187.   The statements made by or on behalf of ATP in Exhibit 18 were true statements.

188.   As ATP admitted in Section 2 of the Subscription Agreement included as Exhibit 4.2 to the ATP Form 8-K Report attached hereto as Exhibit 19, CSFB, Bison's new financing source for ATP, acted as the sole Placement Agent for the $150 million Series B Cumulative Perpetual Preferred Stock financing which constitutes the Sixth Capital Transaction.

189.   The statements made by or on behalf of ATP in Exhibit 19, including in the Subscription Agreement attached as Exhibit 4.2 to Exhibit 19, were true statements.

190.   As ATP admitted in ATP's Form 10-Q for the quarterly period ended March 31, 2006 under the heading "Note 4 – Series B Preferred," ATP paid "$4.50 million in placement agent commissions" in connection with the $150 million aggregate value of preferred stock financing that constitutes the Fifth Capital Transaction. The $4.50 million in fees and expenses paid to CSFB is equal to 3.0% of the $150 million

aggregate Value of this preferred stock issue. A true and correct copy of ATP's Form 10-Q Report for the quarterly period ended March 31, 2006 is attached hereto as Exhibit 20.

191.    The statements made by or on behalf of ATP in Exhibit 20 were true statements.

192.    Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Fifth Capital Transaction with CSFB, by which an aggregate Value of $150 million of funds was made available for the benefit of ATP.

193.    The Bison Contract requires ATP to pay Bison a cash fee equal to 1.25% of the aggregate Value of that $150 million Capital Transaction (i.e., $1.875 million)

194.    In breach of its contract, ATP has not paid the $1.875 million fee for the Fourth Capital Transaction that ATP owes to Bison.

<u>ATP'S SIXTH CAPITAL TRANSACTION</u>

195.    In accordance with the Bison Financing Plan, ATP and CSFB consummated *in the debt capital markets* a sixth Capital Transaction on June 22, 2006, through which an aggregate Value of $525 million of funds were made available for the benefit of ATP ("Sixth Capital Transaction"). That financing included senior secured debt with a scheduled maturity almost four years from closing and minimal scheduled amortization until the final year the debt was to be outstanding.  The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated debt amortization.

196.    To facilitate successful consummation of the Sixth Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community in March, April and May 2006 regarding ATP's increased production and increased production revenues during the first quarter of 2006, the substantial increase in proved developed reserves and total proved reserves, first production at "Gomez" and "Tors," the "Cheviot" project and additional acquisitions.

197.    In the June 22, 2006 ATP press release entitled "ATP Expands Credit Facility, Reduces Interest Rate" and in the ATP Form 8-K Report filed with the SEC on June 23, 2006 announcing consummation of the $525 million debt financing that constitutes the Sixth Capital Transaction, ATP admitted that the Company had "*expanded* and *improved*" the terms of its Senior Secured Credit Facility by:

- *Increasing the facility size* from $350 million to $525 million;

- *Decreasing the interest rate* from LIBOR plus 5.5% to LIBOR plus 3.25% (rate reduction of 1.75%);

- Adding provisions that allow ATP, if it so chose, to repurchase its own shares in the open market; and

- *Amending covenants within the credit facility to provide additional flexibility.*

In that same press release ATP admitted that CSFB, Bison's new financing source for ATP, "acted as sole lead arranger for the financing" that constitutes the Sixth Capital Transaction.  A true and correct copy of the June 22, 2006 ATP press release entitled "ATP Expands Credit Facility, Reduces Interest Rate" is attached hereto as Exhibit 21.  A true and correct copy of the ATP Form 8-K Report filed with the SEC on June 23, 2006 is attached hereto as Exhibit 22.

198.    The statements made by or on behalf of ATP in Exhibit 21 were true statements. The statements made by or on behalf of ATP in Exhibit 22 were true statements.

199.    ATP Chairman Bulmahn stated in Exhibit 21 that "Our continued successful execution of our _business plan_ has allowed us to _expand_ the facility, _improve_ its terms and further _reduce_ our overall cost of capital…. The _added financial flexibility_ and resources will enable ATP to fund development activities at its newly acquired and existing properties, and will enhance ATP's ability to continue making strategic acquisitions. It also provides to the company the _flexibility_ to address other elements of the capital structure in our continuing efforts to _reduce our overall cost of capital_."

200.    The Sixth Capital Transaction was much improved financing in the debt capital markets that provided funding for ATP on terms that were materially different – and much more beneficial to ATP – than the Third Capital Transaction, effectively replacing the funding of the Third Capital Transaction.

201.    In the ATP Form 8-K Report attached hereto as Exhibit 22, ATP disclosed that it paid "$11.1 million for fees and expenses" in connection with the financing that constitutes the Sixth Capital Transaction. This $11.1 million paid largely to CSFB, the sole lead arranger, is equal to 2.11% of the aggregate Value of the $525 million Sixth Capital Transaction.

202.    Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Sixth Capital Transaction with CSFB, by which an aggregate Value of $525 million of funds was made available to or for the benefit of ATP.

203.    The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $525 million Capital Transaction (i.e., $5.25 million).

204.    In breach of its contract, ATP has not paid the $5.25 million fee for the Fourth Capital Transaction that ATP owes to Bison.

ATP'S SEVENTH CAPITAL TRANSACTION

205.    In accordance with the Bison Plan, ATP and CSFB consummated *in the debt capital markets* a seventh Capital Transaction on November 22, 2006, through which an aggregate Value of $1.125 billion of funds were made available for ATP's benefit ("Seventh Capital Transaction"). That financing included senior secured debt and second lien debt with a scheduled maturity almost three and a half years from closing and minimal scheduled amortization until the final year the debt was to be outstanding.  The debt was placed with a substantial number of investors, and there were no "borrowing base" limit or "redeterminations" to compel accelerated debt amortization.  That same date, ATP announced it had agreed to redeem all of its outstanding preferred stock.

206.    To facilitate successful consummation of the Seventh Capital Transaction, ATP made a series of press releases, SEC filings and presentations to and other communications with the investment community during August, September, October and November 2006 emphasizing increased production and increased production revenues during second and third quarters of 2006, the "Gomez," "Tors," "Cheviot" and "Telemark Hub" projects and its acquisition of properties in the Gulf of Mexico, all with a 100% working interest and operated by ATP.

207.    In the November 22, 2006 ATP press release entitled "ATP Reduces Overall Cost of Capital Below 10%, Redeems Preferred Shares and Expands Credit Facil-

ity" and in ATP's Form 8-K Report filed with the SEC on November 29, 2006, ATP announced consummation of the $1.125 billion debt financing that constitutes the Seventh Capital Transaction.  ATP admitted that the existing $525 million first lien term loan facility had been expanded by $375 million, and a new $50 million revolving line of credit and a new second lien facility of $175 million had been added, making an aggregate Value for the entire financing transaction of $1.125 billion. The key advantages of consummating the financing that constitutes the Seventh Capital Transaction included:

- *Increasing the aggregate amount of the entire facilities by a total of $600 millon;*

- *Reducing the overall cost of capital* (the blended cost of the preferred dividend and interest rate) from 11.5% to 9.5%, resulting in a net annual cost savings of approximately $19.3 million for 2007 alone;

- *Eliminating the 13.5% and 12.5% dividend rates* by redeeming all of the preferred shares;

- *Adding a net $155.5 million to the treasury of the company*;

- *Amending covenants and adding a revolver* to the credit facility *to provide additional flexibility* to ATP.

