UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
BISON CAPITAL CORPORATION,                    :
                                              :      Civil Action No. 10 CV 714
                                              :      (SHS) (AJP)
                        Plaintiff,            :
                                              :
            - against -                       :
                                              :
ATP OIL & GAS CORPORATION,                    :
                                              :
                        Defendant.            :
--------------------------------------------------------X

———————————————————————————————

Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss

———————————————————————————————


Jeffrey W. Gutchess
Marty Steinberg

Hunton & Williams LLP
Attorneys for Plaintiff, Bison Capital Corporation
1111 Brickell Avenue
Miami, Florida, 33139
(305) 810-2500
msteinberg@hunton.com
jgutchess@hunton.com

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

    ATP's Dependence Upon External Financing ....................................................2

    ATP's Financial Difficulties ...............................................................................3

    ATP Falls Into the Clutches of a Vulture Fund .................................................4

    ATP Turns to Bison for Help .............................................................................6

    The Bison Contract ............................................................................................7

    The Bison Plan ...................................................................................................9

    The Initial Capital Transaction Arranged by Bison .........................................10

    ATP Betrays Bison by Refusing Payment for the Second Capital Transaction ...............11

    The Additional Capital Transactions ...............................................................11

    The Value of the Capital Transactions to ATP .................................................11

STANDARD ON MOTIONS TO DISMISS ....................................................12

ARGUMENT .....................................................................................................12

1.    The Bison Contract Requires Payment "For Each Capital Transaction" with CSFB ........13

2.    Bison's Participation in the Subsequent Capital
    Transactions with CSFB Is Not Required to Entitle Bison to a Fee ..................16

3.    Bison Fully Performed All Services Required
    To Earn Its Fees For All Fourteen Capital Transactions ...................................17

4.    Paragraph 7 Starts the Obligation to Pay Fees; Not
    Provide An End Date .........................................................................................19

5.    The Cases Cited By ATP Actually Support Bison ...........................................20

6.    ATP's "Absurd" Arguments Are Contrary To Controlling Authority ............22

        A.    ATP's Must Pay Bison As Long As ATP's Consummates Capital
            Transactions With Bison's Financing Source, Credit Suisse. . . . . . . . . . . . . 23

B.  It Would Be Unjust To Permit ATP to Receive Continuous
    Benefits Under The Contract Without Paying The Corresponding
    Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION ................................................................................................................26

Hunton & Williams LLP

<u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ................................................................12

*CIBC World Markets Corp. v. TechnologyTrader, Inc.*, 183 F. Supp. 2d 605 (S.D.N.Y. 2001) ................................................................................................................17

*Chase Manhattan Bank v. Remington Products, Inc.*, 865 F. Supp. 194 (S.D.N.Y. 1994) ................................................................................................................................17

*Deutsche Bank Securities, Inc. v. Rhodes*, 578 F. Supp. 2d 652 (S.D.N.Y. 2008) ............16

*Guilbert v. Gardner*, 480 F.3d 140 (2d Cir. 2007) ..........................................................11

*Lazard Freres & Co. v. Crown Sterling Management, Inc.*, 901 F. Supp. 133 (S.D.N.Y. 1995) ..........................................................................................................17

*In re National Basketball Association*, 630 F. Supp. 136 (S.D.N.Y. 1986) ....................13

*In re: Oneida, Ltd*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009) ..............................................21

*PaineWebber Inc. v. Campeau Corp.*, 670 F. Supp. 100 (S.D.N.Y. 1987) ......................17

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ................................................................12

*Seiden Associates v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992)...........................12

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000)...................................................12

*Warner-Lambert Pharmaceutical Co., Inc. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959) *aff'd* 280 F.2d 197 (2d Cir. 1960)..............................................23

**STATE CASES**

*Hoover v. Kleer-Pak of North Carolina, Inc.*, 236 S.E.2d 386 (Ct. App. N.C. 1977) ..................................................................................................................................25

*Lease Corp. of America, Inc. v. Resnick*, 732 N.Y.S.2d 266 (3rd Dep't 2001) ................13

*Lura v. Multaplex*, 129 Cal. App. 3d 410 (1982).........................................................23, 25

*Mercury Partners LLC v. Pacific Medical Buildings, L.P.*, 2007 WL 2197830 (S.D.N.Y.) ........................................................................................................................13, 17

*Muller Enterprises, Inc. v. Gerber*, 133 N.W.2d 913 (Neb 1965)...............................23, 24

*Muller Enterprises, Inc. v. Samuel Gerber Advertising Agency*, 153 N.W.2d 920
    (Neb. 1967) ...........................................................................................................25

*Peter J. Solomon Co., L.P. v. Oneida Ltd.*, 2010 WL 234827 (S.D.N.Y.) .......................20

*Phelps v. Shawprint, Inc.*, 103 N.E.2d 687 (Mass. 1952)..................................................25

*Phoenix Capital Investments, LLC, v. Ellington Management Group, L.L.C.,*
    51 *A.D.3d 549*, 859 N.Y.S.2d 46 (2008) ....................................................................21

HUNTON & WILLIAMS LLP

<u>INTRODUCTION</u>

Plaintiff, Bison Capital Corporation ("Bison Capital" or "Bison"), submits this memorandum of law in opposition to the motion to dismiss Counts III through XIII of the First Amended Complaint ("FAC") filed by Defendant, ATP Oil & Gas Corporation ("ATP"). In this case, ATP retained Bison to set up a financing structure, and find a financing source, with which ATP could, repeatedly, raise funds for its capital expenditures, and the clear and unambiguous language of the parties' contract requires ATP to pay Bison "for *each* Capital Transaction" that is "made or *to be made*" by Bison's financing source, with Bison's fees "*in each case* to be paid on the date such funds are made available." This language requires ATP to pay Bison its fees as long as ATP uses Bison's financing source. If ATP seeks to cease paying Bison's fees, all ATP has to do cease using Bison's financing source. Accordingly, ATP's motion to dismiss any counts seeking payment for any Capital Transactions must be denied.

<u>ALLEGATIONS IN THE FIRST AMENDED COMPLAINT</u>

Bison is a private financial advisory and investment firm headed by its President Edwin Wells ("Wells"), who has more than 35 years of experience working for the world's largest investment banks advising the world's largest oil and gas companies, including Exxon, Mobil, Royal Dutch Shell, Shell Oil, BP, Chevron, Amoco, Conoco, Phillips Petroleum and others, on strategic and financing matters. Wells' experience includes hundreds of financings in the oil and gas industry, utilizing a variety of different financing structures, including secured and unsecured commercial bank loans from individual banks and multi-bank syndicates and offerings of debt, equity, mezzanine securities, options and warrants in the capital markets. FAC ¶¶ 78-81.

ATP is a public company engaged in the development, production and acquisition of oil and gas properties offshore, in the Gulf of Mexico and North Sea, focusing on the acquisition

and development of properties with proved _undeveloped_ reserves[1] that are not strategic to major or exploration-oriented independent oil and gas companies. FAC ¶ 50-51. Between 1997 and 2004, ATP's asset base of properties with proved undeveloped reserves grew sharply from 1.8 million barrels of oil equivalent (MBoe) to 41.1 MBoe.[2] ATP's major problem was that it had no access to the billions of dollars needed to develop those reserves. Due to its ill-conceived financing structure and ATP's inability to maintain a financing relationship with its bank lenders, ATP was at serious risk of losing its valuable properties to a "vulture" hedge fund. FAC ¶ 2.

