UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BISON CAPITAL CORP.,                              :

              Plaintiff,                   :

           -against-                        :

ATP OIL & GAS CORP.,                              :

            Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

         10 Civ. 0714 (SHS) (AJP)

   **REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Sidney H. Stein, United States District Judge:**

        Plaintiff Bison Capital Corp. brings this action alleging that ATP Oil and Gas Corp. breached their February 1, 2004 contract when ATP refused to pay Bison fees for "Capital Transactions" it made with Credit Suisse First Boston ("CSFB"). (E.g., Dkt. No. 6: Am. Compl. ¶¶ 2-7; see Dkt. No. 24: Bison Opp. Br. at 1-2, 11.)

        Presently before the Court is defendant ATP's motion to dismiss Counts III through XIII of the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 10: ATP Notice of Motion) on the grounds that: (1) the contract did not "impose on ATP a . . . 'continuing' and perpetual duty" to pay Bison fees for Capital Transactions that ATP and CSFB consummated after April 1, 2005 (Dkt. No. 12: ATP Br. at 2, 6, 7-10); and (2) Bison "provided no services in connection" with the Capital Transactions at issue in Counts III through XIII (ATP Br. at 2, 6, 10-12).

        For the reasons set forth below, ATP's motion to dismiss should be DENIED.

## FACTS

The facts alleged in Bison's amended complaint are assumed to be true for purposes of this motion, and will be set forth herein without use of the preamble "Bison alleges."

ATP is a public oil and gas company that focuses on "acquiring and developing . . . oil and gas properties" with "undeveloped reserves."  (Dkt. No. 6: Am. Compl. ¶¶ 8, 50, emphasis omitted.)

ATP is dependent on debt financing because development of its properties requires significant capital expenditures.  (Am. Compl. ¶¶ 9, 52, 55, 56; Bison Opp. Br. at 2.)  Prior to 2004, ATP obtained commercial bank loans to finance its operations.  (Am. Compl. ¶¶ 10, 58; Bison Opp. Br. at 3.)  ATP experienced "difficulties under this financing structure" because the loans did not provide adequate financing, allowed the banks to set the amount available, permitted the banks to "'reduce [the loan] limit[] unilaterally" based on the "'estimated'" value of ATP's "reserves," and provided for "substantial early amortization" and accelerated amortization under certain circumstances. (Am. Compl. ¶¶ 10, 58, 108-14; Bison Opp. Br. at 3, emphasis omitted.)  As a result, "ATP moved from one [commercial] bank to another," as "ATP found its needs for funds growing larger and as ATP experienced difficulties complying with loan covenants."  (Am. Compl. ¶¶ 10, 58-59, 114; Bison Opp. Br. at 3-4.)

On August 13, 2003, after the fourth and fifth banks during a five year period ended their relationship with ATP, ATP turned to hedge fund Cerberus Capital Management.  (Am. Compl. ¶¶ 2, 58-59; Bison Br. at 3-4.)  Cerberus made an $110 million loan to ATP with high interest rates

and "restrictive financial and operating covenants."  (Am. Compl. ¶ 61.)  The loan was secured by "substantially all of ATP's U.S. oil and gas properties and two-thirds of the stock of its foreign subsidiaries and guaranteed by the subsidiary ATP Energy."  (Id.)

During the next seven months, ATP violated multiple loan covenants.  (Am. Compl. ¶¶ 62-64, 69-73; Bison Opp. Br. at 4-5.)   As a result, Cerberus required ATP to pay millions of dollars in penalties, add additional properties as security and grant Cerberus "'vulture'" lender warrants to purchase shares of ATP stock.  (Am. Compl. ¶¶ 62-64, 69-73; Bison Opp. Br. at 4-5.)

ATP faced another hurdle because it had to deliver an auditor's report to Cerberus by April 2004.  (Am. Compl. ¶¶ 13-14, 72-73.)  If the auditors were unable to conclude that ATP was a "'going concern,'" ATP would be in default, allowing Cerberus to "seize ATP's oil and gas property or force a financial restructuring that could give [Cerberus] a majority equity interest in ATP, substantially diluting or wiping out the existing stockholders' interests and allowing the 'vulture' lender [i.e., Cerberus]  to seize control of ATP and liquidate its vlauable assets."  (Am. Compl. ¶¶ 13-14, 73-74.)

On February 1, 2004, ATP turned to Bison, a "private financial advisory and investment firm," because ATP knew it needed to develop a new financing structure and form relationships with new financing sources, but did not have the expertise to form the new structure and "did not know, had no relationship with, and no other way to quickly capture the attention of [major banks] in the existing crisis."  (Am. Compl. ¶¶ 78, 86, 88; Bison Opp. Br. at 1, emphasis omitted.)  ATP believed that Bison President Edwin Wells, who had more than thirty five years

experience advising and structuring finances for oil and gas companies, had the expertise and contacts essential for ATP to accomplish its goals.  (Am. Compl. ¶¶ 78-81, 86, 88; Bison Opp. Br. at 1.)  ATP senior management told Wells that "ATP needed to quickly raise $35-$40 million" in order to satisfy the auditors' concerns and prevent default on its Cerberus loan, but preferred to raise approximately $150 million so that it could pay off Cerberus and continue present and future development activities.  (Am. Compl. ¶¶ 82-83, 85.)