ATP also admitted in that same press release that CSFB, Bison's new financing source for ATP, "acted as lead arranger for the financing."  A true and correct copy of the November 22, 2006 ATP press release entitled "ATP Reduces Overall Cost of Capital Below 10%, Redeems Preferred Shares and Expands Credit Facility" is attached hereto as Exhibit 23. A true and correct copy of the ATP Form 8-K Report filed with the SEC on November 29, 2006 is attached hereto as Exhibit 24.

208.   The statements made by or on behalf of ATP in Exhibit 23 were true statements.  The statements made by or on behalf of ATP in Exhibit 24 were true statements.

209.  In the ATP press release attached hereto as Exhibit 23, ATP Chairman Bulmahn admitted that "*Reducing our cost of capital* was paramount in this transaction. This year, we executed the *next steps of our business plan* that expanded ATP production by 321% since third quarter of 2005.  Continued production growth is expected to accelerate into 2007 to over 300 MMcfe per day.  *We have now executed another step in our financial plan to bring added value to our shareholders with an overall cost of capital below 10%.*" (Emphasis added.)

210.  The Seventh Capital Transaction was much improved financing that provided funding for ATP on terms that were materially different – and much more beneficial to ATP – than the Sixth Capital Transaction, effectively replacing the funding provided by the combination of the Fourth, Fifth and Sixth Capital Transaction.

211.   In the ATP Form 8-K Report attached hereto as Exhibit 24, ATP disclosed that it paid "$13.7 million for fees and expenses" for the $1.125 billion debt financing with CSFB, Bison's new financing source for ATP, plus "approximately $9.3 million of costs relating to calling and retiring all outstanding shares of preferred stock." Thus, total fees paid in connection with the $1.125 billion Seventh Capital Transaction, part of which was used to retire the outstanding preferred, was $23 million, equal to 2.04% of the aggregate Value of the Seventh Capital Transaction.

212.  Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Seventh Capital Transaction with CSFB, by which an aggregate Value of $1.125 billion of funds was made available for the benefit of ATP.

213.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $1.125 billion Capital Transaction (i.e., $11.25 million)

214.   In breach of its contract, ATP has not paid the $11.25 million fee for the Seventh Capital Transaction that ATP owes to Bison for that Capital Transaction.

<u>ATP'S EIGHTH CAPITAL TRANSACTION</u>

215.   In accordance with the Bison Financing Plan, ATP and CSFB consummated *in the debt capital markets* an eighth Capital Transaction on March 23, 2007, through which an aggregate Value of $1.325 billion of funds were made available for ATP's benefit ("Eighth Capital Transaction"). That financing consisted of senior secured debt having a scheduled maturity more than three years from closing and minimal scheduled amortization until the final year the debt was to be outstanding.  The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated debt amortization.

216.   To facilitate successful consummation of the Eighth Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community during January, February and March 2007 emphasizing ATP's increased production and increased production revenues for the year 2006, information from reports prepared by third-party engineers showing a very substantial increase in ATP's proved developed reserves and total proved reserves, and information regarding a major "Gomez" expansion, the "Tors," "Cheviot" and "Telemark Hub" development projects, and additional property acquisitions in 2006 and 2007.

217.   In the March 23, 2007 ATP press release entitled "ATP Prepays Second Lien Debt and Expands Credit Facility" and in ATP's Form 8-K Report filed with the

SEC on March 23, 2007, announcing the $1.325 billion debt financing that constitutes the Eighth Capital Transaction, ATP identified key advantages in consummating the Eighth Capital Transaction, including:

- *Expanding* and *improving the terms* of its first lien term loan;

- *Expanding the aggregate principal amount* of financing available to ATP under the $900 million first lien facility by $375 million;

- *Eliminating the $175 million second lien LIBOR + 4.75% term loan* and *refinancing that facility* with first lien term loan proceeds at a rate of LIBOR + 3.5% for an *annual savings* of 1.25% or *$2.1875 million;*

- Allowing pre-agreement for an MLP (Master Limited Partnership) structure of up to $500 million;

- *Amending covenants to provide additional flexibility* to ATP; and

- *Adding a net $192 million of incremental proceeds to ATP's treasury.*

ATP also admitted in that ATP press release that CSFB, Bison's new financing source for ATP, "acted as sole lead arranger for the financing." A true and correct copy of the March 23, 2007 ATP press release entitled "ATP Prepays Second Lien Debt and Expands Credit Facility" is attached hereto as Exhibit 25. A true and correct copy of ATP's Form 8-K Report filed with the SEC on March 23, 2007 is attached hereto as Exhibit 26.

218. The statements made by or on behalf of ATP in Exhibit 25 were true statements. The statements made by or on behalf of ATP in Exhibit 26 were true statements.

219. In the ATP press release attached hereto as Exhibit 25, ATP Chairman Bulmahn admitted "This new financing reflects the company's improved credit profile from the successful execution of its year-to-date 2007 development activities….These activities set the stage for *another dramatic increase in our reserves, production and financial strength this year.*"

220.   The Eighth Capital Transaction was much improved financing that provided funding for ATP on terms that were materially different – and much more beneficial to ATP – than the Seventh Capital Transaction, effectively replacing the funding provided by the Seventh Capital Transaction.

221.   The ATP 8-K Report attached hereto as Exhibit 26 disclosed that ATP would pay "fees and expenses incurred" in connection with this financing of $8.5 million. This $8.5 million in fees and expenses is equal to 0.64% of the $1.325 billion aggregate Value of the Eighth Capital Transaction.

222.   Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Eighth Capital Transaction with CSFB, by which an aggregate Value of $1.325 billion of funds was made available for the benefit of ATP.

223.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $1.325 billion Capital Transaction (i.e., $13.25 million)

224.   In breach of its contract, ATP has not paid the $13.25 million fee for the Eighth Capital Transaction that ATP owes to Bison.

ATP'S NINTH CAPITAL TRANSACTION

225.   In accordance with the Bison Plan, ATP and CSFB consummated *in the debt capital markets* a ninth Capital Transaction on September 7, 2007, through which an aggregate Value of $160 million of funds were made available for ATP's benefit, and on September 14, 2007 ATP and CSFB upsized this Transaction to $210 million ("Ninth Capital Transaction"). That financing consisted of subordinated debt with a scheduled

maturity of four years and no scheduled amortization prior to maturity. The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated debt amortization.

226. To facilitate successful consummation of the Ninth Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community during May, June, July and August 2007 emphasizing ATP's record production and record production revenues for the second and third quarters of 2007, further "Gomez" expansion and development, the "Tors," "Cheviot," and "Telemark Hub" projects, and acquisitions in 2006 and 2007.

227. ATP announced consummation of the $160 million financing that constitutes part of the Ninth Capital Transaction in a September 7, 2007 ATP press release entitled "ATP Oil & Gas Adds New Subordinated Debt Facility" and in ATP's Form 8-K Report filed with the SEC on September 7, 2007, which identified key advantages of the financing, including:

- *Expanding the debt financing facilities of ATP in the amount of $160 million* through the addition of an unsecured subordinated term loan facility in that amount;

- *Borrowings under the unsecured subordinated term loan facility were subordinated to the ATP's existing term loan facility*; and

- The new subordinated term loan facility contains *no financial performance covenants;* and

- The new subordinated term loan facility *may be prepaid at any time at the option of the Company*, subject to limitations set forth in the Company's existing term loan facility.