<u>ATP's Dependence Upon External Financing</u>

As ATP has stressed in its SEC filings, development of offshore properties "requires significant capital expenditures. FAC ¶¶ 8-9; 50-56. As ATP Chairman T. Paul Bulmahn ("Bulhman") has admitted, the "sheer magnitude of capital required" is "huge" and is "one of the more significant hurdles in offshore oil and gas operations . . . ." _See_ Decl. of Jeffrey Gutchess ("Gutchess Dec.") Exs. 1 & 2. Since ATP does not generate the capital it needs from exploration success, ATP is dependent on debt financing. As Bulmahn has admitted, "capital is the lifeblood of the upstream business, and companies cannot grow without access to the prerequisite financing." Gutchess Dec. Ex. 1. ATP has admitted in SEC filings that it "historically needed and will _continue_ to need substantial amounts of cash to fund our capital expenditure and working capital requirements" and that continuing need for capital will "require _future_ financing transactions to support our planned strategy." FAC ¶¶ 50-56; Gutchess Dec. Ex. 4, p. 15.

---

[1]     As ATP explains in its SEC filings, "Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate, with reasonable certainty, can be recovered _in future years_ from known reservoirs under existing economic and operating conditions. Proved undeveloped reserves are the portion of proved reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively _major expenditure is required_ for completion_."_

[2]     Gutchess Dec. Ex. 4 at p.10 & Ex. 3, p.23. Since oil is measured in barrels and natural gas in thousands of cubic feet, the term "barrels of oil equivalent" or "Boe" is a way of measuring the _energy equivalency_ of oil and natural gas. The US Geological Survey states that "Six thousand cubic feet of gas equals one barrel of oil equivalent." Thus, 6 Bcfe (billion cubic feet equivalent) of natural gas is equivalent to 1 million barrels of oil (1 MBoe).

<u>ATP's Financing Difficulties</u>

For financing before 2004, ATP relied upon *commercial bank loans* under a *"borrowing base" structure* with tight covenants that allowed the banks to set the "borrowing base" limit (the amount available for loans) and "redetermine" and reduce that limit, unilaterally. This structure restricted ATP's ability to grow because: (a) ATP's financing needs were much larger than the structure permitted, (b) the banks imposed strict "borrowing base" limits and reduced the funds available after ATP incurred working capital deficits, which ATP did *<u>repeatedly</u>* (in fact, ATP's SEC filings disclose that ATP incurred working capital deficits in 11 out of the 12 quarters between 2001 and 2003) and breached covenants, and (c) substantial amortization of ATP's borrowings was required every year. FAC ¶¶ 108-115; Gutchess Dec. Ex. 9.

For example, BNP Paribas, which became ATPs' primary lender in April 2001, initially set a "borrowing base" of $65 million. After ATP delayed payments to its creditors, creating a working capital deficit at June 30, 2001 that breached a working capital covenant, BNP Paribas reduced ATP's "borrowing base" to $50 million. When ATP breached that covenant again on September 30, BNP Paribas began reducing the "borrowing base" by $4 million each month. On November 5, 2001, after only six months, BNP Paribas exited its financing relationship with ATP completely, leaving Union Bank of California as ATP's primary lender. FAC ¶¶58-59.

As ATP admitted in its 10-K Report for 2001, a "reduction in the borrowing base" has "a material negative impact on our cash flows and our ability to fund future operations . . . ." Gutchess Dec. Ex 5. Consequently, in 2002 ATP "reduced certain previously planned development activities" postponing four projects and reducing capital expenditures from $110.8 million to $35.2 million. Because reducing capital expenditures negatively impacts future revenues, ATP also disclosed in its Form 10K that "decreases [in] the amount of capital

expenditures . . . could negatively impact our future revenues and cash flows." Gutchess Dec. Ex. 6, p. 27; FAC ¶¶18, n.2    That is exactly what happened.

ATP's difficulties continued in the first half of 2003 with both production and revenues dropping more than 30% and ATP breaching covenants with working capital deficits of $34 million and $22.4 million.  FAC ¶ 59, 114. In its June 30, 2003 10-Q Report, ATP disclosed it also had unspecified "events of default." During this period, Union Bank of California and Guaranty Bank (to whom Union offloaded 32% of its ATP exposure) reduced ATP's "borrowing base" limit to $50 million.  Gutchess Dec. Ex. 9; FAC ¶¶ 111-113.

<u>ATP Falls Into the Clutches of a "Vulture" Fund</u>

On August 13, 2003, both Union Bank and Guaranty Bank exited their relationships with ATP, becoming the fourth and fifth commercial bank lenders over the period 1998-2003 to do so.   To replace the banks, ATP turned to Ableco Finance, the lending arm of the highly controversial "vulture" fund, Cerberus Capital Management (individually and collectively, "Cerberus"). The name "Cerberus" was copied from the monstrous three-headed beast in Greek mythology which guarded the gates of Hades and prevented the doomed from escaping. Cerberus was known for investing in financially distressed companies, often entities on the verge of bankruptcy, and then using its position as secured lender to take control, change management, close down, "strip" and sell off assets to extract value for its own investors.  FAC ¶¶ 2, 59-62.

Cerberus agreed to loan ATP $110 million secured by substantially all of ATP's U.S. oil and gas properties and two-thirds of the stock of its foreign subsidiaries.  Cerberus imposed strict financial covenants and, when ATP breached working capital and minimum EBITDA covenants six weeks later, Cerberus required ATP to pay a $1.65 million "amendment fee."  A mere three weeks later, when ATP faced year end covenant breaches and needed an extra $15 million,

- 4 -

Cerberus extracted an additional $750,000 fee for a second amendment and added ATP'S UK North Sea properties as additional security. That was a stiff price to pay for such a small increase: some of ATP's most valuable assets were located in the UK North Sea, including "Helvellyn," the "Tors," and "Emerald" (renamed "Cheviot"), major properties with very large undeveloped reserves. FAC ¶¶ 62, 71.

On December 19, 2003, ATP learned that an arbitration panel had ordered ATP to pay $8.2 million to Legacy Resources Co. for ATP's breach of its property acquisition contract. By letter dated December 30, 2003, Cerberus notified ATP that the arbitration award caused ATP to be in default. To obtain a default waiver, ATP agreed to new covenants and granted the "vulture" lender warrants to purchase 750,000 shares of ATP stock, exercisable at $6.75 per share until February 16, 2009. At the high price ATP stock later reached, those 750,000 warrants would have had a value of *more than $38 million*. FAC ¶¶ 63, 71.