        In order to "induce Wells to devote his attention right away to assisting ATP – and especially to provide strong motivation for Wells" to find a source for long term financing, ATP agreed to sign a contract drafted by Wells. (Am. Compl. ¶¶ 89, 93-94.)  The February 1, 2004 contract states in relevant part:

> 1.     **Services to be Rendered**.  ATP hereby engages Bison, under the leadership of its President Edwin E. Wells, Jr., as its financial advisor for the purpose of:
>
> (a)  advising [ATP] with respect to potential financing alternatives and assisting [ATP] in structuring and negotiating the terms of potential financing arrangements ("Capital Transactions");
>
> (b)  if requested by [ATP], advising [ATP] with respect to other Transactions (as defined below) that [ATP] may wish to consider and assisting [ATP] in negotiations concerning a Transaction or Transactions.
>
> 2.  **Compensation**.  In connection with this engagement, ATP shall pay to Bison:
>
> (a)  monthly advisory fees of $25,000 per month . . . each month during the term of this agreement; and

(b)      for each Capital Transaction through which funds are made available to or for the benefit of ATP, its affiliates or lenders as a result of arrangements made or to be made by investment or commercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A . . . , cash fees equal to one percent (1%) of the aggregate Value of such funds, . . . ; and

(c)      for each Capital Transaction through which funds are made available to or for the benefit of ATP or its existing lenders as a result of arrangements with other sources of funds (i.e., sources other than investment or commercial banking firms) approached by Bison on behalf of ATP, as listed in Exhibit B . . . , cash fees equal to:

. . . .

(d)      for each other Transaction with respect to which Bison advises or assists ATP pursuant to Section 1(b) above, cash fees equal to two percent (2%) of the aggregate Value of each such Transaction. . . .

. . . .

7.      **Term**.  This Agreement shall commence on the date hereof and shall terminate, unless extended by Bison and [ATP], on April 1, 2004; *provided, however*, that either party may terminate this Agreement with or without cause upon receipt of ten business days' prior written notice to the other party to that effect.  Notwithstanding the foregoing, Bison shall be entitled to the fees set forth in Paragraph 2 above in the event [ATP] consummates or enters into an agreement or arrangement providing for a Capital Transaction . . . at any time within twelve months following termination of this Agreement; and no termination of Bison's engagement hereunder shall affect [ATP's] obligation to pay fees and expenses to the extent provided for herein . . . .

8.      **Public Announcements**.  [ATP] acknowledges that Bison may at its option and expense, after announcement of any Capital Transaction or Transaction, place announcements and advertisements or otherwise publicize the Capital Transaction or Transaction in such financial and other newspapers and journals as it may choose, stating that Bison acted as a financial advisor to [ATP] in connection with such Capital Transaction or Transaction. [ATP] further consents to Bison's public use or display of [ATP's] logo, symbol or trademark as part of Bison's general marketing or promotional activities,

provided such use or display is in the nature of a public record or tombstone announcement in relation to the Capital Transaction or Transaction.

(Am. Compl. Ex. 2: Bison-ATP 2/1/04 Contract ¶¶ 1, 2, 7, 8.)

Bison recommended that ATP cease relying on commercial bank loans with "'borrowing base'" structures and instead turn to the capital markets for multiple debt financings placed with a number of investors. (Am. Compl. ¶¶ 109-12, 116-18.) Bison recommended multiple debt financing because it: (1) would eliminate the possibility of one or two investors wielding their financing power "to impose overly restrictive [and exploitative] covenants"; (2) did not have "'borrowing base'" limits; (3) required only minimal amortization; and (4) allowed ATP to return to the capital markets repeatedly for more flexible and larger financing if it showed increased oil and gas production. (Am. Compl. ¶ 119, emphasis omitted.) "To implement the Bison Plan, ATP [needed] to enlist the resources of a major investment bank with 'junk bond' financing capabilities in the capital markets." (Am. Compl. ¶ 120, emphasis omitted.)

At ATP's request, Wells arranged a meeting between ATP and CSFB, an investment bank with "'junk bond'" expertise. (Am. Compl. ¶¶ 120-22.) ATP decided to work with CSFB and requested that Bison assist ATP in "structuring and negotiating the terms of ATP's potential financing arrangements." (Am. Compl. ¶ 123.)

On March 29, 2004, ATP and CSFB "consummated" an initial $185 million Capital Transaction. (Am. Compl. ¶¶ 128, 131, 134.) ATP paid Bison a $1.85 million fee, i.e., 1% of the $185 million. (Am. Compl. ¶ 137; Bison Opp. Br. at 10.)

On September 24, 2004, ATP "consummated" a second Capital Transaction with CSFB, which provided $220 million for ATP's benefit and included terms far more beneficial to ATP than the initial Capital Transaction's terms.  (Am. Compl. ¶¶ 140-48.)  When Bison requested its $2.2 million fee for the transaction, ATP refused to pay and "cut off communications with Bison." (Am. Compl. ¶¶ 150-56; Bison Opp. Br. at 11.)[1]

After the second Capital Transaction, ATP and CSFB consummated a third Capital Transaction before April 1, 2005[2] and eleven Capital Transactions after April 1, 2005.  (Am. Compl. ¶¶ 6, 26-29, 159-286.)   ATP has refused to pay Bison fees for these Capital Transactions.  (Am. Compl. ¶¶ 6, 169-70, 181-82, 193-94, 203-04, 213-14, 223-24, 235-36, 246-47, 263-64, 274-75, 285-86.)

**ATP's Motion to Dismiss**

ATP has moved to dismiss Counts III through XIII (the breach of contract counts dealing with the eleven Capital Transactions after April 1, 2005, set forth in Am. Compl. ¶¶ 319-73), pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 10: ATP Notice of Motion), on the grounds that: (1) the February 1, 2004 contract did not "impose on ATP a . . . 'continuing' and perpetual duty" to pay Bison fees for Capital Transactions with CSFB occurring after April 1, 2005 (Dkt. No. 12: ATP

---

[1]    ATP's failure to pay Bison the fee for the second Capital Transaction is not at issue on this motion to dismiss.  (See Dkt. No. 10: ATP Notice of Motion.)