A true and correct copy of the September 7, 2007 ATP press release entitled "ATP Oil & Gas Adds New Subordinated Debt Facility" is attached hereto as Exhibit 27. A true and

correct copy of ATP's Form 8-K Report filed with the SEC on September 7, 2007 is attached hereto as Exhibit 28.

228.    The statements made by or on behalf of ATP in Exhibit 27 were true statements.  The statements made by or on behalf of ATP in Exhibit 28 were true statements.

229.    ATP Chairman Bulmahn admitted, in the ATP press release attached as Exhibit 27, "This new facility provides *additional funding for expansion of ATP's strategy for enhanced shareholder value in 2007, 2008 and beyond*." (Emphasis added.)

230.    ATP announced in a September 14, 2007 ATP press release entitled "ATP Oil & Gas Expands Loan Commitment" that it had *increased* the financing that constitutes the Ninth Capital Transaction, upsizing to $210 million its previously announced $160 million subordinated term loan facility. That same press release also announced that CSFB, Bison's new financing source for ATP, "acted as sole lead arranger for the financing." A true and correct copy of the September 14, 2007 ATP press release entitled "ATP Oil & Gas Expands Loan Commitment" is attached hereto as Exhibit 29.

231.    The statements made by or on behalf of ATP in Exhibit 29 were true statements.

232.    In ATP's Form 10-Q Report for the quarter ended September 30, 2007, under the heading "Note 6 – Long Term Debt", ATP disclosed that it incurred "$16.2 million for the original issue discount, fees and expenses" in connection with the subordinated debt financing that constitutes the Ninth Capital Transaction. The $16.2 million in fees, expenses and original issue discount is equal to 7.7% of the $210 million aggregate Value of the Ninth Capital Transaction.  A true and correct copy of ATP's Form 10-Q Report for the quarter ended September 30, 2007 is attached hereto as Exhibit 30.

233.   The statements made by or on behalf of ATP in Exhibit 30 were true statements.

234.   Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Ninth Capital Transaction with CSFB, by which an aggregate Value of $210 million of funds was made available for ATP's benefit.

235.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $210 million Capital Transaction (i.e., $2.1 million)

236.   In breach of its contract, ATP has not paid the $2.1 million fee for the Ninth Capital Transaction that ATP owes to Bison.

<u>ATP'S TENTH CAPITAL TRANSACTION</u>

237.   In accordance with the Bison Financing Plan, ATP and CSFB consumma- ted *in the debt capital markets* a tenth Capital Transaction on June 27, 2008, through which an aggregate Value of $1.70 billion of funds were made available to or for the benefit of ATP ("Tenth Capital Transaction"). That financing consisted of senior secured debt in the amount of $1.05 billion with a scheduled maturity (July 2014) six years from the date of closing this Capital Transaction and minimal scheduled amortization until the final year the debt was to be outstanding, a $600 million asset sale loan facility with a "bullet maturity" in January 2011, two and a half years from closing, and a $50 million senior secured revolving credit facility with a scheduled maturity more than five years from closing, with no scheduled amortization prior to maturity.  The debt was placed with

a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" to compel accelerated amortization.

238.    To facilitate successful consummation of the Tenth Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community in January - June 2008 announcing record record production and record production revenues for fourth quarter 2007, full year 2007 and first quarter 2008, and emphasizing activities at "Gomez," the "Tors," "Cheviot" and the "Telemark Hub."

239.    ATP announced consummation of the $1.70 billion financing that constitutes the Tenth Capital Transaction in a June 27, 2008 ATP press release entitled "ATP Closes New $1.05 Billion Senior Term Loan and Adds a $600 Million Asset Sale Facility" and in ATP's Form 8-K Report filed with the SEC on June 27, 2008, which identified key advantages of the financing, including:

- Reducing ATP's first lien senior secured term loan from $1.20 billion to $1.05 billion and *extending the maturity by over four years* from April 2010 to July 2014;

- *Eliminating the $210 million subordinated loan with an all-in interest rate of 15%*;

- *Adding a $600 million asset sale facility that enables ATP to accomplish its previously announced deleveraging goal,* which facility had a "bullet maturity," with *no amortization required prior to maturity*; and

- *Including* "a $50.0 million revolving credit facility, which is subject to increase to $100 million."

ATP admitted in that same ATP press release that CSFB, Bison's new financing source for ATP, "acted as sole lead arranger for the financing" that constitutes the Tenth Capital Transaction. A true and correct copy of the June 27, 2008 ATP press release entitled "ATP Closes New $1.05 Billion Senior Term Loan and Adds a $600 Million Asset Sale Facility"

is attached hereto as Exhibit 31.  A true and correct copy of ATP's Form 8-K Report filed

with the SEC on June 27, 2008 is attached hereto as Exhibit 32.

240.    The statements made by or on behalf of ATP in Exhibit 31 were true state-

ments.  The statements made by or on behalf of ATP in Exhibit 32 were true statements.

241.    ATP Chairman Bulmahn admitted, in the ATP press release attached as

Exhibit 31, "The new term facility provided *two very important pieces of capital* for ATP.

First, it puts in place a truly long-term, six-year financing of $1.05 billion at rates that are

extremely competitive in today's market. This facility will provide ATP the *ability to

continue to execute its plans for development and acquisitions* for the next several years.

Secondly, and *equally important,* the new facility provides an *asset sale facility* that will

enable ATP to reduce its debt by $600 in the near term…." (Emphasis added.)

242.    The Tenth Capital Transaction was much improved financing that provided

funding for ATP on terms that were materially different – and much more beneficial to

ATP – than the Eighth and Ninth Capital Transactions, effectively replacing the funding

provided by the Eighth and Ninth Capital Transactions.

243.    In ATP's Form 10-Q Quarterly Report for the quarter ended June 30, 2008,

under the heading "Liquidity and Capital Resources," ATP disclosed that it incurred

"issuance costs" of $56.6 million for the financing that constitutes the Tenth Capital

Transaction, constituting 3.33% of the $1.70 billion aggregate Value of the Tenth Capital

Transaction.  A true and correct copy of ATP's 10-Q Quarterly Report for the quarter

ended June 30, 2008 is attached hereto as Exhibit 33.

244.    The statements made by or on behalf of ATP in Exhibit 33 were true

statements.

245. Without Bison's work on ATP's behalf – developing and recommending the Bison Financing Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Tenth Capital Transaction with CSFB, by which an aggregate Value of $1.70 billion of funds was made available for the benefit of ATP.

246. The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $1.70 billion Capital Transaction (i.e., $17.0 million).

247. In breach of its contract, ATP has not paid the $17.0 million fee for the Tenth Capital Transaction that ATP owes to Bison.

<u>ATP'S ELEVENTH AND TWELFTH CAPITAL TRANSACTIONS</u>

248. In accordance with the Bison Financing Plan, ATP and CSFB consummated an eleventh and a twelfth Capital Transaction *in the capital markets* on September 29, 2009, through which an aggregate Value of $238.05 million of funds were made available to or for the benefit of ATP. The size of the eleventh Capital Transaction was subsequently increased, pursuant to an underwriters' overallotment provision, raising the aggregate Value of the two Capital Transactions to $247.5775 million, consisting of $107.5775 in aggregate Value for the eleventh Capital Transaction and $140 million in aggregate Value for the twelfth Capital Transaction.