Even this grant of warrants to Cerberus did _not_ solve ATP's problems with the predator – it _merely postponed_ for _five weeks_ another ATP event of default. By early April 2004 ATP had to deliver to Cerberus audited financials for 2003 with an auditors' "opinion [which] shall be without … a 'going concern' or like qualification or exception." Such qualification would trigger another event of default, allowing Cerberus to force a financial restructuring that could give it a major equity interest in ATP, substantially diluting or wiping out the existing stockholders' interests and allowing Cerberus to take control of ATP and its assets. FAC 13-14, 73-74.

At this point, while ATP was cash-poor, it was asset-rich. ATP had extremely valuable properties with large proved undeveloped reserves (41.1 MBoe) in its "Gomez", "Tors" and other properties. ATP also had 40 MBoe of undeveloped reserves in its "Emerald" ("Cheviot") field, and an additional 28 MBoe of probable reserves. ATP knew then it would take over three

years and it would need well over a billion dollars to develop these properties.[3]  Gutchess Dec. Exs. 8-9.  ATP could not obtain these funds from commercial banks (all of ATP's lenders in 1998-2003 had reduced their commitments and exited their financing relationships), from Cerberus, or from common stock offerings.[4]  ATP had no way to gain access to the capital it needed to develop its large _undeveloped_ properties, or acquire new properties, and it was only weeks away from potentially losing its valuable properties to Cerberus.  FAC ¶ 2, 28, 72-74.

<u>ATP Turns to Bison for Help</u>

In or about February 1, 2004, ATP turned to Bison for help.  From early February through March 2004, Bison's President, Mr. Wells, worked out of ATP's Houston offices. Wells analyzed ATP's business and finances, its past financing sources, its financing alternatives, and met frequently with ATP senior management, including ATP Chairman and CEO Bulmahn, Senior Vice President Gerald W. Schlief ("Schlief") and Chief Financial Officer Albert L. Reese, Jr. ("Reese") (who collectively owned more than 50% of ATP's common stock). Bulmahn and Schlief told Bison ATP needed to quickly raise $35 million to satisfy the auditors' concerns regarding adequate working capital and prevent a default under the financing documents with the "vulture" lender.  They also stated that ATP would, however, prefer raising $115 million or so to pay off Cerberus, if feasible, _plus_ additional funds to satisfy the auditors' concerns and to continue ATP's ongoing development activities.  FAC ¶¶ 82-89.

Bulmahn and Schlief emphasized that, as important as ATP's existing problems were, it had _even greater financing needs_ that had to be addressed.  They stated that ATP had attractive

---

[3]    ATP 10-Ks disclosed that it subsequently spent $3.487 billion on  development and acquisition activities in 2004-2009.  After spending on development and acquisition activities  $34.9 million in 2002, $83.8 million in 2003 and $87.4 million in 2004, ATP's expenditures after Bison obtained a major new financing source for ATP in February 2004 increased dramatically, to  $420.5 million in 2005, $577.0 million in 2006, $849.5 million in 2007, $917.5 million in 2008 and $635.3 million in 2009.

[4]   ATP tried an equity financing in May 2003, but a placement of 4,000,000 shares raised only $10.9 million in net proceeds, with ATP receiving only $2.725 per share for its stock while diluting existing shareholders by 17%.

oil and gas properties it wanted to develop, including _large_ interests in the "Gomez" and "Tors" projects; that acquiring, retaining and developing _large_ interests in high-potential projects such as those was an important part of its business plan, that ATP was skilled in acquiring properties for development and it would continue to do so, if ATP could obtain the needed financing in the future.  FAC 82, 83, 85(b).  This would require huge amounts of external funds that management of the struggling and financially unstable ATP had _not_ been able to obtain. FAC ¶¶ 2, 66, 83-91

ATP's Promises and the Bison Contract

Bulmahn and Schlief told Wells that, to satisfy ATP's large and increasing funding requirements, ATP needed a new structure for its financings and a relationship with a major new financing source that could provide the funds ATP needed, then and in future years. FAC ¶ 86. They told Wells that ATP needed outside professional assistance to help ATP form a relationship with a major bank which could provide the large funding amounts ATP needed, then and in future years, and they represented to Wells that ATP believed Wells' professional assistance to help them do that was essential, both for ATPs' survival and for its future success. FAC ¶ 88.

To gain Wells' expert assistance, ATP promised _continuing_ compensation to Bison, fees for each financing _to be arranged_ in the future by any of several listed banks approached by Bison on ATP's behalf.  FAC ¶ 90.  Bulmahn and Schlief emphasized that ATP's _continuing_ compensation would provide very valuable rewards for Bison if he helped ATP form a financing relationship with a listed bank which _continued_ to make arrangements in future years for the large amounts of external funding ATP wanted.[5] Bulmahn stated Bison's fees would not only be

---

[5]    ATP's  promises to Bison of continuing compensation for ATP financings in the future were consistent with typical oil industry practices. As *Black's Law Dictionary* (9th ed. at p. 1446) states, an "overriding royalty interest" is a form of continuing interest which is a "share of either production or revenue from production … carved out of a lessee's interest under an oil and gas lease", is "often used to compensate those who have helped _structure_ a drilling venture."  This was also consistent with ATP's own practices of continuing compensation to ATP financing sources and others who helped position ATP to generate future operating revenues.  ATP had granted overriding royalties to Bulmahn and Schlief, in properties acquired by ATP for development; granted interests in future revenues

larger if a bank would provide larger amounts of financing than had obtained in the past, but the fees could increase *even more* if a bank would "stick with" ATP and arrange multiple financings to allow ATP to carry out its plan of continuing to acquire and develop properties with large interests. In reliance on ATP's promises, Bison agreed to help ATP. FAC ¶¶ 89-91.

ATP's promises were reflected in a contract dated February 1, 2004 ("Bison Contract"). FAC ¶ 94 & Ex. 2. Paragraph 1, entitled "Services to be Rendered, states: "ATP hereby engages Bison, under the leadership of its president, Edwin E. Wells, as its financial advisor for the purpose of … advising the Company with respect to potential financing alternatives and assisting the Company in structuring and negotiating the terms of *potential financing arrangements* ("Capital Transactions")" (emphasis added). Paragraph 2, entitled "Compensation," states: "In connection with this engagement, ATP shall pay to Bison:

(a) monthly advisory fees of $25,000 per month paid in cash on or prior to the 20th calendar day of each month *during the term of this agreement*; and

(b) "*for each Capital Transaction* through which funds are made available to or for the benefit of ATP, its affiliates or lenders as a result of arrangements made or *to be made* by investment or commercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A . . .cash fees equal to one per cent (1%) of the aggregate Value of such funds, such fees *in each case* to be paid on the date such funds are made available**,** provided, however, for funds made available through the sale, exchange or placement of equity securities, such fees shall be equal to one and one quarter per cent (1.25%) of the aggregate Value of such funds." (emphasis added)

By specifying ATP must pay Bison "*for each Capital Transaction*" and specifying the timing of payment "*in each case*", the Bison Contract clearly and unequivocally contemplated and applied to *multiple* Capital Transactions. By specifying that ATP must pay Bison for

---

from production to ATP's principal financing source in 1997; granted overriding royalties to another ATP financing source (Aquila Energy Capital) in 1998-2001; granted to Cerberus warrants that would enable it to obtain ATP common stock – another form of continuing economic interest -- at a favorable price; and granted warrants worth $123 million to CSFB, the new financing source Bison obtained for ATP, for providing a mere $35 million of additional financing to ATP in March 2004). Gutchess Dec. Ex. 3 at p. 38; Ex. 4, p. 58.