[2]    ATP's failure to pay Bison the fee for the third Capital Transaction is not at issue on this motion to dismiss.  (See ATP Notice of Motion.)

Br. at 2, 6, 7-10); and (2) Bison "provided no services in connection" with the Capital Transactions at issue in Counts III through XIII (ATP Br. at 2, 6, 10-12).

## ANALYSIS

## I.      THE STANDARDS GOVERNING A MOTION TO DISMISS

### A.      The Twombly-Iqbal "Plausibility" Standard

In two decisions in the last few years, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

> Two working principles underlie our decision in Twombly.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.

> Second, only a complaint that states a plausible claim for relief survives a
> motion to dismiss. Determining whether a complaint states a plausible claim
> for relief will . . . be a context-specific task that requires the reviewing court
> to draw on its judicial experience and common sense. But where the well-
> pleaded facts do not permit the court to infer more than the mere possibility
> of misconduct, the complaint has alleged - but it has not "show[n]" - "that the
> pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).
>
> In keeping with these principles a court considering a motion to
> dismiss can choose to begin by identifying pleadings that, because they are
> no more than conclusions, are not entitled to the assumption of truth. While
> legal conclusions can provide the framework of a complaint, they must be
> supported by factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and then determine whether
> they plausibly give rise to an entitlement to relief.

Ashcroft v. Iqbal,-- U.S. --, 129 S. Ct. 1937, 1949-50 (2009) (citations omitted & emphasis added)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556-57, 570, 127 S. Ct. 1955, 1965-66, 1974

(2007) (retiring the Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957), pleading

standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief.")).[3/]

　　　　Even after Twombly and Iqbal, the Court's role in deciding a motion to dismiss "'is

merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which

---

[3/]　　Accord, e.g., Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009); Lindner v. Int'l Bus. Machs.
Corp., 06 Civ. 4751, 2008 WL 2461934 at *3 (S.D.N.Y. June 18, 2008); Joseph v. Terrence
Cardinal Cooke Health Care Ctr., 07 Civ. 9325, 2008 WL 892508 at *1 (S.D.N.Y. Apr. 2,
2008); Elektra Entm't Group, Inc. v. Barker, 551 F. Supp. 2d 234, 237 (S.D.N.Y. 2008);
Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 216-17 (S.D.N.Y.
2008); Diana Allen Life Ins. Trust v. BP P.L.C., 06 Civ. 14209, 2008 WL 878190 at *3
(S.D.N.Y. Mar. 31, 2008).

might be offered in support thereof.'" Saunders v. Coughlin, 92 Civ. 4289, 1994 WL 88108 at *2

(S.D.N.Y. Mar. 15, 1994) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)); accord,

e.g., Caldwell v. Crossett, Civ. No. 09-CV-576, 2010 WL 2346337 at *2 (N.D.N.Y. May 24, 2010),

report & rec. adopted, 2010 WL 2346330 (N.D.N.Y. June 9, 2010); Scherman v. N.Y. State Banking

Dep't, 09 Civ. 2476, 2010 WL 997378 at *4 (S.D.N.Y. Mar. 19, 2010) (Peck, M.J.); Gallien v.

Procter & Gamble Pharm., Inc., 09 Civ. 6903, 2010 WL 768937 at *1 (S.D.N.Y. Mar. 5, 2010);

Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 08 Civ. 7746-47, 2010 WL 430771 at

*3 (S.D.N.Y. Jan. 26, 2010); Watson v. McGinnis, 964 F. Supp. 127, 130-31 (S.D.N.Y. 1997)

(Kaplan, D.J. & Peck, M.J.).

> ### B.   Consideration Of Documents Attached To Or Referred To In The Complaint

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading.  Thus,

in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the

complaint." Vassilatos v. Ceram Tech Int'l, Ltd., 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y.

May 19, 1993) (citing Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991)).[4/]  The Court,

_____

[4/]   Accord, e.g., Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006); Aniero Concrete Co. v.
N.Y.C. Constr. Auth., 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); Six
W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 97 Civ. 5499, 2000 WL 264295
at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss
pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and
evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6)
motion, the Court must either exclude the additional materials and decide the motion based
solely upon the complaint, or convert the motion to one for summary judgment under Fed.
R. Civ. P. 56.  See Fed. R. Civ. P. 12(b); Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir.
(continued...)

however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference.  E.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . .").[5]

"However, before materials outside the record may become the basis for a dismissal, several conditions must be met.  For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document."  Faulkner v. Beer, 463 F.3d at 134 (citations omitted).

In this breach of contract case, the Court refers only to the Bison-ATP contract attached to Bison's amended complaint (as Exhibit 2).

---

[4]    (...continued)
2000); Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988).

[5]    See also, e.g., Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960, 112 S. Ct. 1561 (1992)); Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## II.    STANDARDS FOR CONTRACT INTERPRETATION UNDER NEW YORK LAW

"It is black letter law that in a diversity action such as this, state substantive law applies." Contri v. Yellow Freight Sys., Inc., 92 Civ. 2603, 1996 WL 87237 at *2 (S.D.N.Y. Feb. 29, 1996) (Peck, M.J.) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938)); accord, e.g., Checkrite Ltd. v. Ill. Nat. Ins. Co., 95 F. Supp. 2d 180, 188 (S.D.N.Y. 2000).  Here, the Bison-ATP contract provides that it is "governed by and construed in accordance with the laws of the State of New York."  (Dkt. No. 6: Am. Compl. Ex. 2: Bison-ATP Contract ¶ 10.)  As the Second Circuit has stated, "the parties agree that New York substantive law governs . . . and 'where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.'" Texaco A/S (Denmark) v. Commercial Ins. Co., 160 F.3d 124, 128 (2d Cir. 1998) (quoting Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997)); accord, e.g., Bellis v. Tokio Marine & Fire Ins. Co., 93 Civ. 6549, 2002 WL 193149 at *13 n.20 (S.D.N.Y. Feb. 7, 2002).[6]