249. To facilitate successful consummation of the Eleventh and Twelfth Capital Transactions, ATP made press releases, SEC filings, presentations and other communications with the investment community in 2009 regarding ATP's production in 2008 and 2009, including 214% production replacement ratio in 2008, record production revenues and record net income realized during the full year 2008, asset sales carried out success-

fully in 2008 and 2009 that generated cash used to reduce outstanding debt and fund ATP's continuing acquisition, development and production activities, including work on "Gomez," the "Tors," "Cheviot" and the "Telemark Hub," and *plans for* *underline* *ATP's existing production in 2010 through the Telemark Hub development*.

250.    In the September 29, 2009 press release entitled "ATP Closes Previously Announced Public Offering of Common Stock" and in an ATP Form 8-K Report filed with the SEC on September 29, 2009, ATP admitted that it had closed a public offering of 5.3 million shares of *common stock* at an offering price of $18.50 per share ("Eleventh Capital Transaction") in which CSFB and JP Morgan Securities had "acted as joint book-running managers." The common stock was placed with a substantial number of investors.  A true and correct copy of ATP's September 29, 2009 press release entitled "ATP Closes Previously Announced Public Offering of Common Stock" is attached hereto as Exhibit 34. A true and correct copy of ATP's Form 8-K Report filed with the SEC on September 29, 2009 is attached hereto as Exhibit 35.

251.    The statements made by or on behalf of ATP in Exhibit 34 were true statements.  The statements made by or on behalf of ATP in Exhibit 35, including in the attachments thereto were true statements.

252.    In the ATP press release attached hereto as Exhibit 34 and in the ATP Form 8-K Report attached hereto as Exhibit 35, ATP stated that it intended to use net proceeds from the common stock offering to fund capital expenditures, primarily at its Telemark location in the deepwater Gulf of Mexico, reduce indebtedness and for general corporate purposes.

253.   In the November 5, 2009 ATP press release entitled "ATP Announces Third Quarter 2009 Results," ATP admitted that, pursuant to the underwriters' overallotment option, the number of shares of common stock in the financing that constitutes the Eleventh Capital Transaction had been increased by an additional 515,000 shares at $18.50 per share. Thus, the aggregate Value of the *entire* Eleventh Capital Transaction, a total of 5.815 million shares sold at $18.50 per share, was $107.5775 million. A true and correct copy of ATP's November 5, 2009 press release entitled "ATP Announces Third Quarter 2009 Results" is attached hereto as Exhibit 36.

254.   The statements made by or on behalf of ATP in Exhibit 36 were true statements.

255.   In the September 29, 2009 ATP press release entitled "ATP Closes Private Placement of 8.0% Convertible Perpetual Preferred Stock" and in the September 29, 2009 ATP Form 8-K Report attached hereto as Exhibit 34, ATP announced  consummation of a private placement of $140 million of *convertible perpetual preferred stock*, the 8.0% Convertible Perpetual Preferred Stock ("Twelfth Capital Transaction"). The perpetual preferred had no scheduled maturity date and *no scheduled amortization*. The stock was placed with a substantial number of investors; there were no "borrowing base" limits or "redeterminations" to compel accelerated amortization.  A true and correct copy of ATP's September 29, 2009 press release entitled "ATP Closes Private Placement of 8.0% Convertible Perpetual Preferred Stock" is attached hereto as Exhibit 37.

256.   The statements made by or on behalf of ATP in Exhibit 37 were true statements.

257.   In the ATP Form 8-K Report attached hereto as Exhibit 35 and in ATP's Form 10-Q Report for the quarter ended September 30, 2009, under the heading "Note 10 – Shareholders Equity *Preferred Stock*," ATP identified key features of the Convertible Perpetual Preferred Stock that constitutes the Twelfth Capital Transaction, stating that:

- The annual dividend on each share of the preferred of $8.00 per share would be payable quarterly and "*The company may, at its option*, *pay dividends in cash, common stock or any combination thereof*";

- "Each share of convertible preferred stock is *perpetual*, has no voting rights";

- The preferred is convertible, *at the holder's option*, initially into 4.5045 shares of company common stock, which is equal to an initial *conversion price of approximately $22.20 per share*; and

- "At any time on or after October 1, 2014, *the Company may, at its option, cause all outstanding shares of the convertible preferred stock to be automatically converted into common stock* at the then-prevailing conversion price," if the closing price of the Company's common stock equals or exceeds certain thresholds.  (Emphasis added.)

A true and correct copy of ATP's Form 10-Q Report for the quarter ended September 30, 2009 is attached hereto as Exhibit 38.

258.   The statements made by or on behalf of ATP in Exhibit 38 were true statements.

259.   Annex C, the "Pricing Term Sheet" to the Underwriting Agreement filed as Exhibit 1.1 with the ATP Form 8-K Report attached as Exhibit 35 hereto and in such Underwriting Agreement itself, under the heading "Section 2. Purchase of the Shares by the Underwriters," ATP disclosed that the ATP common stock to be sold in that financing had been priced at $17.6675 per share, after an underwriting discount of $0.8325 per share. Thus, total underwriting discounts for the entire 5.815 million common share financing that constitutes the Eleventh Capital Transaction was approximately $4.841

million, or 4.5% of the $107.5775 million in aggregate Value of the Eleventh Capital Transaction.

260.   The ATP Form 8-K Report attached hereto as Exhibit 35 disclosed that CSFB and J.P. Morgan Securities acted as Representatives of the initial purchasers of the Convertible Perpetual Preferred Stock for the $140 million financing that constitutes the Twelfth Capital Transaction. That same ATP Form 8-K Report attached as Exhibit 35 admitted that ATP paid "Initial Purchasers' discounts of approximately $4.2 million," which is equal to 3.0% of the $140 million aggregate Value of the Twelfth Capital Transaction.

261.   Without Bison's work on ATP's behalf – developing and recommending the Bison Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Eleventh and Twelfth Capital Transactions with CSFB, by which an aggregate Value of $247.5775 million of funds was made available for the benefit of ATP.

262.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1.25% of $98.05 million in aggregate Value of the Eleventh Capital Transaction ($1,225,625) on September 29, 2009, the date of the first closing on the Eleventh Capital Transaction, and an additional cash fee equal to 1.25% of the $9.5275 million aggregate Value increase in size of the Eleventh Capital Transaction ($119,093.75) on November 5, 2009, the closing date for the underwriters' overallotment portion of the Eleventh Capital Transaction. Thus, the total fee due to Bison for the Eleventh Capital Transaction is $1,344,718.75.

263.   The Bison Contract also requires ATP to pay Bison a cash fee equal to 1.25% of the $140 million aggregate Value of the Twelfth Capital Transaction ($1.75 million) on September 29, 2009, the closing date of the Twelfth Capital Transaction.

264.   In breach of its contract, ATP has not paid either the $1,344,718.75 million fee that ATP owes to Bison for the Eleventh Capital Transactions nor the $1.75 million fee that ATP owes Bison for the Twelfth Capital Transaction.

<u>ATP'S THIRTEENTH CAPITAL TRANSACTION</u>

265.   In accordance with the Bison Plan, ATP and CSFB consummated *in the debt capital markets* a thirteenth Capital Transaction on November 2, 2009, through which an aggregate Value of $1.247875 billion ($1,247.875 million) of funds were made available to or for the benefit of ATP ("Thirteenth Capital Transaction"). That financing consisted of $1.036875 billion ($1,036.875 million) of senior secured debt (Tranche B-1) with a scheduled maturity more than four and a half years from closing and minimal scheduled amortization until the final year the debt was to be outstanding, $161 million in Tranche B-2 of the Term Loans with the bullet maturity of July 2011, one year and eight months from the closing of this Capital Transaction, and a $50 million senior secured revolving credit facility with a scheduled maturity more than three and a half years from closing, with no scheduled amortization prior to maturity.  The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeter-minations" that could compel accelerated amortization.