"arrangements made or _to be made_" by any of the listed investment banking firms approached by Bison on ATP's behalf and defining "Capital Transactions" as "_potential financing arrangements_", the Contract clearly applied to _future_ ATP financings.  FAC ¶¶ 95-97.

As to timing, ATP agreed that consummation of _a_ single Capital Transaction at any time within 12 months following the termination of the Contract would _start_ ATP's _continuing_ obligation to pay Bison 1% of the aggregate value of "_each_ Capital Transaction . . . made or _to be made_" with such fees "_in each case_" to be paid on the date such funds were made available. FAC ¶ 98-104.  That test was stated in Paragraph 7 of the Contract, which provides:

> "Term: This Agreement shall commence on the date hereof and shall terminate unless extended by Bison and the Company, on April 1, 2005 . . . _Notwithstanding_ the foregoing, Bison shall be entitled to the fees set forth _in Paragraph 2_ above in the event the Company consummates _or_ enters into an agreement or arrangement providing for _a_ Capital Transaction … at any time within twelve months following termination of this Agreement; and _no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided herein_…."  (emphasis added.) [6]

<u>The Bison Plan</u>

Bison recommended major changes in ATP's financing structure - that ATP cease its reliance on loans from commercial banks under a "borrowing base" structure and turn to the capital markets for multiple debt financings placed with a substantial number of investors, with more flexible covenants, longer maturities and minimal amortization prior to maturity of the debt, no "borrowing base" limits or related "redeterminations" that could compel accelerated loan amortization, with occasional preferred stock sales to broaden ATP's investor pool and minimize dilution from common stock sales.   FAC ¶¶ 116-120.

---

[6] That objective test was important to both Bison and ATP. It ensured that ATP could not dodge its continuing compensation obligations to Bison by waiting until after April 1, 2004 to _start_ utilizing a new financing source provided by Bison. It also protected ATP: in the event that, for any reason, ATP did not _start_ its utilization of a listed bank approached by Bison on ATP's behalf until after twelve months following termination of the Contract, ATP would _not_ be required to pay Bison for financings arranged by that bank. FAC ¶ 98-104.

Under the Bison Plan, ATP could quickly raise the funds needed to satisfy the auditors, replace Cerberus and return to the capital markets, repeatedly, in the future to consummate improved financings with lower rates, more flexible covenants, or increased funding amounts. Bison advised ATP the best way to raise funds was in the "junk bond" capital markets and advised ATP to enlist the resources of a major investment bank with "junk bond" capabilities, recommending Credit Suisse First Boston ("CSFB"). Bison approached CSFB on ATP's behalf and ATP enlisted CSFB to arrange financings for ATP in the capital markets. FAC ¶¶ 120-28.

<u>The Initial Capital Transaction</u>

On March 30, 2004, ATP and CSFB consummated the initial $185 million Capital Transaction, consisting of $150 million of first lien debt and $35 million of second lien debt. In addition to fees of $6.75 million paid to CSFB, ATP granted CSFB, for itself and other second lien lenders, warrants to purchase 2,452,366 shares (10% of the outstanding shares) of ATP stock, exercisable through March 2010 at $7.25 per share. Gutchess Dec. Ex. 3, p. 38. At the high price of $57.58 per share ATP stock reached in November 2007, these warrants were worth *more than $123 million.*[7] ATP also paid Bison $1.85 million, or one per cent fee of the $185 million. FAC ¶¶ 131-138.

In a press release ATP noted the transaction "improved the Company's liquidity and working capital position by approximately $56 million, allowing it to comfortably execute its 2004 capital program," and admitted that the transaction "represents an *important change in the Company's debt structure*, as borrowings and scheduled amortization were set at closing and will <u>not</u> be subject to the periodic redeterminations associated with traditional revolving credit

---

[7]    These warrants are one more example of how desperate ATP was in February and March 2004 to obtain funds that would allow it to continue developing the properties with large undeveloped reserves, like "Gomez," the "Tors," and "Emerald" (renamed "Cheviot") which were already in ATP's inventory.

facilities." FAC ¶ 135 (emphasis added).  In its SEC filings, ATP stated that the new financing structure was "*instrumental* in providing the funds needed to complete our 2004 developments and provide us the initial financial resources for our 2005 program," and was the "catalysts in achieving such a productive year," which was ATP's "most active development year since becoming a publicly traded company in February 2001."  FAC ¶ 146.

<u>ATP Betrays Bison by Refusing Payment for the Second Capital Transaction</u>

On September 24, 2004, ATP consummated a second Capital Transaction with CSFB in the debt capital markets through which an aggregate Value of $220 million of funds were made available for ATP's benefit. This Capital Transaction replaced the funding of the First Capital Transaction with terms materially different and much more beneficial to ATP. When Bison requested payment of the $2.2 million fee ATP owes Bison for the $220 million Second Capital Transaction, ATP refused to pay and cut off communications with Bison.[8]  FAC ¶¶ 139-157.

<u>The Additional Capital Transactions</u>

Since February 2004, ATP has utilized Bison's new financing source CSFB for six years for *each* of ten debt financings, *each* of three preferred stock financings, and a common stock financing – fourteen different financing arrangements with an aggregate Value exceeding $8.705 billion.  *See* FAC ¶¶ 6, 131-286, 294 & Ex. 46.  During that time, ATP has failed to honor the Contract and pay Bison its fees "*in each case*" on the date such funds were made available**.**

<u>The Value of the Capital Transactions to ATP</u>

The funds made available as a result of Bison's work fueled a remarkable increase in ATP's *oil and gas production*, raising ATP's *revenues from production* from only *$13.6 million*

---

[8]    ATP is wrong when it asserts that by filing the action on January 29, 2010, Bison filed the "action one day before the expiration of the statute of limitations."  ATP Br. at 2.  The Agreement was effective on February 1, 2004, but it was not breached until, at the earliest, September 24, 2004, when ATP failed and later refused to pay Bison its fee for the Second Capital Transaction. *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) ("A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach.")

for the fourth quarter of 2003 to *$226.0 million* for the first quarter of 2008, and fueled a spectacular increase in ATP's *value,* propelling its stock to rise from *$5.01* per share when ATP hired Bison in February 2004, to highs of *$39.10* in 2005, *$49.26* in 2006, *$57.58* in 2007, and *$47.35* in 2008. At its 2007 high, ATP's market value had risen from *$123 million* to *$1.764 billion*. The Bison Plan also made ATP management – who were at risk of losing their ATP equity stakes before Bison agreed to assist ATP – very rich men. When ATP hired Bison, ATP CEO Bulmahn's stake in ATP had a value of *$44 million*. At the price reached in 2007, that stake was worth a stunning *$505 million*. FAC ¶¶ 287-298.