---

[6]    See also, e.g., Herzfeld v. JPMorgan Chase Bank, N.A., 354 Fed. Appx. 488, 489 (2d Cir. 2009); British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 81 (2d Cir. 2003) ("The parties agree that New York law governs this diversity case; their 'consent concludes the choice of law inquiry.'"); Stagl v. Delta Airlines, Inc., 52 F.3d 463, 467 (2d Cir. 1995); Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 n.5 (2d Cir. 1986), cert. denied, 480 U.S. 948, 107 S. Ct. 1608 (1987); Printers II, Inc. v. Prof'l Publ'g, Inc., 784 F.2d 141, 146 n.6 (2d Cir. 1986); Colon v. U.S. Liab. Ins. Group, No. 06-CV-5422, 2009 WL 2413646 at *2 (E.D.N.Y. Aug. 6, 2009); IBS, Inc. v. Banco Exterior De Espana, Ltd., 98 Civ. 6487, 2001 U.S. Dist. LEXIS 23505 at *8 n.2 (S.D.N.Y. Jan. 12, 2001); Norfolk S. Ry. v. Flexi-Van Leasing, Inc., 99 Civ. 0055, 2000 WL 1855112 at *5 n.1 (S.D.N.Y. Dec. 18, 2000); Checkrite Ltd. v. Ill. Nat. Ins. Co., 95 F. Supp. 2d at 188; ABC Radio Network, Inc. v. Lens Am., Inc., 97 Civ. 9467, 1999 WL 771360 at *2 (S.D.N.Y. Sept. 28, 1999); Air Support Int'l, Inc. v. Atlas Air, Inc., 54 F. Supp. 2d 158, 165 (E.D.N.Y. 1999);  Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F. Supp. 2d 183, 189 (S.D.N.Y. 1999) (Stein, D.J. & Peck, M.J.).

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.'  Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous."  <u>Alexander & Alexander Servs., Inc.</u> v. <u>These Certain Underwriters at Lloyd's</u>, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted); <u>accord</u>, <u>e.g.</u>, <u>W.W.W. Assoc., Inc.</u> v. <u>Giancontieri</u>, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."); <u>Sutton</u> v. <u>E. River Sav. Bank</u>, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462 (1982) ("the threshold decision on whether a writing is ambiguous is the exclusive province of the court").[7]

"It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence."  <u>Feifer</u> v. <u>Prudential Ins. Co.</u>, 306 F.3d 1202, 1210 (2d Cir. 2002); <u>accord</u>, <u>e.g.</u>, <u>Rosenblatt</u> v. <u>Christie</u>,

---

[7]     See, <u>e.g.</u>, <u>Law Debenture Trust Co.</u> v. <u>Maverick Tube Corp.</u>, 595 F.3d 458, 465 (2d Cir. 2010); <u>JA Apparel Corp.</u> v. <u>Abboud</u>, 568 F.3d 390, 396-97 (2d Cir. 2009); <u>Am. Home Assurance Co.</u> v. <u>Hapag Lloyd Container Linie, GmbH</u>, 446 F.3d 313, 316 (2d Cir. 2006); <u>Augienello</u> v. <u>Coast-to-Coast Fin. Corp.</u>, 64 Fed. Appx. 820, 821-22 (2d Cir. 2003) (citing <u>Int'l Multifoods Corp.</u> v. <u>Commercial Union Ins. Co.</u>, 309 F.3d 76, 83 (2d Cir. 2002)); <u>Lucente</u> v. <u>Int'l Bus. Mach. Corp.</u>, 310 F.3d 243, 257 (2d Cir. 2002); <u>Mellon Bank</u> v. <u>United Bank Corp.</u>, 31 F.3d 113, 115 (2d Cir. 1994); <u>Norfolk S. Ry.</u> v. <u>Flexi-Van Leasing, Inc.</u>, 2000 WL 1855112 at *5; <u>Checkrite Ltd.</u> v. <u>Ill. Nat. Ins. Co.</u>, 95 F. Supp. 2d at 188-89; <u>ABC Radio Network, Inc.</u> v. <u>Lens Am., Inc.</u>, 1999 WL 771360 at *2; <u>Air Support Int'l, Inc.</u> v. <u>Atlas Air, Inc.</u>, 54 F. Supp. 2d at 165; <u>see also</u>, <u>e.g.</u>, <u>Commercial Union Ins. Co.</u> v. <u>Flagship Marine Servs., Inc.</u>, 190 F.3d 26, 33 (2d Cir. 1999); <u>Haber</u> v. <u>St. Paul Guardian Ins. Co.</u>, 137 F.3d 691, 695 (2d Cir. 1998); <u>Sayers</u> v. <u>Rochester Tel. Corp.</u>, 7 F.3d 1091, 1094 (2d Cir. 1993); <u>Seiden Assoc., Inc.</u> v. <u>ANC Holdings, Inc.</u>, 959 F.2d 425, 429 (2d Cir. 1992); <u>First Indem. of Am. Ins. Co.</u> v. <u>Shinas</u>, 03 Civ. 6634, 2009 WL 3154282 at *5 (S.D.N.Y. Sept. 30, 2009); <u>Berman</u> v. <u>Parco</u>, 986 F. Supp. 195, 209 (S.D.N.Y. 1997) (Wood, D.J. & Peck, M.J.); <u>EJS-ASOC Ticaret ve Danismanlik Ltd.</u> v. <u>AT&T</u>, 886 F. Supp. 331, 334 (S.D.N.Y. 1994); <u>Chase Manhattan Bank, N.A.</u> v. <u>Keystone Distrib. Inc.</u>, 873 F. Supp. 808, 811 (S.D.N.Y. 1994).