266.   To facilitate successful consummation of the Thirteenth Capital Trans-action, ATP made press releases, SEC filings, presentations and other communications with the investment community during 2009 regarding ATP's production, including the

214% production replacement ratio during 2008, the record production revenues and record net income realized during the full year 2008, asset sales and equity offerings carried out successfully in 2008 and 2009 to generate cash used to reduce ATP's outstanding debt by approximately $440 million and fund the Company's continuing acquisition, development and production activities, including work on such projects as "Gomez," the "Tors," "Cheviot" and the "Telemark Hub," and the _plan_ for _doubling ATP's existing production_ in 2010 through the Telemark Hub development.

267.   ATP announced the $1.247875 billion ($1, 247.875 million) financing that constitutes the Thirteenth Capital Transaction in the November 3, 2009 ATP press release entitled "ATP Credit Facility Amendment Provides Additional Flexibility" and in the ATP Form 8-K Report filed with the SEC on November 6, 2009. After admitting the $161 million aggregate Value of the Tranche B-2 Term Loan (the "Asset Sale Facility") in that November 3, 2009 ATP press release, ATP provided details regarding the Thirteenth Capital Transaction in the ATP Form 10-Q Report for the quarter ended September 30, 2009, under the heading Note 7 – Term Loans," including the $1.036875 billion ($1,036.875 million) aggregate Value of the Tranche B-1 Term Loan and the $50 million aggregate Value of the revolving credit facility. A true and correct copy of the November 3, 2009 ATP Press Release entitled "ATP Credit Facility Amendment Provides Additional Flexibility" is attached hereto as Exhibit 39.  A true and correct copy of the ATP Form 8-K Report filed with the SEC on November 6, 2009 is attached hereto as Exhibit 40.  A true and correct copy of the ATP Form 10-Q Report for the quarter ended September 30, 2009 is attached hereto as Exhibit 38.

268.   The statements made by or on behalf of ATP in Exhibit 38 were true statements.  The statements made by or on behalf of ATP in Exhibit 39, including in the attachments thereto, were true statements.  The statements made by or on behalf of ATP in Exhibit 40 were true statements.

269.   ATP commented in the 10-Q Report for the September 30, 2009 quarter attached as Exhibit 38, under the heading "Note 3 -   Risks and Uncertainties," on difficulties in the business and financial environment that made the covenant restrictions a major problem for ATP: "Our Term Loans impose _restrictions_ on us that _increase our vulnerability in the current adverse economic and industry climate_ ….[O]ur ability to meet these _covenants_ is primarily dependent on the adequacy of cash flows from operations, oil and natural gas reserve levels and cash flows from other financing transactions. _Our inability to satisfy the covenants…contained in the Term Loans would constitute an event of default_….." (Emphasis added.)

270.   In the subsequent November 3, 2009 ATP press release attached hereto as Exhibit 39, ATP Chairman Bulmahn stated "_Since 2008, the world has experienced a severe recession,_" and ATP admitted that the financing that constitutes the Thirteenth Capital Transaction "added flexibility to its Term Loans by _widening its covenants_ for the reporting periods from December 31, 2009 through December 31, 2010." In that same press release, Bulmahn also stated that "ATP was able to obtain _greater flexibility with our covenants_ in order to address our goals of first production at Telemark, reduction of the Tranche B-2 and added financial strength." (Emphasis added.)

271.   The Thirteenth Capital Transaction was much improved financing that provided funding for ATP on terms that were materially different – and much more

beneficial to ATP – than the Tenth Capital Transaction, effectively replacing the funding provided by the Tenth Capital Transaction.

272.   The ATP press release attached as Exhibit 39 admitted that CSFB, the financing source Bison brought in under the Bison Contract, "acted as sole lead arranger" for the transaction. The ATP Form 10-Q attached hereto as Exhibit 38, under the heading "Note 7 – Term Loans," admitted ATP paid $12.6 million (1.04% of the aggregate Value of the Thirteenth Capital Transaction) in initial fees and expenses to CSFB and lenders for the Thirteenth Capital Transaction, and an _additional_ one-time fee of up to 1.0% may be due on the aggregate unpaid balance of the Term Loans at June 30, 2010.

273.   Without Bison's work on ATP's behalf – developing and recommending the Bison Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Thirteenth Capital Transaction with CSFB, by which an aggregate Value of $1.197875 billion ($1,197.875 million) of funds was made available for ATP's benefit.

274.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $1. 247875 billion ($1,247.875 million) Capital Transaction (i.e., $12,478,750)

275.   In breach of its contract, ATP has not paid the $12,478,750 fee for the Eighth Capital Transaction that ATP owes to Bison.

<u>ATP'S FOURTEENTH CAPITAL TRANSACTION</u>

276.   In accordance with the Bison Plan, ATP and CSFB consummated _in the debt capital markets_ a fourteenth Capital Transaction on January 29, 2010, through which an aggregate Value of $1.24525 billion ($1,245.25 million) of funds were made available

to or for the benefit of ATP ("Fourteenth Capital Transaction"). That financing consisted of $1.19525 billion ($1,195.25 million) of senior secured debt (Tranches B-1 and B-2) and a $50 million revolving credit facility.  The debt was placed with a substantial number of investors, and there were no "borrowing base" limits or "redeterminations" that could compel accelerated amortization.

277.   To facilitate successful consummation of the Fourteenth Capital Transaction, ATP made press releases, SEC filings, presentations and other communications with the investment community during November and December 2009 updating major projects and regarding ATP's expected production increase from the "Telemark" development that would *more than double existing production in 2010* and substantially increase production revenues and progress on the major "Cheviot" development which was also expected to generate substantial future production increases and future increases in production revenues, and the asset sales and equity offerings carried out successfully in 2008 and 2009 to generate cash used to reduce ATP's outstanding debt and fund the Company's continuing acquisition, development and production activities.

278.   ATP announced the $1.24525 billion ($1,245.25 million) financing that constitutes the Fourteenth Capital Transaction in the February 2, 2010 ATP press release entitled "ATP Updates Production, Reserves, Developments and Financial Transactions" and in the ATP Form 8-K Report filed with the SEC on February 4, 2010. A true and correct copy of the February 2, 2010 ATP Press Release entitled ""ATP Updates Production, Reserves, Developments and Financial Transactions" is attached hereto as Exhibit 41.  A true and correct copy of the ATP Form 8-K Report filed with the SEC on February 4, 2010 is attached hereto as Exhibit 42.

279. The statements made by or on behalf of ATP in Exhibit 41 were true statements. The statements made by or on behalf of ATP in Exhibit 42, including in the attachments thereto, were true statements.

280. ATP identified key advantages of the financing that constitutes the Fourteenth Capital Transaction in the ATP press release attached as Exhibit 41 and in the ATP Form 8-K Report attached as Exhibit 42, including:

- Amending a definition of EBITDAX used in covenants to allow ATP to recognize $123.1 million relating to economic gains from certain previously completed property transactions that took place during the current and preceding three calendar quarters that did not qualify for gain treatment under U.S. generally accepted accounting principles (GAAP), and

- Amending the provisions of the financing agreement "to provide ATP the right to issue unlimited indebtedness in the form of unsecured senior debt, provided that 75% of the net proceeds from any such additional indebtedness are used to repay outstanding Term Loans."