## STANDARDS ON MOTION TO DISMISS

When evaluating a motion to dismiss, a court shall "accept as true all of the factual allegations . . . draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). To survive, a complaint must state a claim that is "plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544 (2007). "In construing the provisions of a contract, courts are to give due consideration "to the circumstances surrounding its execution, to the purpose of the parties in making the contract and, if possible, ... give the agreement a fair and reasonable interpretation.'" *Mercury Partners LLC v. Pacific Medical Bldgs., L.P.,* 2007 WL 2197830, 9 (S.D.N.Y. 2007). The Court also must be "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Deutsche Bank Securities, Inc. v. Rhodes*, 578 F. Supp. 2d 652, 668 (S.D.N.Y. 2008).

Finally, the court must honor the intent of the parties "as revealed by the language they chose to use." *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992). It may neither rewrite the term under the guise of interpretation nor "redraft the contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Terwilliger v.*

*Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000). In particular, "the courts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous." *Mercury Partners LLC v. Pacific Medical Bldgs., L.P.*, 2007 WL 2197830, 10 (S.D.N.Y.). It is not the "court's function to rewrite improvident or inequitable provisions of a contract." *In re Nat'l Basketball Ass'n*, 630 F. Supp. 136, 140 (S.D.N.Y. 1986). Indeed, a court cannot modify an agreement simply because the defendant realizes, "with the benefit of hindsight, [that it] may have made a bad bargain." *Lease Corp. of Am., Inc. v. Resnick*, 732 N.YS.2d 266, 269 (3rd Dep't 2001). Here, of course, ATP made a wise bargain, as it was Bison who saved ATP from financial disaster and provided the structure and the financing source that enabled ATP to develop its business to remarkable heights.

### The Bison Contract Requires Payment "For *Each* Capital Transaction*"*

The Contract clearly and unambiguously sets forth ATP obligation to pay Bison's fees. Paragraph 2, entitled "Compensation," states: "In connection with this engagement, ATP shall pay to Bison" and sets forth four separate, and different, paragraphs. Under paragraph (a), ATP must pay Bison "monthly advisory fees of $25,000 per month paid in cash on or prior to the 20th calendar day of each month *during the term of this agreement*." In contrast, Paragraph (b) does <u>not</u> limit ATP's obligation to pay fees to the term of the agreement. In fact, Paragraph (b) contains no time limit whatsoever. Instead, it obligates ATP to continue paying Bison:

> "*for <u>each</u> Capital Transaction* through which funds are made available to or for the benefit of ATP, its affiliates or lenders as a result of arrangements made or <u>to be made</u> by investment or commercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A . . .cash fees equal to one per cent (1%) of the aggregate Value of such funds, such fees <u>in each case</u> to be paid on the date such funds are made available."

By defining Capital Transactions as "<u>*potential* financing arrangements</u>", specifying that ATP must pay Bison "for each Capital Transaction" and by specifying the timing of payment "*in <u>each</u>*

- 13 -

*case*", and including the terms "made or *to be made*", the Bison Contract clearly and unequivocally obligates ATP to pay Bison for *multiple* Capital Transactions *to be made* in the *future* by listed banks approached by Bison on ATP's behalf, including CSFB.[9]  FAC ¶ 96-97.

The Contract requires ATP to pay Bison its fees as long as ATP continues to use CSFB, which was approached by Bison on ATP's behalf.  Paragraph 7 reaffirms that point by stating "no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided herein….", and by referring specifically to ATP's continuing payment obligations under Paragraph 2(b) for "each Capital Transaction", defined as "potential financing arrangements" that were "made or to be made" by CSFB.  FAC ¶ 98.

The Contract also specifies that, "notwithstanding" a termination date of April 1, 2004, "Bison shall be entitled to the fees set forth in Paragraph 2 above in the event the Company consummates *or* enters into an agreement or arrangement providing for *a* Capital Transaction … at any time within twelve months following termination of this Agreement . . . ."  This clause establishes three things.  *First*, it applies only in the situation when, after the contract terminates, one specific event takes place that reinforces ATP's obligations to pay Bison's fees: that event is the consummation or entry into an agreement or arrangement providing for "*a* Capital Transaction."  *Second*, it specifies that if that event occurs within twelve months of termination, then Bison becomes entitled -- *not* just to fees for that one transaction -- but to the fees set forth in Paragraph 2.  *Third*, Paragraph 2 specifies that Bison is entitled to fees "*for each Capital Transaction*" with such fees "*in each case*" to be paid on the date funds are made available.

In addition to the clear and unambiguous contract language, the extrinsic evidence of

---

[9]   This result is required simply by the definition of the term "each", which means "every one of two or more"  *See, e.g.,* Webster's New Universal Unabridged Dictionary; *see also, e.g.,* Black's Law Dictionary.  Moreover, ATP effectively admits that it intended to pay Bison for multiple transactions by not moving to dismiss Bison's claims for fees on the Second and Third Capital Transactions.

intent alleged in the First Amended Complaint also demonstrates that ATP intended and agreed to pay Bison continuing compensation so long as ATP utilized Credit Suisse. _First_, ATP's large portfolio of undeveloped reserves would take years into the future to develop (Gutchess Dec. Ex. 7), meaning ATP would need multiple Capital Transactions over multiple years to obtain the financing needed to develop those reserves. _Second_, ATP could not obtain that financing from commercial banks, particularly with a record in its SEC filings of repeated working capital deficits, covenant violations, "borrowing base" cutbacks by its banks, and exits by all the major banks who financed ATP from 1998-2001. Gutchess Dec. Ex. 9. _Third_, ATP had no existing major investment bank financing sources, having had a "falling out" with Lehman Brothers and having been rejected by UBS "in early 2004 because ATP failed to disclose financial information requested by UBS." FAC ¶ 87. _Fourth_, ATP was desperate to obtain large amounts of financing, and ATP desperately needed and wanted professional assistance from someone who had the necessary financing expertise and access to major banks which could provide the financing ATP needed, then and in the future. FAC ¶¶ 86-88.

ATP recognized that Wells could provide a solution to ATP's existing and future funding problems, if Wells were willing and motivated to do so. ATP was willing to pay high prices for access to the financing it needed, as demonstrated by ATP's longstanding and consistent record of compensating financing sources with very valuable continuing interests, including interests in future production revenues, overriding royalties, and extraordinarily valuable warrants to buy ATP common stock. FAC ¶¶ 88-91; Gutchess Dec. Ex. 3, P. 38 and Ex. 4, p. 58.

In exchange for Wells' services, a _continuing_ compensation structure of 1%-1.25% of the aggregate value of _future_ financing arrangements made or _to be made_ by such a new financing source was not only fair and appropriate, it was a small price to pay for ATP to obtain the

financing without which it could not grow and succeed. Moreover, if Wells did not provide such a financing source – or if, for any reason, ATP elected not to use Bison's financing source within twelve months following a "termination" date – then Bison would not be entitled to continuing compensation with respect to such financing source. FAC ¶ 104.