Manson & Woods, Ltd., 195 Fed. Appx. 11, 12 (2d Cir. 2006) ("Where, as here, a contract is

unambiguous, it is enforced according to its terms, and the court will generally not look 'outside the

four corners of the document' to add to or vary it."); United States v. Liranzo, 944 F.2d 73, 77 (2d

Cir.1991); Crowley v. VisionMaker, LLC, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007); S. N.J. Rail

Group, LLC v. Lumbermens Mut. Ins. Co., 06 Civ. 4946, 2007 WL 2296506 at *7 & n.9 (S.D.N.Y.

Aug. 13, 2007) (Peck, M.J.) (& cases cited therein); R/S Assoc. v. N.Y. Job Dev. Auth., 98 N.Y.2d

29, 33, 744 N.Y.S.2d 358, 360 (2002) ("Unless the court finds ambiguity, the rules governing the

interpretation of ambiguous contracts do not come into play.   Thus, when interpreting an

unambiguous contract term [e]vidence outside the four corners of the document . . . is generally

inadmissible to add to or vary the writing.  [E]xtrinsic and parol evidence is not admissible to create

an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.")

(ellipsis & brackets in original, citations & quotations omitted) (quoting W.W.W. Assoc. Inc. v.

Giancontieri, 77 N.Y.2d at 162-63, 565 N.Y.S.2d at 443); Weissman v. Sinorm Deli, Inc., 88 N.Y.2d

437, 447, 646 N.Y.S.2d 308, 313 (1996) ("[W]hen parties set down their agreement in a clear,

complete document, evidence outside the four corners of the document as to what was actually

intended is generally inadmissible.").

          Where a contract's language is clear and unambiguous, a court may dismiss a breach

of contract claim on a Rule 12(b)(6) motion to dismiss.  See, e.g., Advanced Mktg. Group, Inc. v.

Bus. Payment Sys., LLC, 300 Fed. Appx. 48, 49 (2d Cir. 2008) ("'[J]udgment as a matter of law is

appropriate if the contract language is unambiguous.'"); Rounds v. Beacon Assoc. Mgmt. Corp., 09

Civ. 6910, 2009 WL 4857622 at *3 (S.D.N.Y. Dec. 14, 2009) ("'Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss.'"); Wurtsbaugh v. Banc of Am. Sec. LLC, 05 Civ. 6220, 2006 WL 1683416 at *5 (S.D.N.Y. June 20, 2006) ("'[I]f an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms,' and a breach of contract claim may be dismissed on a Rule 12(b)(6) motion.") (quoting Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004)).

However, "'when the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal" on a Rule 12(b)(6) motion. Crowley v. VisionMaker, LLC, 512 F. Supp. 2d at 152; accord, e.g., Psenicska v. Twentieth Century Fox Film Corp., 07 Civ. 10972, 08 Civ. 1571, 08 Civ. 1828, 2008 WL 4185752 at *4 (S.D.N.Y. Sept. 3, 2008) ("Where there are alternative, reasonable interpretations of a contract term rendering it ambiguous, the issue should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss."); Wurtsbaugh v. Banc of Am. Sec. LLC, 2006 WL 1683416 at *5 ("Where a contract term is ambiguous and material to the breach of contract claim, the claim may not be dismissed for failure to state a claim."); see also, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. & Trust Co., 375 F.3d at 178 ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissable on the pleadings."). In other words, while a court is not "obliged to accept the allegations of the complaint

as to how to construe" a contract, it "should resolve any contractual ambiguities in favor of the plaintiff" on a motion to dismiss. Subaru Distrib. Corp. v. Subaru of Am., Inc.,425 F.3d 119, 122 (2d Cir. 2005); accord, e.g., Gerritsen v. Glob Trading, Inc., No. 06-CV-3756, 2009 WL 262057 at *4 (E.D.N.Y. Feb. 4, 2009) ("Where, as here, a court is determining whether a plaintiff has adequately stated a cause of action for breach of contract, all contractual ambiguities should be resolved in favor of the plaintiff."); D.C. USA Operating Co. v. Indian Harbor Ins. Co., No. 07-CV-0116, 2007 WL 945016 at *8 (S.D.N.Y. Mar. 27, 2007) ("[W]hen considering a motion to dismiss, courts should resolve any contractual ambiguities in favor of the plaintiff without resorting to parol evidence.").

"Contract language is not ambiguous if it has a 'definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d at 1277 (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978)).[8] Conversely, a contract is ambiguous if it is reasonably susceptible to more than one meaning. E.g., Chimart Assoc. v. Paul, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346

---

[8]    Accord, e.g., Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d at 467; JA Apparel Corp. v. Abboud, 568 F.3d at 396; Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003) ("Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.") (internal quotations omitted); RJE v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003); Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996); Sayers v. Rochester Tel. Corp., 7 F.3d at 1095; Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d at 428; Norfolk S. Ry. v. Flexi-Van Leasing, Inc., 2000 WL 1855112 at *5; Checkrite Ltd. v. Ill. Nat. Ins. Co., 95 F. Supp. 2d at 189; ABC Radio Network, Inc. v. Lens Am., Inc., 1999 WL 771360 at *3; Air Support Int'l, Inc. v. Atlas Air, Inc., 54 F. Supp. 2d at 165.