281. ATP admitted advantages of this new financing in the February 2, 2010 press release attached as Exhibit 41, stating "The primary reason a gain could not be recognized for GAAP purposes was that ATP maintained a level of control or a continuing interest in the property after the monetization, *a benefit to both ATP and its Lenders*," and citing the *new financing flexibility for ATP* permitted by the other "new provision [which] *allows ATP to continue to reduce its secured indebtedness by inserting a more permanent level of unsecured long-term capital into its capital structure*." (Emphasis added.)

282. The Fourteenth Capital Transaction was much improved financing that provided funding for ATP on terms that were materially different – and much more beneficial to ATP – than the Thirteenth Capital Transaction, effectively replacing the funding provided by the Thirteenth Capital Transaction.

283.   The ATP Form 8-K Report attached as Exhibit 42 admitted that CSFB, the major new financing source Bison obtained for ATP under the Bison Contract, acted as "Administrative Agent and Collateral Agent" for the financing transaction, and also admitted that ATP paid "a total of $9.2 million" in fees and expenses to CSFB and the lenders for the financing, consisting of fees of 0.5% of the outstanding balance of the Term Loans and 0.25% of the outstanding balance of the Term Loans and related revolver, plus related expenses.

284.   Without Bison's work on ATP's behalf – developing and recommending the Bison Plan, approaching CSFB on ATP's behalf, and helping ATP form a reliable financing relationship with CSFB – ATP would not have had the opportunity to consummate the Fourteenth Capital Transaction with CSFB, by which an aggregate Value of $1.24525 billion ($1,245.25 million) of funds was made available for ATP's benefit.

285.   The Bison Contract requires ATP to pay Bison a cash fee equal to 1% of the aggregate Value of that $1.24525 billion ($1,245.25 million) Capital Transaction (i.e., $12,452,500).

286.   In breach of its contract, ATP has not paid the $12,452,500 fee for the Eighth Capital Transaction that ATP owes to Bison.

<u>BENEFITS TO ATP AND ATP MANAGEMENT</u>

287.   Bison's work saved ATP from financial ruin and enabled ATP to pursue its aggressive business plan through *continuing* access to large amounts of external funds, *transforming* ATP from a small, struggling and desperate company, barely surviving and on the brink of failure, into a much larger, successful and very valuable company.

288.   Without Bison's assistance and the funding Bison's work made available, ATP could have failed or been taken over, dismantled and its assets seized by Cerberus or another predator. At best, ATP might still be just struggling along, with fewer assets and smaller interests in whatever properties it had been able to acquire and retain, barely surviving but only temporarily, still financially unstable and again on the brink of failure, with losses looming for ATP stockholders, employees and business counterparties.

289.   Instead, as a result of Bison's work, ATP is a completely different entity: the Capital Transactions that ATP consummated with the major new financing source Bison brought into the messy and uncertain ATP situation, a highly respected *investment bank* skilled in _capital markets_ *financings* that ATP _did not know_*, had* _no prior relation-_ _ship with,_ and _needed desperately_ to rescue it from the predator Cerberus – and continuing development work on major oil and gas projects in which ATP acquired and retained large interests ("Gomez," the "Tors," "Cheviot," "Telemark") – enormously valuable *deepwater projects* that ATP shifted its focus to beginning in 2004[18], _after_ ATP first obtained funding from Bison's financing source CSFB – for which the Capital Transactions arranged by CSFB have made available _billions_ of dollars of needed funding, have had a massive uplifting impact on ATP*, transforming its existence, its operations and prospects, and its value. (Exhibits 43, 44, 45)

290.   The financing arrangements made available by Bison's work fueled a stunning increase in ATP's oil and gas production, raising it from *3.25 Bcfe* for the fourth quarter of 2003, the last quarter before ATP hired Bison, to *20.17 Bcfe* by the fourth quarter of 2007 and *21.57 Bcfe* by the first quarter of 2008, and ATP's revenues from

---

[18]   See Exhibit 45 pages 10, 11, 15 – 21.

production, from only _$13.6 million_ for the fourth quarter 2003 to _$205.7 million_ by the fourth quarter 2007 and _$226.0 million_ for the first quarter of 2008. (Exhibit 1)

291.   The financing arrangements made available by Bison's work propelled the sharp rise in ATP's share price from _$5.01_ per share when ATP hired Bison to a record price in 2007 of _$57.58_ per share, an _increase of 1149%_. (Exhibit 1) When ATP retained Bison, the market value of ATP common equity in the stock market was only _$123 million_, based on an ATP stock price of $5.01 per share.[19]  By November 1, 2007, when ATP stock traded at $57.58 per share, the market value of ATP's common equity had increased enormously, to _$1.764 billion_.[20]

292.   When ATP was in desperate straits, and lacked the funds needed to pay off the "vulture" lender and fund ATP's continuing operations, Bison _immediately_ attracted the attention of the Head of CSFB's Global Energy Group and persuaded him to lead an experienced team to join Bison _right away_ in helping ATP, when others were unwilling to do so.  Bison endorsed ATP and provided close and visible support for its management – _despite_ ATP's troubled history, ATP's poor record with lenders, and problems causing at least two investment banks to reject ATP as a customer – as Wells worked side-by-side with ATP in its Houston offices on a full-time basis during this crucial period. Bison helped ATP form a reliable and _continuing_ relationship with CSFB, that major financing source, new to ATP when Bison summoned it to join him in assisting ATP, which made available funds with an aggregate Value of $7.410+ billion which _saved_ ATP, _trans-formed_ the Company and its possibilities, and _fueled the stunning rise in its market value_.

---

[19]    Approximately 24,523,300 shares at $5.01 per share. (Exhibit 7)
[20]    Based on approximately 30,632,351 shares outstanding as of November 5, 2007. (Exhibit 30, cover page)

293.   ATP's management has profited greatly from Bison's work saving ATP from ruin, recommending the multiple-financing structure for capital markets financings that ATP has *repeatedly* followed, and obtaining for ATP the assistance of CSFB, which has *continued* to provide funds needed to carry out ATP's business plan successfully.

294.   ATP Chairman Bulmahn was ATP's largest shareholder when ATP hired Bison in February 2004, with 8,775,267 shares (35.8% of the outstanding).  (Exhibit 7) At that time, Bulmahn's common stock stake in ATP had a public market value of *$44 million*.  At the November 1, 2007 trading price of $57.58 per share, the market value of Bulmahn's original stake[21] would have been worth *$505 million*.

295.   ATP Senior Vice President Schlief was the second largest management shareholder when ATP hired Bison, with 3,155,433 shares (12.87% of the outstanding) having a public market value of *$15.8 million*.  At the 2007 price of $57.58 per share, the market value of Schlief's original stake[22] would have been approximately *$181.7 million*.

296.   ATP CFO Reese was the third largest management shareholder when ATP hired Bison, with 489,676 shares (2.00% of the outstanding) having a public market value of *$2.45 million*.  (Exhibit 7) At the November 1, 2007 price of $57.58 per share, the market value of Reese's original stake[23] would have been approximately *$29.2 million*.