### ATP's ARGUMENTS ARE CONTRARY TO THE CONTRACT

ATP makes three arguments why it is not obligated to pay Bison for the Capital Transactions that are the subjects of Counts III through XIII. *First*, ATP argues Bison was required to perform a service of "assisting the company in structuring and negotiating the terms of" each Capital Transaction to be entitled to its fees, and ATP argues Bison did not perform those services with respect to the Capital Transactions set forth in Counts III-XIII. *Second*, ATP argues the Contract has a "fee tail" provision that sets an end date after which ATP no longer is obligated to pay Bison any fees. *Third*, ATP argues "a purported 'continuing' and perpetual duty to pay plaintiff a percentage of the value of every financing transaction it enters into with CSFB for the life of the company" would "be absurd." ATP Br. at 2. These arguments fail in the face of the plain language of the Contract, the purpose of the parties in making the contract, the circumstances surrounding its execution, and well-settled authority.

1. Bison's Participation in Transactions with CSFB Is Not Required to Entitle Bison to a Fee

ATP argues that "to make out a prima facie claim for breach of contract, plaintiff must allege that it performed the services it owed under the Agreement." ATP Br. at 10. While Bison did in fact perform all the services due under the Contract, and ATP used Bison's services in each of the Capital Transactions at issue here, it is important to note that ATP is simply wrong on the law. As numerous cases make clear, "it is not uncommon in the investment banking field for investment banks to be contractually entitled to fees even when they do not arrange or

facilitate the transactions . . .” *Deutsche Bank Securities, Inc. v. Rhodes*, 578 F. Supp. 2d 652, 668 (S.D.N.Y. 2008) (granting summary judgment in favor of Deutsche bank and holding that Deutsche Bank “did not have to be involved in the closing for it to be entitled to a fee”). Similarly, in *CIBC World Markets Corp. v. TechTrader, Inc.,* 183 F. Supp. 2d 605 (S.D.N.Y. 2001) the court held there was “no requirement that CIBC take any action at all to earn their fee,” and the “fact that CIBC did not locate or identify the Series-B Investors is wholly irrelevant to whether TT is obliged to pay a transaction fee to CIBC.” *Id.* at 611.[10]

Moreover, in each of those cases, the advisor failed to consummate a transaction, had been terminated, and had *not* been involved in the transaction eventually completed. Here, in contrast, Bison *did* provide the services required, succeeding spectacularly in its work for ATP: approaching CSFB (a bank listed on Exhibit A) on ATP’s behalf, helping ATP form a financing relationship that ATP used for multiple Capital Transactions, helping ATP arrange and consummate the initial Capital Transaction which saved ATP from financial ruin, and recommending a new financing structure that ATP *continued to use*, *repeatedly*, for thirteen additional Capital Transactions that provided billions of dollars of funds needed for ATP’s ongoing activities.

2.      Bison Fully Performed All Services Required To Earn Its Fees For All Fourteen Transactions And Capital Transactions

ATP argues Bison was to “earn compensation under Paragraph 2(b) *only* on transactions which it actually advised and assisted ATP in negotiating and structuring.” ATP Br. at 10.   ATP incorrectly asserts that Bison “concedes that it provided no services . . . with respect to any of the transactions described in Counts III through XIII.” ATP Br. at 10.  ATP’s statements simply are

---

[10]      *See, e.g., Mercury Partners*, 2007 WL 2197830, 10 (S.D.N.Y.) (there “is no explicit condition in the Agreement requiring Mercury to work on every specific transaction for which it receives an advisory fee”); *Chase Manhattan Bank v. Remington Products, Inc.*, 865 F. Supp. 194 (S.D.N.Y. 1994) (the agreement did not “condition Chase's receipt of a fee on its bringing about a Transaction”) *accord, e.g., Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.,* 901 F. Supp. 133 (S.D.N.Y. 1995) (granting summary judgment to plaintiff); *PaineWebber Inc. v. Campeau Corp.,* 670 F. Supp. 100 (S.D.N.Y. 1987) (granting summary judgment to plaintiff).

not an accurate characterization of the facts alleged in the First Amended Complaint. With regard to each of the Fourteen Capital Transactions, Bison alleges that it "has fully performed all its obligations under the Bison Contract." *E.g.,* FAC ¶ 310, 315, 320, 32,5, 330.

Paragraph 2(b) establishes only one requirement for payment: that the Capital Transaction be consummated "as a result of arrangements made or *to be made* by investment or comercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A[.]" CSFB was the first bank listed on Exhibit A, and ATP conceded fees were owed for Capital Transactions consummated by CSFB when it paid Bison's 1% fee for the First Capital Transaction consummated by CSFB on March 30, 2004. There is no other requirement for Bison to earn its fees under Paragraph 2(b). Once Bison completed its work by approaching CSFB on ATP's behalf, Bison was entitled to be paid for "*each* Capital Transaction" consummated by CSFB.

The work Bison performed -- approaching CSFB on ATP's behalf and helping ATP form a financing relationship with CSFB, one which ATP has elected to utilize, *repeatedly,* over the past six years to arrange and consummate *multiple* Capital Transactions to provide the external funds which ATP has needed and wanted to continue its development and acquisition activities – has benefitted ATP and its shareholders in *each* Capital Transaction ATP subsequently consummated with CSFB.[11] Once Bison performed its part of the Contract, the Contract required that ATP pay Bison "*for each Capital Transaction* . . . made *or to be made* . . .." by CSFB.

ATP also is wrong when it asserts, incorrectly, "Bison *agreed* that its compen-sation would be tied to the services described in the 'Services to be Rendered' section . . . in Paragraph

---

[11]  While not required for payment under paragraph 2(b), ATP has also continued to use and benefit from Bison's assistance in structuring the terms of the Capital Transaction. As set forth in the First Amended Complaint, "ATP repeatedly utilized the potential financing arrangements *structured* by Bison and repeatedly utilized Bison's new financing source . . . to provide the funds that saved ATP  . . . and made it possible for ATP to carry out its business plan." FAC ¶ 28. Bison's "work providing ATP with potential financing arrangements – both Bison's new financing structure and ATP's *continuing* access to huge amounts of external funding *to be made* available by Bison's new financing source – have proved essential for ATP's success . . . ." FAC ¶ 29.