(1986) (to determine if ambiguity exists in contract court must determine "whether the agreement on its face is reasonably susceptible of more than one interpretation"); Angelino v. Freedus, 69 A.D.3d 1203, 1206, 893 N.Y.S.2d 668, 671 (3d Dep't 2010) ("'A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion.'"); Fernandez v. Price, 63 A.D.3d 672, 675, 880 N.Y.S.2d 169, 173 (2d Dep't 2009); St. Mary v. Paul Smith's Coll. of Arts & Sciences, 247 A.D.2d 859, 859, 668 N.Y.S.2d 813, 813 (4th Dep't 1998); Hutzel v. U.S. Aviation Underwriters, Inc., 132 A.D.2d 45, 49, 522 N.Y.S.2d 301, 303 (3d Dep't 1987) ("an ambiguity exists . . . when a term 'is capable of more than one meaning'"), appeal denied, 71 N.Y.2d 804, 528 N.Y.S.2d 829 (1988); see, e.g., JA Apparel Corp. v. Abboud, 568 F.3d at 396-97; Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987) ("An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."); Health-Chem Corp. v. Baker, 737 F. Supp. 770, 773 (S.D.N.Y. Feb. 26, 1990) ("[A] term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement. . . .'"), aff'd, 915 F.2d 805 (2d Cir. 1990).[9]

---

[9]     See also, e.g., Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d at 466 ("An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"); Parks Real Estate
(continued...)

Clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations.  E.g., Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93 ("Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact."), aff'd, 2 N.Y.2d 456, 161 N.Y.S. 2d 90 (1957); Slattery Skanska Inc. v. Am. Home Assurance Co., 67 A.D.3d 1, 14, 885 N.Y.S.2d 264, 274 (1st Dep't 2009) ("That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not

---

9/      (...continued)
Purchasing Group v.  St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) ("An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (internal quotations omitted); United Air Lines, Inc. v. Ins. Co. of the State of Pa., 439 F.3d 128, 134 (2d Cir. 2006) (A contract "is ambiguous when it is reasonably susceptible to more than one reading.") (internal quotations omitted); Liberty Surplus Ins. Corp. v.  The Segal Co., 142 Fed. Appx. 511, 513 (2d Cir. 2005); Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005) ("An ambiguous term is one that is reasonably susceptible to more than one reading, or one as to which reasonable minds could differ."); Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d at 86; Sayers v. Rochester Tel. Corp., 7 F.3d at 1095; Goodheart Clothing Co. v. Laura Goodman Enter., Inc., 962 F.2d 268, 272 (2d Cir. 1992); Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d at 428; Norfolk S. Ry. v. Flexi-Van Leasing, Inc., 2000 WL 1855112 at *5; Checkrite Ltd. v. Ill. Nat. Ins. Co., 95 F. Supp. 2d at 189; Berman v. Parco, 986 F. Supp. at 209 & n.9 (citing cases); Lipari v. Maines Paper & Food Serv., Inc., 245 A.D.2d 1085, 1085, 667 N.Y.S.2d 548, 549 (4th Dep't 1997); Levey v. A. Leventhal & Sons, Inc., 231 A.D.2d 877, 877, 647 N.Y.S.2d 597, 597 (4th Dep't 1996); Arrow Commc'n Labs., Inc. v. Pico Prods., Inc., 206 A.D.2d 922, 922-923, 615 N.Y.S.2d 187, 188 (4th Dep't 1994); Am. Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("A contract should be construed so as to give full meaning and effect to all of its provisions."), appeal denied, 77 N.Y.2d 807, 569 N.Y.S.2d 611 (1991).

render the term ambiguous."); <u>Moore</u> v. <u>Kopel</u>, 237 A.D.2d 124, 125, 653 N.Y.S.2d 927, 929 (1st

Dep't 1997) ("[A] contract is not rendered ambiguous just because one of the parties attaches a

different, subjective meaning to one of its terms."); <u>see</u>, <u>e.g.</u>, <u>Law Debenture Trust Co.</u> v. <u>Maverick

Tube Corp.</u>, 595 F.3d at 467; <u>JA Apparel Corp.</u> v. <u>Abboud</u>, 568 F.3d at 396; <u>Aetna Cas. & Sur. Co.</u>

v. <u>Aniero Concrete Co.</u>, 404 F.3d 566, 598 (2d Cir. 2005) ("[T]he language of a contract is not made

ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where

one party's view strain[s] the contract language beyond its reasonable and ordinary meaning.")

(quotations omitted); <u>Photopaint Techs., LLC</u> v. <u>Smartlens Corp.</u>, 335 F.3d at 160 ("Unambiguous

contract language is not rendered ambiguous by competing interpretations of it urged in