297.   Bulmahn, Schlief and Reese have all taken advantage of the huge increase in ATP's stock price to sell some of their ATP stock, pocketing millions of dollars.  ATP's latest proxy statement, dated April 28, 2009, shows that as of that date Bulmahn

---

[21]    Bulmahn has sold some of that original stake into the sharply rising market, but  acquired additional ATP stock after February 2004.

[22]    Exhibit 7. Schlief, who retired from ATP in December 2007 but has continued to provide consulting services to the Company, also sold some of his original stake into the rising market and acquired rights to additional stock after February 2004.

[23]    Reese has also sold some of that original stake into the sharply rising market, but  acquired rights to additional stock after February 2004.

owned 6,799,042 shares (18.88% of the outstanding) and Reese owned 339,370 shares (0.94% of the outstanding). As of April 28, 2008, Schlief owned 833,055 ATP shares.

298.    ATP's management, enriched by hundreds of millions of dollars, were on the brink of financial disaster, losing control and losing a major portion, if not all, of their ATP common stock interests in early 2004, when they hired Bison – and yet, even after *admitting* that it still owes Bison "something more" for Bison's extraordinarily valuable services pursuant to the Bison Contract, ATP has willfully refused and failed to pay Bison the *continuing* compensation that ATP promised when it represented to Wells that his professional assistance was essential, both for ATP's survival and for its future success.

299.    With only two exceptions[24], ATP has utilized Bison's new financing source CSFB to make arrangements for *all* of ATP's financings in the capital markets since ATP hired Bison. By utilizing the Bison-sponsored CSFB for *each* of fourteen separate Capital Transactions, through which ATP has obtained *continuing* access to the large amounts of external funding ATP wanted so it could pursue its aggressive multi-year business plan, has made it *crystal clear* that ATP considers the financing relationship Bison helped ATP form with CSFB – when ATP desperately needed and requested Wells' help – to be indispensable, demonstrating that Bison's assistance in helping ATP build a reliable and continuing relationship with that new financing source has been extraordinarily valuable.

300.    CSFB has profited greatly from the ATP relationship. The fees, expenses and other consideration that ATP has paid CSFB for the fourteen Capital Transactions

---

[24]    The only substantial financings consummated by ATP since ATP hired Bison in February 2004 for which the funding arrangements were *not* made by CSFB were the two common stock financings in December 2004 and November 2007, sales that generated proceeds of $291 million, before fees and expenses – or less than *3.4%* of the aggregate Value of the external funds made available to ATP by Bison's financing source CSFB since ATP hired Bison.

that ATP *chose*, *repeatedly*, to consummate with CSFB since Bison brought CSFB into the messy and difficult ATP situation are estimated to substantially exceed $100 million.

301.   Nevertheless, ATP remains obligated to pay *Bison* the compensation ATP promised *Bison* for its professional services, which have proved to be extraordinarily valuable. As the Bison Contract states, "*No fees…payable to any… investment bank… either by the Company or by any other entity shall reduce or otherwise adversely affect the fees…to be paid hereunder to Bison*." (Exhibit 2, Paragraph 3, emphasis added.)

302.   To obtain Bison's professional services, ATP promised *continuing* compensation to Bison based on the aggregate Value of *each* potential financing arrangement *to be made* by any of the listed banking firms approached by Bison on ATP's behalf, including CSFB, with "such fees *in each case* to be paid on the date such funds are made available" and ATP agreed that "*no termination of Bison's engagement … shall affect the Company's obligation to pay fees*." (Emphasis added.)

303.   It was ATP's promises that induced Bison to provide the desperately needed financing advice, assistance and funding that saved ATP and its stockholders – public stockholders, as well as ATP's now-rich and self-oriented management – from the predatory clutches of the event-driven "vulture" fund Cerberus and the imminent threats of Chapter 11 bankruptcy, financial failure and devastating losses that ATP faced in early 2004 and that fueled its transformation from the small, struggling and financially unstable entity that Bison discovered when Wells began his work for ATP in February 2004, into the large, asset-rich, and well-positioned company ATP is today. (See Exhibits 44, 45)

304.   Since ATP made its promises to Bison, with Bulmahn assuring Bison that ATP would never seek to deprive Bison of the *continuing* compensation ATP promised,

ATP has *continued* to rely upon Bison's valuable work product – the Bison Plan and the *continuing* ability to obtain *improved* funding arrangements made by the new financing source Bison brought to ATP and helped ATP build a reliable relationship with – to carry out the business plan of acquiring and retaining *large* interests in high-potential properties and developing those properties to generate "added equity returns" (Exhibit 13), "added value to our shareholders" (Exhibit 23) and "enhanced shareholder value" (Exhibit 26).

305.   To pursue its ambitious business plan for multi-year growth, ATP needed a major new financing source that ATP could count on to serve as a *continuing* source of external funding.  In response to ATP's promises, Bison provided that financing source.

306.   It was Bison's new financing source that ATP *chose*, *repeatedly*, to utilize for financings needed to carry out that business plan. ATP returned to the capital markets time and time again – taking advantage of the Bison Plan and utilizing Bison's financing source CSFB – to expand, extend and improve ATP's funding arrangements as needed.

307.   It was the *repeated* financing arrangements made by Bison's reliable new financing source that have been crucial to ATP's ability to pursue its plan to grow the Company, to its ability to weather the devastating financial crises of 2008 and 2009,  and to its ability to boast now to the financial community that its Telemark development – whose enormous costs ATP has been able to *continue* to fund as a result of the billions of dollars of funding arrangements made by Bison's new financing source for ATP – will allow ATP to at least *double* its production in 2010 (Exhibits 43, Exhibit 44 pages 20,26, Exhibit 45 page 19).

308.   ATP owes Bison fees totaling $86,638,468.75 for the Second through Fourteenth Capital Transactions, thirteen financing arrangements with an aggregate Value

exceeding $8.520 billion ($8,520 million) made by CSFB, a banking firm listed in Exhibit A to the Bison Contract, with ATP's payment of such fees to Bison having been due, *in each case*, on the date funds were made available under those arrangements.[25]   ATP's willful refusal and failure to pay those fees, plus interest and expenses, constitutes repeated breaches of ATP's promises to Bison and of the Bison Contract.

## COUNT I
## BREACH OF CONTRACT

309.   Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

310.   Bison has fully performed all its obligations under the Bison Contract.

311.   ATP violated express provisions of the Bison Contract by refusing to pay Bison the appropriate fee for the Second Capital Transaction.

312.   The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

313.   That as a result of the foregoing, Bison has incurred damages of $2.2 million in lost fees for the Second Capital Transaction under the Bison Contract plus prejudgment interest on those fees from the date those fees were due September 24, 2004, which as of February 12, 2010 amounts to $1,066,487.67.

## COUNT II
## BREACH OF CONTRACT

314.   Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

315.   Bison has fully performed all its obligations under the Bison Contract.

---

[25]     The aggregate Value of each of those Capital Transactions and the fees to be paid to Bison by ATP are summarized in Exhibit 44.

316.   ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Third Capital Transaction.

317.   The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

318.   That as a result of the foregoing, Bison has incurred damages of $3.5 million in lost fees for the Third Capital Transaction under the Bison Contract, plus prejudgment  interest on those fees from the date those fees were due April 14, 2005, which as of February 12, 2010 amounts to $1,549,109.59.

### COUNT III
### BREACH OF CONTRACT

319.   Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

320.   Bison has fully performed all its obligations under the Bison Contract.

321.   ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Fourth Capital Transaction.