1 of the Agreement."  In fact, paragraph 2(b) does *not* tie compensation to services.  Instead, the only requirement in paragraph 2(b) is that the transaction be performed by one of the ten investment banks listed in Exhibit A which had been approached by Bison on ATP's behalf.  That is the same for paragraph 2(c), for which the only requirement is that the Capital Transaction be consummated by "sources of funds . . . as listed on Exhibit B."  In contrast, paragraph 2(d) is the *only* paragraph that "ties" Bison's fees to any other services, stating "for each other Transaction with respect to which Bison advises or assists ATP pursuant to Section 1(b), cash fees equal to two per cent (2%) of the aggregate Value of each such Transaction[.]"  In sum, the Bison Contract draws a *clear distinction* between ATP's obligation to pay Bison fees under paragraphs 2(b) and 2(c) for Capital Transactions consummated by investment banking firms approached by Bison on ATP's behalf, and ATP's obligation to pay Bison fees under paragraph 2(c) for each Transaction "with respect to which Bison advises or assists ATP."[12]

> 3.     Paragraph 7 *Starts* the Obligation to Pay Fees, Not Provide an End Date

ATP argues that paragraph 7 "provides that the cut-off for Bison to receive compensation under Paragraph 2 can be no later than the 12-month tail after the termination date."  ATP Br. at 8.  The paragraph says nothing at all about a "cut-off for Bison to receive compensation under Paragraph 2."  If paragraph 7 were intended to "cut off" the fees, it would have said simply that "Bison shall be entitled to fees for each Capital Transaction that is consummated within twelve months following termination of this Agreement." It does *not* say that or anything like that. Instead, it establishes a "triggering event" after which Bison becomes entitled to its continuing compensation under Paragraph 2:

---

[12]     Moreover, ATP obviously does not believe its own argument that that Counts III through XIV should be dismissed because Bison would "earn compensation . . . *only* on transactions which it actually advised and assisted ATP in negotiating and structuring."  That is because Bison's involvement in the Capital Transactions that are set forth in Counts I and II is the same as its involvement in the Capital Transactions that make up Counts III through XIII, and yet ATP does not argue Counts I and II should be dismissed.

"*Notwithstanding* [the April 1, 2004 termination date], Bison shall be entitled to the fees *set forth in Paragraph 2 above* in the event the Company consummates or enters into an agreement or arrangement providing for a Capital Transaction … at any time within twelve months following termination of this Agreement; and *no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided herein…*."

The intent of paragraph 7 is to prevent ATP from circumventing its payment obligations by delaying a Capital Transaction until after the Agreement was terminated.[13] Once the event specified in Section 7 takes place – in the event of *a* Capital Transaction arranged by CSFB at any time within twelve months following April 1, 2004 – then ATP's obligation is governed by Paragraph 2(b), and the only way to circumvent the continuing compensation requirement set forth in Paragraph 2(b) is to cease using CSFB for Capital Transactions. It is not sensible to set up a financing structure for *multiple* financings *to be arranged in the future* to satisfy ATP's need to fund *future* development and acquisitions, under which ATP would *repeatedly* return to the capital markets to consummate Capital Transaction after Capital Transaction, and to contractually require that ATP pay Bison its fee for "*each Capital Transaction*" (i.e., *each* "*potential* financing arrangement") "*to be made*", but then limit the payment of Bison's fees to only transactions that occur within twelve months.

> ### 4.    The Cases Cited By ATP Actually Support Bison.

ATP cites only two cases of even marginal relevance, and both cases actually support Bison. In *Peter J. Solomon Co., L.P. v. Oneida Ltd.*, 2010 WL 234827 (S.D.N.Y.), the agreement at issue provided that PJSC would be entitled to a monthly advisory fee of $125,000 and, "in the event of a Restructuring Transaction, a transaction fee" and that "the Restructuring Transaction Fee shall be payable upon . . . the closing of the restructuring transaction." Gutchess

---

[13]    ATP had until April 5, 2004 -- 95 days after the close of the 2003 fiscal year – to deliver to Cerberus the audited financial statements for the 2003 fiscal year without a "going concern" qualification or exception, and the Contract set a scheduled "termination" date of April 1, 2004 for the monthly advisory fees under Section 2 (a).

Dec. Ex. 10.  The Bankruptcy Court held (after a full trial) that, based on the contract language and the testimony, it was, "clear that PJSC would be entitled to one Transaction fee only." *In re: Oneida, Ltd*, 400 B.R. 384, 392 (Bankr. S.D.N.Y. 2009).  The District Court agreed, holding that: "Oneida did not intend to pay PJSC twice . . . ." Here, in contrast, ATP and Bison both intended for ATP to pay Bison for multiple Capital Transactions, and the Contract clearly and unambiguously reflects that intent by specifying that ATP must pay Bison for "*each* Capital Transaction" and by specifying the timing of payment "*in each case.*"

The Court also held that Oneida did not intend to pay PJSC "once for its work on a transaction and then a second time for work that it did not perform and for which another firm was paid." *Id*.  Here, in contrast, ATP *did* intend agree to pay Bison for work for which another firm was paid.  The Bison Contract specifically states that "*No fees or expenses payable to any other investment banking, commercial banking or other financial or business or legal advisor ... shall reduce or otherwise adversely affect the fees and expense reimbursement to be paid hereunder to Bison.*"[14] (Emphasis added)

The second case ATP cites, *Phoenix Capital Investments, LLC, v. Ellington Management Group, L.L.C.,* 51 A.D.3d 549, 859 N.Y.S.2d 46 (2008) also supports Bison.  There Ellington Management ran a hedge fund seeking non-US investors and retained Phoenix Capital to

---

[14]   The *Peter Solomon* case is very different on the facts.  There, pursuant May 1, 2004 agreement, Oneida engaged PJSC to for a single restructuring transaction.  PJSC invoiced Oneida and Oneida paid PJSC its monthly advisory fee until August 2004, when Oneida completed a financial restructuring and paid PJSC a transaction fee.  Thereafter, "PJSC stopped billing for, and Oneida stopped making, the monthly payment," and the court held that "the parties showed by their subsequent course of conduct that they understood the engagement had been completed." In April 2005, PJSC claimed its agreement was still effective because there was no written notice of termination.  Oneida disagreed but nevertheless sent a written notice dated April 27, 2005 but stating the termination had occurred in August 2004.  A year later, on March 19, 2006, Oneida filed a voluntary bankruptcy petition and sought court approval of a pre-negotiated plan of reorganization, which plan was approved in May 2006.  PJSC claimed it was entitled to fees for the reorganization, arguing that its agreement had not been terminated in writing until April 27, 2005, and it was entitled to fees "in the event that any Transaction is consummated at any time prior to the expiration of one year after such termination."  The Court rejected that argument, holding that the agreement had been terminated in August 2004 after that single restructuring transaction, and that both parties by their subsequent conduct had treated the contract as completed and terminated.

introduce prospective investors to Ellington Funds. If such investors agreed to invest in Ellington Funds, then Ellington agreed to pay Phoenix "0.75 % per annum on all Investments if the total of all Investments . . . is less than $200 million" and "1.00% per annum on all Investments if the total of all Investments . . . is equal to or greater than $200 million" and that "fees shall be paid annually at the time of each Investment and each annual anniversary thereof." Gutchess Dec. Ex. 11.