litigation.").[10]/

---

[10]/     See also, e.g., <u>Sayers</u> v. <u>Rochester Tel. Corp.</u>, 7 F.3d at 1095; <u>Seiden Assoc., Inc.</u> v. <u>ANC
         Holdings, Inc.</u>, 959 F.2d at 428; <u>Metro. Life Ins. Co.</u> v. <u>RJR Nabisco, Inc.</u>, 906 F.2d 854, 889
         (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely
         because the parties urge different interpretations in the litigation."); <u>Hunt Ltd.</u> v. <u>Lifschultz
         Fast Freight, Inc.</u>, 889 F.2d at 1277; <u>CDR-Wantagh, Inc.</u> v. <u>Shell Oil Co.</u>, No. 07-CV-4497,
         2009 WL 936672 at *7 (E.D.N.Y. Mar. 31, 2009); <u>In re Delta Air Lines, Inc.</u>, 05 Civ. 17923,
         07 Civ. 7745, 07 Civ. 11437, 08 Civ. 2411, 08 Civ. 2449, 08 Civ. 6879, 2008 WL 4444001
         at *5 (S.D.N.Y. Sept. 29, 2008); <u>Norfolk S. Ry.</u> v. <u>Flexi-Van Leasing, Inc.</u>, 2000 WL
         1855112 at *6; <u>Checkrite Ltd.</u> v. <u>Ill. Nat. Ins. Co.</u>, 95 F. Supp. 2d at 189; <u>ABC Radio
         Network, Inc.</u> v. <u>Lens Am., Inc.</u>, 1999 WL 771360 at *3; <u>Air Support Int'l, Inc.</u> v. <u>Atlas Air,
         Inc.</u>, 54 F. Supp. 2d at 165-66; <u>Berman</u> v. <u>Parco</u>, 986 F. Supp. at 210; <u>EJS-ASOC Ticaret</u> v.
         <u>AT&T</u>, 886 F. Supp. at 334; <u>Chase Manhattan Bank, N.A.</u> v. <u>Keystone Distrib., Inc.</u>, 873 F.
         Supp. at 811; <u>Broadway Nat'l Bank</u> v. <u>Progressive Cas. Ins. Co.</u>, 775 F. Supp. 123, 126
         (S.D.N.Y. 1991), <u>aff'd</u>, 963 F.2d 1522 (2d Cir. 1992); <u>Health-Chem Corp.</u> v. <u>Baker</u>, 737 F.
         Supp. at 773.

### III.   ATP'S MOTION TO DISMISS SHOULD BE DENIED

ATP argues that Bison's complaint should be dismissed because: (1) paragraph seven of the contract is "unambiguous . . . that the cut-off for Bison to receive compensation under Paragraph 2 can be no later than the 12-month tail after the termination, *i.e.*, not later than April 1, 2005, the expiration date" (Dkt. No. 12: ATP Br. at 8); and (2) Bison provided no services in connection with Capital Transactions after April 1, 2005.  (ATP Br. at 10-12).

With respect to ATP's argument that the contract only requires it to pay Bison for Capital Transactions occurring before April 1, 2005, this Court holds that, at the very least, the contract is ambiguous.  Paragraph 2 provides that ATP must pay Bison a fee for each Capital Transaction consummated with an investment or commercial bank "approached by Bison on behalf of ATP."  (Dkt. No. 6: Am. Compl. Ex. 2: Bison-ATP 2/1/04 Contract ¶ 2, quoted at page 5 above.)  Paragraph 2 does not limit the time frame.  (See Bison-ATP 2/1/04 Contract ¶ 2.)  Nevertheless, ATP argues that paragraph seven "cut[s] off" fees after April 1, 2005.  (ATP Br. at 8-9.)  Paragraph seven states:

> Bison shall be entitled to the fees set forth in Paragraph 2 above <u>in the event</u> [ATP] consummates or enters into an agreement or arrangement providing for <u>a</u> Capital Transaction . . . at any time within twelve months following termination of this Agreement; <u>and no termination of Bison's engagement hereunder shall affect [ATP's] obligation to pay fees and expenses to the extent provided for herein</u> . . . .

(Bison-ATP 2/1/04 Contract ¶ 7, emphasis added.)  Resolving any ambiguities of this paragraph in Bison's favor for purposes of the motion to dismiss (see cases cited at pages 15-16 above), this paragraph only requires ATP to enter into "a" Capital Transaction (with a funding source found by Bison) prior to April 1, 2005 in order for Bison to be entitled to the fees described in paragraph 2

(i.e. payment for each Capital Transaction that ATP consummates with a bank "approached by Bison on behalf of ATP").   Nowhere does paragraph seven state that Bison <u>only</u> is entitled to fees for Capital Transactions occurring before April 1, 2005.   Rather, paragraph seven can reasonably be interpreted, as Bison argues, to merely "establish[] a 'triggering event' after which Bison becomes entitled to its continuing compensation under Paragraph 2."  (Dkt. No. 24: Bison Opp. Br. at 19-20.) Paragraph seven's language that the contract's termination "shall [not] affect [ATP's] obligation to pay fees and expenses" (Bison-ATP 2/1/04 Contract ¶ 7) provides further support for Bison's "trigger event" theory, which is consistent with Bison's argument that the parties intended for Bison to find ATP a long term funding source, and for Bison to be compensated for all transactions involving that source.[11]

---

[11]    ATP cites <u>Phoenix Capital Inv. LLC</u> v. <u>Ellington Mgmt. Group, L.L.C.</u>, 51 A.D.3d 549, 859 N.Y.S.2d 46 (1st Dep't 2008), and <u>Peter J. Solomon Co.</u> v. <u>Oneida Ltd.</u>, 09 Civ. 2229, 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010) (Chin, D.J.), to support its argument that paragraph seven "cut[s] off" ATP's duty to pay Bison fees.  (ATP Br. at 8-9.)  ATP's reliance on these cases is misplaced.

   In <u>Phoenix</u>, hedge fund Ellington Management Group retained Phoenix to introduce prospective investors to Ellington.  (Dkt. No. 25: Gutchess Aff. Ex. 11: Phoenix-Ellington 2/11/00 Contract at 1.)  The contract stated:

        In consideration for [Phoenix's] services, Ellington will pay Phoenix fees ("Fees") for all investments accepted by [Ellington] from investors contacted pursuant to this Agreement . . . ; provided, however, no Fee shall be paid with respect to . . . any investor whose first Investment is made later than one year after [Ellington's personnel] have made their last contact with that investor on behalf of Ellington.