322.   The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

323.   That as a result of the foregoing, Bison has incurred damages of $2,187,500 in lost fees for the Fourth Capital Transaction under the Bison Contract, plus prejudgment t interest on those fees from the date those fees were due on August 3, 2005, which as of February 12, 2010 amounts to $892,140.41.

### COUNT IV
### BREACH OF CONTRACT

324.   Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

325.    Bison has fully performed all its obligations under the Bison Contract.

326.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Fifth Capital Transaction.

327.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

328.    That as a result of the foregoing, Bison has incurred damages of $1.875 million in lost fees for the Fifth Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due on March 20, 2006, which as of February 12, 2010 amounts to $658,356.16.

**COUNT V**
**BREACH OF CONTRACT**

329.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

330.    Bison has fully performed all its obligations under the Bison Contract.

331.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Sixth Capital Transaction.

332.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

333.    That as a result of the foregoing, Bison has incurred damages of $5.25 million in lost fees for the Sixth Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due June 22, 2006, which as of February 12, 2010 amounts to $1,721,712.33.

## COUNT VI
## BREACH OF CONTRACT

334.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

335.    Bison has fully performed all its obligations under the Bison Contract.

336.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Seventh Capital Transaction.

337.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

338.    That as a result of the foregoing, Bison has incurred damages of $11.25 million in lost fees for the Seventh Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due November 22, 2006, which as of February 12, 2010 amounts to $3,264,965.75.

## COUNT VII
## BREACH OF CONTRACT

339.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

340.    Bison has fully performed all its obligations under the Bison Contract.

341.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Eighth Capital Transaction.

342.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

343.    That as a result of the foregoing, Bison has incurred damages of $13.25 million in lost fees for the Seventh Capital Transaction under the Bison Contract, plus

prejudgment interest on those fees from the date those fees were due March 23, 2007, which as of February 12, 2010 amounts to $3,450,082.19.

## COUNT VIII
## BREACH OF CONTRACT

344.   Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

345.    Bison has fully performed all its obligations under the Bison Contract.

346.   ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Ninth Capital Transaction.

347.   The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

348.   That as a result of the foregoing, Bison has incurred damages of $2.1 million in lost fees for the Ninth Capital Transaction under the Bison Contract, plus prejudgment  interest on those fees from the date those fees were due September 14, 2007, which as of February 12, 2010 amounts to $459,813.70.

## COUNT IX
## BREACH OF CONTRACT

349.   Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

350.    Bison has fully performed all its obligations under the Bison Contract.

351.   ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Tenth Capital Transaction.

352.   The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

353.    That as a result of the foregoing, Bison has incurred damages of $17.0 million in lost fees for the Tenth Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due June 27, 2008, which as of February 12, 2010 amounts to $2,494,109.59.

## COUNT X
## BREACH OF CONTRACT

354.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

355.     Bison has fully performed all its obligations under the Bison Contract.

356.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Eleventh Capital Transaction.

357.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

358.    That as a result of the foregoing, Bison has incurred damages of $1,344,718.75  in lost fees for the Eleventh Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due, with $1,225,625 in lost fees being due on September 29, 2009 and prejudgment interest as of February 12, 2010 amounting to $41,100.41, and $119,093.75 in lost fees being due on November 5, 2009 and prejudgment interest as of February 12, 2010 amounting to $2,907.19.

## COUNT XI
## BREACH OF CONTRACT

359.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

360.     Bison has fully performed all its obligations under the Bison Contract.

361.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Twelfth Capital Transaction.

362.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

363.    That as a result of the foregoing, Bison has incurred damages of $1.75 million in lost fees for the Twelfth Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due September 29,2009, which as of February 12, 2010 amounts to $58,684.93.

## COUNT XII
## BREACH OF CONTRACT

364.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

365.     Bison has fully performed all its obligations under the Bison Contract.

366.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Thirteenth Capital Transaction.

367.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

368.    That as a result of the foregoing, Bison has incurred damages of $12,478,750 in lost fees for the Thirteenth Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due November 2, 2009, which as of February 12, 2010 amounts to $313,849.11.

## COUNT XIII
## BREACH OF CONTRACT

369.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

370.    Bison has fully performed all its obligations under the Bison Contract.

371.    ATP violated express provisions of the Bison Contract by refusing to pay Bison its appropriate fee for the Fourteenth Capital Transaction.

372.    The aforementioned acts of ATP, as well as other acts to be discovered, constitute a breach of the Bison Contract.

373.    That as a result of the foregoing, Bison has incurred damages of $12,452,500 in lost fees for the Fourteenth Capital Transaction under the Bison Contract, plus prejudgment interest on those fees from the date those fees were due January 29, 2010, which as of February 12, 2010 amounts to $42,986.71.

## COUNT XIV
## RECOVERY OF COSTS, EXPENSES AND ATTORNEYS' FEES

374.    Bison repeats and realleges each and every allegation in the paragraphs set forth above, with the same force and effect as though set forth herein at length.

375.    Paragraph 4 of the Bison Contract provides "ATP shall reimburse Bison for all of Bison's reasonable expenses incurred in connection with the performance of its engagement hereunder and the enforcement of this Agreement, including without limitation the fees, disbursements and other charges of any legal counsel … provided, however, in the event of litigation between Bison and ATP over this Agreement, ATP shall not be obligated to reimburse Bison for the fees, disbursements and other charges of legal counsel unless ATP *fails to prevail* in such litigation, in which case ATP shall pay the fees, disbursements and other charges of Bison's legal counsel." Exhibit 1, Paragraph 4.

376.    As a result of ATP's breaches of its contractual obligations, Bison has incurred – and continues to incur – costs and expenses and attorneys' fees in enforcing the Bison Contract.

## PRAYER FOR RELIEF

WHEREFORE, Bison demands judgment against ATP and prays:

A.      That Bison be awarded damages in an amount no less than $86,638,468.75,

plus incidental damages, in an amount to be proven at trial;

B.      That Bison be awarded pre-judgment interest in an amount of

$16,016,305.74 as of February 12, 2010 plus $21,362.91 for each day past February 12,

2010, plus any post-judgment interest as is allowable by law, and at the maximum rate

allowable by law;

C.      That Bison be awarded its costs and disbursements to be taxed herein, and

its reasonable attorney fees incurred herein;

D.      That Bison be awarded punitive damages; and

E.      That Bison be awarded such other and further relief as the Court deems just

and proper.

Dated: February 11, 2010
       New York, New York

                              Respectfully submitted,

                              HUNTON & WILLIAMS LLP

                              _____
                              Jeffrey W. Gutchess
                              Marty Steinberg (to be admitted *pro hac vice*)
                              Hunton & Williams LLP
                              1111 Brickell Avenue
                              Miami, Florida, 33139
                              (305) 810-2500
                              msteinberg@hunton.com
                              jgutchess@hunton.com

                              *Attorneys for Plaintiff,*
                              *Bison Capital Corporation*

## DECLARATION OF SERVICE

Bradford C. Mulder, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746.

I am the Managing Clerk at the law firm of Hunton & Williams LLP, attorneys for Plaintiff, Bison Capital Corporation.

That on February 11, 2010, I served a true copy of the attached First Amended Complaint on the Defendant at the address listed below, by depositing the same in a duly enclosed and sealed wrapper, for Federal Express Next Day Overnight Delivery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 11, 2010.

_____
Bradford C. Mulder

TO:    John E. Tschirtart, Esq.
       General Counsel
       ATP Oil & Gas Corporation
       4600 Post Oak Place, Suite 200
       Houston, Texas 77027