Thus, this case, too, shows the industry practice of continuing compensation for firms who raise money. All Phoenix did was find investors for Ellington, and Ellington paid Phoenix a fee of 1% per year for investments of $200 million, paying that fee as long as the investors kept their money in the funds. That is similar to the fees ATP agreed to pay Bison of 1% "for _each_ Capital Transaction" "made or _to be made_ by" Bison' financing source. The difference is, instead of merely finding an investor, Bison analyzed ATP's problems and financing alternatives, recommended the financing structure ATP needed, and had the expertise and credibility to obtain and help ATP develop a financing relationship with a new financing source who could -- and did -- "stick with" ATP and provide the "huge" and continuing funding which ATP needed and wanted.[15]

5.    ATP's "Absurd" Arguments Are Contrary To Controlling Authority

ATP last-ditch argument is that it would be "absurd" to "impose on ATP a purported 'continuing' and perpetual duty to pay plaintiff a percentage of the value of every financing transaction it enters into with CSFB for the life of the company." ATP Br. at 2. ATP's argument

---

[15]    The _Phoenix Capital_ case also is very different on its facts. The clause at issue in that case provided that "no Fee shall be paid with respect to . . . any investor whose first Investment is made later than one year after [Phoenix] have made their last contact with that investor." The agreement was officially terminated in June 2004. Then, more than two years after Phoenix Capital had its last contact with Norges Bank, on August 31, 2006, Norges Bank invested more than $500 million in funds that Ellington managed. Despite the passage of two years, Phoenix Capital still claimed it was entitled to its fee under the "one year" provision. The Court dismissed that claim.

is contrary to well established precedent.

        A.       ATP's Must Pay Bison As Long As ATP's Consummates Capital Transactions' With Bison's Financing Source, Credit Suisse.

The seminal case enforcing contracts with continuing payment obligations "for each" transaction was decided under New York law and affirmed by the Second Circuit. *See, Warner-Lambert Pharmaceutical Co., Inc. v. John J. Reynolds, Inc.,* 178 F. Supp. 655 (S.D.N.Y. 1959) *aff'd* 280 F.2d 197 (2d Cir. 1960) ("summary judgment is affirmed on the opinion" below). There, Warner-Lambert manufactured and sold Listerine pursuant to an agreement "to pay . . . the sum of twenty dollars *for each and every* gross of said Listerine hereafter sold . . . ." After paying more than $22 million -- and with payment growing in excess of $1.5 million yearly -- Warner-Lambert sought a declaration that the contract could not be enforced because it required payments to continue in perpetuity.

The Court rejected that argument, holding that the "plain meaning of the language used in these agreements is simply that [plaintiff's] obligation to pay is co-extensive with manufacture or sale of Listerine" and "when they cease manufacturing or selling Listerine the condition for continued payment comes to an end and the obligation to pay terminates," and they were "free at any time . . . to stop manufacturing and selling Listerine." *Id.* at 660. See also, e.g., *Lura v. Multaplex*, 129 Cal. App. 3d 410 (1982) ("far from being obligated to make payments forever, respondent could at any time terminate its obligations to appellant by ceasing to sell to the accounts"); *Muller Enterprises, Inc. v. Gerber*, 133 N.W.2d 913 (Neb 1965) (the contract "clearly contemplates that the duration of the obligation is commensurate with Gerber's performance . . . His only obligation is to pay Muller 10 percent for as long as he himself performs the contract. If it becomes unprofitable or onerous, all he has to do is quit."). The same is true here: ATP's obligation to pay Bison is conditioned upon ATP's continued use of

CSFB. ATP can cease using CSFB, and ATP would no longer be obligated to pay Bison its fee.

> B.     It Would Be Unjust To Permit ATP to Receive Continuous Benefits
> Under The Contract Without Paying The Corresponding Obligation

These courts have also held that such agreements "to pay as long as [the company] continued selling" were "entirely fair" since it was that agreement on which the company "built up a very large and successful business." *Warner-Lambert,* 178 F. Supp. at 666. The Court explained that the fact the company has had such "great success indicates how valuable the rights under the contract are and how *unjust it would be permit it to have its cake and eat it too*." *Id.* at 666-67. The *Muller* court agreed, noting that "*to hold otherwise would be to permit the receipt of continuous benefits under a contract without payment of the corresponding obligation*." *Id.* at 471. The same is true here: Bison's work provided the prerequisite financing on which ATP has built up a very large and successful business. ATP's business has greatly expanded and its principals have greatly profited based upon ATP's repeated use of both Bison's assistance in structuring ATP's financing transactions and Bison's work in obtaining a major new financing source for ATP. That demonstrates how valuable Bison's work was, and how unjust it would be to permit ATP to have its cake and eat it too.

ATP also argues that "No reasonable manager would agree to pay unknown sums in compensation to a financial advisor simply because he or she assisted in a single transaction." Br. at 9. Again, ATP's argument is contrary to the facts alleged in the First Amended Complaint *First,* ATP did *not* agree to pay "unknown sums" to Bison. Rather, ATP agreed to pay a specific percent of sums raised, which was "one per cent (1%) of the aggregate Value of such funds." In fact, because ATP knew *exactly* the aggregate value of the funds it raised, ATP knew *exactly* how much it had to pay Bison. *Second*, Bison did more than "assist in a single transaction" - Bison assisted in developing a new financing structure, and Bison obtained a new financing

source for ATP.  ATP has used *both* the new financing structure and the new financing source, *repeatedly,* to the great benefit of ATP management and its shareholders.

ATP's argument is also contrary to well-established precedent.  Assisting in a single transaction is sufficient consideration for an obligation to pay a percentage of all transactions so long as those transactions continue.  *See, e.g.*, *Lura*, 129 Cal. App. 3d at 410 (plaintiff's "only duties were to obtain the accounts," and "once this performance was executed, the only obligation remaining was that of [the defendant] to pay the agreed compensation"); *Hoover v. Kleer-Pak of N.C., Inc.,* 236 S.E.2d 386, 389 (Ct. App. N.C. 1977), (holding that "the purpose of the contractual arrangement between the parties was for plaintiff to use his contacts to develop Brevoni as a customer for defendant in consideration for which plaintiff would receive a 5% commission" which "would be paid to plaintiff as long as defendant sold its products to Brevoni."); *Muller Enterprises, Inc. v. Gerber Agency,* 153 N.W.2d 920 (Neb. 1967) ("So long as the Gerber agency uses the benefits of its contract with Muller in its advertising for Service Life, Muller is entitled to the benefits of his contract with the Gerber agency."); *Phelps v. Shawprint, Inc.,* 103 N.E.2d 687 (Mass. 1952), ("Where, as here, the contract has been fully performed on one side, 'the law will not permit the injustice of the other party retaining the benefit without paying unless compelled by some inexorable rule.'); *Alexander v. Capital Paint Co.,* 111 A. 140 (My. 1920) ("wanted the introduction; it was willing and expected to pay for it, and if, instead of paying a definite sum for something which might prove to be of no value to it, it preferred to make the compensation contingent upon success and proportioned to the benefit it might derive from it, there was no reason why it could not do so").

HUNTON & WILLIAMS LLP

## **CONCLUSION**

Bison respectfully requests that this Court enter an order denying Defendant's Motion to Dismiss Counts III through XIII.

Dated: April 19, 2010
      New York, New York

                          Respectfully submitted,

                          HUNTON & WILLIAMS LLP

                           _Jeffrey W. Gutchess_____
                          Jeffrey W. Gutchess
                          Marty Steinberg
                          Hunton & Williams LLP
                          1111 Brickell Avenue
                          Miami, Florida, 33139
                          (305) 810-2500
                          msteinberg@hunton.com
                          jgutchess@hunton.com

                          *Attorneys for Plaintiff,*
                          *Bison Capital Corporation*