   (Phoenix-Ellington 2/11/00 Contract at 2, emphasis omitted.)  Phoenix contacted an investor, but the investor did not invest with Ellington until two years after the contractual trigger date. <u>Phoenix Capital Inv. LLC</u> v. <u>Ellington Mgmt. Group, L.L.C.</u>, 51 A.D.3d at 550, 859 N.Y.S.2d at 48.  Phoenix nevertheless sued for fees based on that investment.  <u>Phoenix</u> (continued...)

ATP's argument that interpreting paragraph seven as providing a "trigger event" that would impose a "'continuing' or 'perpetual' duty [on] ATP" to pay fees to Bison would be absurd and commercially unreasonable (ATP Br. at 9; Dkt. No. 28: ATP Reply Br. at 3-4), is unavailing because, to the extent the contract's language is susceptible to Bison's interpretation (and it is so

_____

11/     (...continued)
Capital Inv. LLC v. Ellington Mgmt. Group, L.L.C., 51 A.D.3d at 549-50, 859 N.Y.S.2d at 47-48.  The First Department dismissed Phoenix's claim for fees because the contract "made clear that plaintiff was entitled to a fee for bringing defendant and prospective investors together only if the actual investment was made within one year of . . . the last contact between plaintiff and a particular investor on defendant's behalf."  Phoenix Capital Inv. LLC v. Ellington Mgmt. Group, L.L.C., 51 A.D.3d at 549-50, 859 N.Y.S.2d at 48.

In ATP's situation, unlike Phoenix, Bison introduced an investment bank, CSFB, to ATP, and it is undisputed that CSFB provided ATP with financing during the initial contract period and the tail period.  (See page 6 above.)  The Bison-ATP contract (paragraphs 2 and 7) can be read to require continuing fees even after the tail period, so long as the Bison-found financing entity CSFB continued to fund Capital Transactions for ATP, and that is a very different contract than Phoenix, and it requires a different result on the motion to dismiss.

Likewise, Peter J. Solomon Co. is inapplicable.  First and foremost, Judge Chin's decision was not on a motion to dismiss, but a review of the Bankruptcy Court's decision after trial.  Peter J. Solomon Co., L.P. v. Oneida Ltd.,2010 234827 at *3.  Second, the Peter J. Solomon contract provided that Oneida was hiring Solomon on a "month-to-month basis" to help Oneida engage in a "Restructuring Transaction."  (Gutchess Aff. Ex. 10: 5/1/04 Solomon-Oneida Contract at page 1 & ¶¶ 1, 6.)  To avoid cancellation (and elimination of fees) right before such a transaction occurred, the contract provided for a fee if the transaction occurred within a year of the contract's termination.  (Id. ¶ 6.)  Oneida entered into a Restructuring Transaction in 2004 and paid Solomon's fee.  Peter J. Solomon Co., L.P. v. Oneida Ltd., 2010 Wl 234827 at *1-2.  The Court found that since the contract contemplated a single transaction, the 2004 Restructuring terminated the contract.  Id., 2010 WL 234827 at *3-4.  The Court held that a subsequent financial transaction, using a different investment banker and a different funding source than the one found by Solomon, did not trigger additional fees.  Id.  Here, in contrast, the Bison-ATP contract contemplated numerous transactions, the additional Capital Transactions for which Bison seeks fees were with the funding source, CSFB, that Bison found for ATP, and this is a motion to dismiss, not a post-trial motion.  Solomon is of no help to ATP on this motion.

susceptible), any decision as to the result being absurd or commercially unreasonable cannot be made by the Court on a motion to dismiss.

     With respect to ATP's argument that Bison had to provide a service for each Capital Transaction in order to receive fees for that Capital Transaction (ATP Br. at 10-12), this Court agrees with Bison that nothing in the contract supports ATP's interpretation.  Paragraph 2(b) only ties Bison's compensation to whether Bison "approached" the commercial bank on ATP's behalf prior to the consummation of the Capital Transaction; nowhere does paragraph 2(b) state that Bison must provide a service for each Capital Transaction in order to receive its fee.  (See Bison-ATP 2/1/04 Contract ¶ 2(b), quoted at page 5 above.)  Notably, as Bison aptly points out (Bison Br. at 18-19), paragraph 2(d) requires Bison to "advise[] or assist[]" ATP in order to receive a fee for a "Transaction," while paragraphs (2)(b) and (2)(c) dealing with Capital Transactions do not contain any such language.  (See Bison-ATP 2/1/04 Contract ¶¶ 2(b)-(d), quoted at page 5 above.)[12]

## CONCLUSION

     For the reasons stated above, ATP's motion to dismiss (Dkt. No. 10) should be DENIED.

---

[12]    Despite the lack of language demonstrating an intent by the parties to require Bison to perform a service for each Capital Transaction, ATP argues that paragraph eight supports its interpretation. (ATP Br. at 11-12.) ATP points to paragraph eight's language that Bison may announce or advertise that it "acted as a financial advisor to [ATP] in connection with" a Capital Transaction and that Bison may use ATP's trademarks, symbols or logos on public record or tombstone announcements "in relation to" a Capital Transaction.  (Bison-ATP 2/1/04 Contract ¶ 8, quoted at pages 5-6 above; ATP Br. at 11-12.)  Contrary to ATP's argument, paragraph eight does not demonstrate any intent to limit ATP's duty to pay Bison fees to only those Capital Transactions for which Bison advised and assisted ATP. Paragraph eight merely provides an additional right for Bison (i.e., promotion) unrelated to fees.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Stein (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:          New York, New York
                June 24, 2010

                                        Respectfully submitted,

                                        _____
                                        Andrew J. Peck
                                        United States Magistrate Judge

Copies to:      Jeffrey W. Gutchess, Esq.
                Gerald G. Paul, Esq.
                Edward J. Murphy, Esq.
                Judge Sidney H. Stein