UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X
                                                            :
BISON CAPITAL CORPORATION,                                  :
                                                            :
                          Plaintiff,                        :   10 CV 714 (SHS) (AJP)
                                                            :
          -against-                                         :
                                                            :
ATP OIL & GAS CORPORATION,                                  :
                                                            :
                          Defendant.                        :
                                                            :
----------------------------------------------------------- X


### DEFENDANT ATP OIL & GAS CORPORATION'S POST-TRIAL BRIEF

Edward J. Murphy, Esq.
Brit T. Brown, Esq.
Benjamin A. Escobar, Jr., Esq.
David A. Walton, Esq.
BEIRNE, MAYNARD & PARSONS, LLP
1300 Post Oak Boulevard, Suite 2500
Houston, Texas 77056
Tel:  (713) 623-0887

-and-

Gerald G. Paul, Esq.
Lissa C. Gipson, Esq.
FLEMMING ZULACK
  WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York  10006
Tel: (212) 412-9500

*Attorneys for Defendant*
*ATP Oil & Gas Corporation*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................iv

PRELIMINARY STATEMENT......................................................................................1

THE ISSUES ...................................................................................................................1

RELEVANT FACTS .......................................................................................................2

1.  Pre-January 31, 2004 – ATP's Financial Distress ............................................2

2.  January 31, 2004 – ATP Retains Bison ...........................................................3

3.  February 2-6, 2004 – The Due Diligence Completed By Bison.........................4

4.  February 6-11, 2004 – CSFB's Initial Involvement .........................................5

5.  February 11-15, 2004 – The Services Agreement ............................................6

6.  February 15-16, 2004 – Execution Of The Services Agreement.......................8

7.  March 29, 2004 – The First Financing Transactions Between ATP And CSFB ...............8

8.  September 24, 2004 – The Second Financing Transactions Between ATP And CSFB.......................................................................................................9

9.  October 15, 2004 – Bison's Demand For Additional "Transaction Advisory Fees" .........9

10. January 20, 2005 – Bison's Threat Of Litigation ...........................................12

11. April 14, 2005 – The Third Financing Transactions Between ATP And CSFB .............12

12. The Services Agreement Contained A "Tail" Provision That Limited The Time Period In Which Bison Was Entitled To A Fee.............................................13

ARGUMENT..................................................................................................................14

1.  The First Issue Is Whether The Agreement Is Ambiguous...............................14

    A.  Bison Was Required To Provide A Service To Receive A Paragraph 2(B) Fee........................................................................................................15

    B.  Paragraph 7 Is A "Tail", Not A Trigger...............................................16

       i.     Paragraph 1 Supports Interpretation That Paragraph 7 Has A "Tail", Not A Trigger. .............................................................. 17

       ii.    The Surrounding Circumstances Indicate That ATP Wanted A "Tail", Not A Trigger. .............................................................. 18

       iii.   Industry Custom And Usage Demonstrate That Paragraph 7 Was A "Tail". ..................................................................................... 19

   C.    Fees Under Paragraph 2(B) Are Only Due On New Money. .............. 19

   D.    Arrangements Can Only Refer To Lender Commitments Or Lending Agreements. ........................................................................................ 20

2.     Appropriate Relief ....................................................................................... 21

REQUESTED RELIEF .................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airco Alloys v. Niagara Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179 (4th Dep't 1980)................... 15

*Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 141 N.E.2d 590, 161 N.Y.S.2d 90 (1957)................................................................................................ 14

*Gerlach v. The Horn & Hardart Co.*, 683 F. Supp. 342 (S.D.N.Y. 1988) ..................................... 7

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274 (2d Cir. 1989).................................... 14

*Jacobson v. Sassower*, 66 N.Y.2d 991, 489 N.E.2d 1283, 499 N.Y.S.2d 381 (1985)................... 7

*Merritt Assocs., Inc. v. Scollard*, 161 A.D.2d 502, 555 N.Y.S.2d 771 (1st Dep't 1990) ............. 19

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435 (2d Cir. 1995) ........................................ 14

*Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp.2d 155 (S.D.N.Y. 2007)............................ 1

*SR Intern. Business Ins. v. World Trade Center*, 467 F.3d 107 (2d Cir. 2006) .......................... 17

*Suburban Tool & Die Co., Inc. v. Century Mold Co., Inc.*, 78 A.D.3d 1530, 911 N.Y.S.2d 746 (4th Dep't 2010)................................................................................ 15

*UBS Securities LLC v. Red Zone LLC*, 77 A.D.3d 575, 910 N.Y.S.2d 55 (1st Dep't 2010)........ 15

*V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188 (S.D.N.Y. 1994)................................ 1

*Westchester Resco Co., LP v. New England Reinsurance Corp.*, 818 F.2d 2 (2d Cir. 1987)......... 6

ATP Oil and Gas Corp. ("ATP") submits this post-trial brief to supplement its proposed findings of fact and conclusions of law filed with the Court on January 10, 2011 (Dkt. No. 82) (incorporated herein by reference).

## PRELIMINARY STATEMENT

Bison Capital Corporation ("Bison") claims that ATP breached the Services Agreement, "at earliest, September, 24, 2004" by refusing to pay Bison "its appropriate fee[s]" for the various financing transactions between ATP and CSFB or its affiliate that were consummated between September 24, 2004 and January 29, 2010. (Pl.'s Resp. to Rule 12(b)(6) Motion (Dkt. No. 24), at p. 11, n. 8; Pl.'s 1st Am. Compl. (Dkt. No. 6), at pp. 83-90, ¶¶ 311, 316, 321, 326, 331, 336, 341, 346, 351, 356, 361, 366, 371.)   Bison bears the burden of proving the material allegations in its amended complaint by a fair preponderance of the evidence. *See, e.g., V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994).

New York's substantive law required Bison to prove each of the following elements:  (1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach. *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp.2d 155, 160 (S.D.N.Y. 2007)).   Bison failed to present sufficient credible evidence to sustain its burden.   Specifically, Bison failed to demonstrate that it fully performed all of its obligations under the Services Agreement or that ATP breached the Services Agreement as pleaded by Bison.

## THE ISSUES

The evidence at trial raised the following issues of fact and law:

1.      Whether Paragraphs 1, 2(b) and/or 7 of the Services Agreement are ambiguous and, if so, what ATP, as the promisor, intended to promise Bison, the promisee.

2.     Whether the Services Agreement required Bison to advise and assist ATP in connection with the transaction on which Bison sought compensation pursuant to Paragraph 2(b) of the Services Agreement.

3.     Whether Paragraph 7 of the Services Agreement contains a "tail" provision that limits the time period during which Bison could claim compensation pursuant to Paragraph 2(b).

4.     Whether the parties intended fees under Paragraph 2(b) be calculated based on financing transactions that only amended the terms of existing debt, or only on debt that resulted in an advance of additional funds to ATP.

**RELEVANT FACTS**

**1.     Pre-January 31, 2004 – ATP's Financial Distress**

In August 2003, ATP entered into a lending agreement with Ableco Finance LLC ("Ableco").   (Tr. of Trial dated January 18, 2011 to January 21, 2011 ["Tr."] at 336:20-22.) Ableco and ATP anticipated that natural gas prices would remain at current levels and that ATP's revenues would be bolstered by production of natural gas from ATP's Hellvelyn field in the North Sea.  (Tr. at 336:23-338:16; 340:15-341:6; Def. Ex. 15.)  These assumptions proved too optimistic.  (*Id.*)  ATP encountered problems with the first well in Hellvelyn field, requiring expensive remedial measures and delaying production by months.  (*Id.*)  ATP's finances suffered additional pressure because the price of natural gas declined.  (*Id.*)

With its finances strained, ATP could not comply with certain financial covenants in its lending agreement with Ableco.  (Tr. at 341:17-344:4.)  Ableco and ATP addressed the situation by negotiating two amendments (in November and December 2003 and February 2004) to the lending agreement.  (*Id.*)  The amendments waived compliance with certain covenants, increased ATP's line of credit, and extended the maturity date on certain payments of principal.  (Def. Ex. 15 at pp. 69-70.)

The amendments did not ameliorate ATP's financial stress.  (Tr. at 345:22-348:13.) ATP's auditor, KPMG, LLP ("KMPG"), expressed concern that ATP's working capital in the first quarter of 2004 could prevent KMPG from providing an unqualified opinion in ATP's year-end financial statements.  (Tr. at 348:14-350:13.)  Albert L. Reese, Jr. ("Reese"), ATP's Chief Financial Officer, estimated that ATP needed a capital infusion of about $35 million to ensure that KPMG would give ATP an unqualified opinion.  (Tr. at 350:2-6.)

To resolve ATP's financial strain, Reese and Gerald W. Schlief ("Schlief"), Senior Vice President, searched for sources of a capital infusion.  Reese focused his efforts on locating a capital infusion of about $35 million.  Schlief searched for a capital infusion of $150 million or more to pay the loan to Ableco, because ATP found the terms of the agreement with Ableco too restrictive.  (Tr. at 351:11-352:4.)  The undisputed evidence demonstrated that ATP's goal was a capital infusion to address its concerns in the first quarter of 2004, not to locate a financing source that would facilitate repeat transactions many years into the future.  (Tr. at 351:17-352:4; 356:16-357:16; 388:2-6; 466:24-471:19.)

## 2.      January 31, 2004 – ATP Retains Bison

Schlief knew Edwin E. Wells, Jr. ("Wells"), Bison's principal, from meetings they had in late 2003, when Wells worked for Rothschild Inc. ("Rothschild").  Wells left Rothschild in January 2004 and called Schlief to offer the services of his new company, Bison.  (Tr. at 452:18-22.)  Between the first call to Schlief and January 31, 2004, when Bison agreed to assist ATP, Schlief and Wells discussed Bison's scope of work and its fees.

ATP wanted Bison's services to help it address the immediate need to raise the $35 million by March 31, 2004, and to raise $150 million, if possible, to pay-off the Abelco loan "so that we [ATP] would have time to really think through what we really wanted to do beyond that."  (Tr. at 351:17-352:4; 356:16-357:16; 388:2-6; 466:24-471:19.)  Bison claims that its

scope of work *was not* to negotiate and close a financial transaction, but rather to find ATP a source to finance ATP's growth for years to come. Setting aside whether any investment advisor could ever provide any company a permanent financing source, the parties ultimately agreed that Bison would advise concerning "potential financing alternatives" (not sources) and assist the company to negotiate and structure "potential financial transactions" (not locating a perpetual financing source). (Pl. Ex. 130 at ¶ 1(a).)

In their preliminary discussions, ATP and Bison talked about a monthly fee for the two months of service. They also talked about a fee calculated as a percentage of funds raised with Bison's help during the term of the Services Agreement or a "tail" period, which would allow Bison to claim the percentage-based fee for transactions that closed before expiration of the "tail" period. (Tr. at 453:6-454:16, 485:11-17.)

The parties, however, did not reach an agreement before Wells started work. Bison claimed it could not be more specific concerning its fees until it undertook more due diligence at ATP's offices. (Tr. at 74:16-75:4; 77:10-13.)

**3.      February 2-6, 2004 – The Due Diligence Completed By Bison**

Although the parties had not reached an agreement on fees, Bison started work on or about January 31, 2004. During the first week of February 2004, Bison performed due diligence on ATP. (Tr. at 95:2-22.) Put differently, Bison was already rendering advisory services without having an agreement concerning the terms of its compensation. (Tr. at 96:2-4.)

It was during this week of due diligence that Bison purportedly came up with its "Bison Plan" for ATP. (Tr. at 100:20-21; 273:10-274:10; 275:5-9.) Wells alleged that he formulated the Plan before the first meeting with ATP and Credit Suisse First Boston ("CSFB"), which occurred on February 11, 2004. The timing means that Wells allegedly developed the "Bison

Plan" before he and Schlief had signed the Services Agreement and before Wells had his alleged discussions with Schlief concerning a continuing fee.

ATP never saw or heard any description of a "Bison Plan." Indeed, Bison admitted that under most circumstances there would be a "document" detailing the "plan," but claimed here the circumstances required him to go without a written plan "like a surgeon in an emergency room." (Tr. at 100:20-101:25.) Bison proffered no evidence of a "plan" other than Wells's oral testimony, not even handwritten notes from before or after its "emergency room surgery"; it is implausible that Bison was able to perform extensive due diligence of ATP and then structure and implement an elaborate plan to save ATP from its "financial death bed" without taking a single "pre- or post-op" note.

**4.     February 6-11, 2004 – CSFB's Initial Involvement**

On February 6, 2004, after its due diligence on ATP, Wells contacted Thomas E. Hassen ("Hassen"), who was Co-Chairman, Co-Head, CSFB's Global Energy Group at the time. (Tr. at 103:11-14; 194:13-195:4; Pl. Ex. 144.)[1] Four days later, Wells met with Hassen in Houston, Texas. (Tr. at 105:16-24.) Bison claimed it first discussed the fundamental elements of the "Bison Plan" with CSFB at this initial dinner meeting, including the purported expectation for "multiple financings." (Tr. at 277:17-24; 279:13-17.) To the contrary, Hassen testified that Bison never provided any instruction or guidance to CSFB on how it should structure any financing transactions with ATP and that Bison at no time described to CSFB any "type of plan" or "Bison Plan" for the benefit of ATP. (Tr. at 327:22; Def. Ex. 32 at 87:14-25, 93:20-94:17.)

---

[1] At this time, Bison told CSFB and other banks on Exhibit A of the Services Agreement that Merrill Lynch was "eager" to consummate financing transactions with ATP (Pl. Ex. 144), presumably to motivate CSFB and other firms to act quickly allowing him to earn a fee.

In response, Bison relies only upon its new uncorroborated statement that it purportedly had disclosed the "Bison Plan" to Hassen's colleague at CSFB, Timothy Perry ("Perry") – a statement that would be seemingly easy for Bison to verify through sworn testimony of Perry, yet such testimony was tellingly absent.  (Tr. at 275:22-276:6.)  Bison's new uncorroborated statement is also at odds with CSFB's presentation to ATP in the meeting of February 11, 2004, during which CSFB described its experience and identified several capital transactions it had facilitated for companies similar to ATP.  (Pl. Ex. 146; Tr. at 106:14-25.)

Hassen's testimony about the February 11, 2004, meeting was that "[i]t was an extremely open discussion by the management of ATP."  (Tr. at 327:22; Def. Ex. 32 at 27:7-28:16.)  From there, CSFB had "various meetings" within the firm "to develop a plan" that CSFB "thought would be interesting for ATP."  (*Id.* at 35:13-36:4.)  There is no evidence that Bison was involved in these internal CSFB meetings and, in fact, Bison does not specifically dispute the testimony of Hassen that CSFB developed and structured the "plan" underlying the financing transactions that ATP and CSFB ultimately consummated.

**5.      February 11-15, 2004 – The Services Agreement**

On February 11, 2004, ATP received the initial draft of the Services Agreement from Bison.  (Tr. at 95:19-20; 116:5-7; 455:23-456:12; Pl. Exs. 127, 132.)  Bison apparently based the draft on a standard-form agreement used by Rothschild.[2]  (Tr. at 144:16-22; 195:10-12; Pl. Ex. 124; *see also* Tr. 327:22; Def. Ex. 31 at 10:9-14:10.)[3]  Although Schlief and Wells met with

---

[2] Peter M. Boukouzis ("Boukouzis"), who was the Vice President, Oil and Gas Group, of Rothschild during the relevant time period, could not recall any Rothschild financial advisory agreement interpreted to permit the "type of continuous fee" that Bison is seeking in this action, *e.g.*, one permitting fees for transactions beyond the tail period.  (Tr. at 327:22, Def. Ex. 31 at 11:9-12:19; 14:3-10.)

[3] Where an ambiguity exists in a standard-form contract, such as the Services Agreement, supplied by one of the parties, the well-established *contra proferentem* principle requires that the ambiguity be construed against that party.  *Westchester Resco Co., LP v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) (citing RESTATEMENT (SECOND) OF CONTRACTS § 206 & comment a (1981)) *Gerlach v. The Horn & Hardart Co.*, 683 F.

CSFB on February 11, 2004, they did not discuss the draft.  (Tr. at 458:17-21.)  In fact, from January 31, 2004 to February 11, 2004, the only discussions between ATP and Bison concerning compensation were about the 1% transaction fee and the $25,000 monthly fee.  (Tr. at 456:8-21.)  During this time, the parties had no further discussions concerning the scope of the services to be rendered by Bison under the Services Agreement.  (Tr. at 457:15-21.)

Over the next two days – before any financing transaction had been arranged, entered into or consummated between ATP and CSFB – Wells claimed he had specific "paragraph-by-paragraph" discussions with Schlief about "continuing compensation [to Bison]," the "continuing duty [of ATP] to pay fees ... after the 14 month period" and that ATP was "on the hook .. to pay continuing fees."  (Tr. at 198:13-201:22; 284:3-21.)  Schlief unequivocally denied Wells's allegations and testified that he and Wells never discussed the Services Agreement in detail.  Schlief testified that the only discussions between him and Wells concerned Schlief's request that the Agreement incorporate a "tail" and identify the firms that Wells would contact.  (Tr. at 453:6-21.)

On February 13, 2004, before Schlief signed the Services Agreement, ATP had a second meeting with CSFB and Wells.  (Tr. at 109:20-22; Pl. Ex. 146.)  During that meeting, CSFB discussed a permanent financing solution, which according to Hassen meant "something that wasn't callable in a short period of time similar to the Cerberus issuance."  This was the same view that Reese had concerning what was meant by a permanent solution.  (Tr. at 356:20-357:16; 327:22,  Def. Ex. 32 at 47:12-48:03.)  No one ever discussed with ATP "multiple" or "a bundle" of financing transactions over many years past the March 31, 2004 termination of the Services

---

Supp. 342, 344 (S.D.N.Y. 1988) (citing *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 499 N.Y.S.2d 381 (1985)).  Bison drafted the Services Agreement; therefore, any ambiguity in the Services Agreement must be resolved in ATP's favor and against Bison.

Agreement or the March 31, 2005 expiration of the "tail" provision. (Tr. at 327:22, Def. Ex. 32 at 93:20-94:17, 95:11-97:9; Tr. at 463:25-464:20; *see also* Tr. at 528:19-25.)

On that same day, February 13, 2004, Bison provided a revised draft of the Services Agreement to ATP. (Tr. at 118:1-15; Pl. Ex. 128.) From February 13, 2004 to the execution of the Services Agreement, Bison – contrary to its claims (Tr. at 124:5; 130:12-14) – did not discuss with ATP "the fees" it expected under the Services Agreement or any particular provision of the Services Agreement. (Tr. at 464:21-465:10; 486:5-7, 12-14; 487:15-16; *see also* Tr. at 360:5-18.) Consequently, at the conclusion of the day, the information before ATP was that CSFB was contemplating going to the market to solicit lenders for secured notes, not to serve as a financing source for years to come.

6.    **February 15-16, 2004 – Execution Of The Services Agreement**

While the exact date of execution is uncertain, it appears that on or about February 15 or 16, 2004, the parties executed the Services Agreement. (Tr. at 473:21-25; Pl. Ex. 130.) At that time, Bison had been rendering services to ATP for about two weeks without any written services agreement or meeting of the minds concerning Bison's compensation. (Tr. at 473:21-25.) Moreover, CSFB had already presented ATP a detailed description of the potential financing transactions it could facilitate – senior secured notes. (Pl. Ex. 146.) The proposal did not indicate that CSFB was planning to provide repeat transactions.

7.    **March 29, 2004 – The First Financing Transactions Between ATP And CSFB**

On March 29, 2004, six weeks after ATP was introduced to CSFB, ATP and CSFB consummated the First Lien Credit Agreement, which resulted in a loan totaling $150 million (Def. Ex. 19) and the Second Lien Credit Agreement, which resulted in a loan totaling $35 million (Def. Ex. 20). (Tr. at 362:17-24; 363:10-364:3.) Under these financing transactions, the lenders advanced $185 million to ATP when the transactions closed. (Tr. at 364:20-22.)

That same day, Wells was "upset" and "angry" because Bison had not received its 1% fee for these financing transactions, plus its monthly fees and out-of-pocket expenses for February and March, 2004.  (Tr. at 226:2-10; 475:11-24.)  Until this day, Bison had not complained or submitted any statement or invoice for its fees or out-of-pocket expenses.  (Tr. at 270:25-272:13.)

ATP told Bison that it needed an invoice for accounting purposes in order for Bison to be paid any fee.  (Tr. at 158:8-22; 475:11-24.)  In response, Bison provided ATP an invoice statement for its services in the amount of $1,937,987.20, which included: (a) $50,000 for the monthly fees for "financial advisory services" rendered during February and March, 2004; (b) $1,850,000 for the "transaction advisory fee" relating to the March 29, 2004 financing transactions; and (c) $37,987.20 for out-of-pocket expenses.  (Tr. at 476:4-8; Def. Ex. 8.)  On March 31, 2004, ATP paid the over $1.9 million to Bison.  (Tr. at 159:7-14; 364:4-7; 476:4-8.)  At this time, the credible evidence shows that there still had not been any discussion between Bison and ATP about being "on the hook" for future transactions with CSFB.  (Tr. at 476:9-16.)

## 8.   September 24, 2004 – The Second Financing Transactions Between ATP And CSFB

On September 24, 2004, under amendments to the March 29, 2004 financing transactions, ATP borrowed an additional $35 million from lenders with help from CSFB.  (Tr. at 161:8-12; 163:13-16; 364:25-365:12; Def. Ex. 29.)  ATP was only advanced the additional $35 million when the transactions closed.  (Tr. at 365:13-21, *see also* Tr. at 255:13-256:25.)  The transactions also involved modifications to financial covenants and the interest rate of the March 29, 2004 loans.

## 9.   October 15, 2004 – Bison's Demand For Additional "Transaction Advisory Fees"

After ATP closed the second transactions involving CSFB on September 24, 2004, Bison learned about the transactions "some days later."  (Tr. at 161:13-18.)  About a week after Bison

learned about it, Wells called Schlief to claim a right of payment of $2.2 million in connection with the September 24, 2004 financing transactions. (Tr. at 166:14-25; 477.) Wells was not "upset" and "angry" concerning payment as he was on March 29, 2004, when ATP did not pay him on the same day the first transactions closed. Instead, Wells was cordial and congratulatory while demanding payment on the September 24, 2004 financing transactions. (Tr. at 231:11-22.)

This was the first ATP had heard from Bison since March 29, 2004, with the exception of the closing dinner to celebrate the March 29, 2004 financing transactions. (Tr. at 230:22-25; 477:6-17.) Indeed, Schlief was surprised by Wells's phone call and claim to an additional $2.2 million fee and stated he would review the Services Agreement. (Tr. at 477:6-17; *see also* Tr. at 232:1-234:9.)

On October 15, 2004, Bison sent ATP a letter discussing its interpretation of the Services Agreement. (Tr. at 235:5-20; Pl. Ex. 190). The letter did not indicate that Bison was entitled to continuing compensation for every financing transaction consummated with CSFB or its affiliates. (Tr. at 480:24-481:16; Pl. Ex. 190.) In fact, the letter stated the contrary: it expressly recognized that the Services Agreement drafted by Bison limited its compensation to only the particular transactions that were consummated prior to April 1, 2005 – that is, prior to the expiration of the "tail" provision of the Services Agreement. (Pl. Ex. 190.) Bison recognized the existence of the "tail" in two separate paragraphs, stating in relevant part as follows:

> Thus, this CSFB refinancing is within the applicable time frame under the Engagement Agreement.
>
> \*   \*   \*
>
> ... since ATP's new financial arrangements were made by CSFB *prior to April 1, 2005*, Bison is entitled to be paid by ATP the additional 1% fee ...

(Pl. Ex. 190 at pp. 2, 4.)

Bison's tenuous explanation for the letter not being consistent with its current interpretation of the Services Agreement is that the letter was not intended to interpret the "tail" provision; instead, it was to take a clairvoyant-approach to stop ATP from purportedly "playing games" with Bison, although there is no evidence that any such "games" were being "played." (Tr. at 237:21, 25; 238:21; 239:10; 240:11; 241:23-242:9; 243:15-16; 244:3-245:5.)    Stated another way, Wells suggests that he anticipated that Schlief would tell him that Paragraph 7 of the Services Agreement was a "tail" and not a trigger.  This begs the question of why and the answer is clear:  Schlief asked for a "tail" and understood Paragraph 7 to serve as a "tail", not a trigger.  Thus, Wells knew how ATP understood the Services Agreement when he prepared the October 15, 2004 letter.

In addition, Bison attempts to side-step other "inconsistent" language it included in the letter, claiming it meant nothing by its interchangeable use of the words "arrangement" and "agreement."  (Tr. at 258:19-264:3.)  Bison claimed it "didn't need" to address its actual interpretation of the Services Agreement despite the fact that it was attempting to collect a $2.2 million fee under the terms of the agreement.  (Tr. at 308:9-309:16.)  There is not a single document in evidence that supports Bison's "after-the-fact" theory behind the October 15, 2004 letter.  The credible evidence shows that, prior to signing the Services Agreement, Bison did not have any discussions with ATP "about the difference, if any, between agreement and arrangement."  (Tr. at 475:6-9;  see also Tr. at 289:17-291:11.)  And ATP understood "agreement" and "arrangement" under the Services Agreement to be "essentially the same." (Tr. at 474:9-11.)

After the October 15, 2004 letter, Bison met with ATP to discuss payment of the $2.2 million. (Tr. at 248:7-22.)  At this meeting, Bison again did not discuss its claim of an obligation

for continuing compensation from ATP; rather, it discussed a "refinancing" issue raised by ATP. (*Id.*; *see also* Tr. at 285:3-23.)

ATP reviewed the Services Agreement to confirm its understanding that services were to be rendered by Bison in order for it to be entitled to a fee; it is undisputed that Bison never rendered these services. (Tr. at 477:23-478:20.) Regardless, in an effort to resolve the dispute, ATP offered to pay Bison "something more" – $350,000, an amount equal to 1% of the $35 million "new" money provided under the September 29, 2004 financing transactions. (Tr. at 169:4-13; 171:4-12; 251:16-252:3; 285:24-286:4; 378:11-379:21; 478:22-479:23, 502:2-6; Def. Ex. 29 .) Bison refused to accept this $350,000 offered by ATP. (Tr. at 252:14-16.)

10.    **January 20, 2005 – Bison's Threat Of Litigation**

In January, 2005, Bison hired attorneys in Houston to threaten litigation and "to take all steps necessary or appropriate to see that ATP pays the $2.2 million fee and expenses that ATP owes Bison." (Pl. Ex. 194.) This was Bison's "last shot, to see whether we could work something out before I had to commence litigation." (Tr. at 180:22-24.)

Bison did not "commence litigation" until five years later without sending a single invoice or communication to ATP concerning the financing transactions that occurred between April 1, 2005 and January, 2010; despite Wells's admission that "[i]f I [Bison] wanted to get paid I would follow up." (Tr. at 296:25-297:1.)

11.    **April 14, 2005 – The Third Financing Transactions Between ATP And CSFB**

On March 29, 2005, CSFB gave a "Lender Presentation" concerning ATP's desire to "amend[] the term loan facility [the September 24, 2009 financing transactions]" to $350 million. (Pl. Ex. 202 at p. 4.) On that same day, CSFB and ATP posted on a non-public "intralink" system the draft confidential information memorandum ("CIM"), which provided CSFB's proposed "time and responsibility" schedule for the financing transaction. (Pl. Ex. 206; *see also*

Tr. at 436:2-21.)  An estimated less than 100 current "lenders to [ATP], as well as any other lender that has an account or responsibility with CSFB" received the draft CIM through the "intralink" system.  (Tr. at 438:4-439:13.)  ATP did not believe, as of this time, that the financing transaction was complete or successful; it merely expected the financing transaction to go forward.  (Tr. at 442:21-443:23.)

Bison concedes that the CIM or the "hope of completing" the financing transaction is not an "arrangement" under the Services Agreement.  (Tr. at 207:22-25; 210:23-25; 291:23-292:23; Pl. Ex. 146.)  Moreover, Bison conceded that it does not know when there was an "arrangement" in connection with the April 15, 2005 financing transactions because "it's a factual matter" and Bison had not "really thought about it very much."  (Tr. at 208:11-209:22.)

On or about April 11, 2005, lenders returned signed commitment letters.  (Tr. at 372:8-21.)  On April 14, 2005, CSFB and ATP consummated the $350 million financing transactions, which consisted of $130 million "new" money on top of the $220 million previously advanced under the September 24, 2004 financing transactions.  (Def. Ex. 29; Pl. Ex. 208.)

12. **The Services Agreement Contained A "Tail" Provision That Limited The Time Period In Which Bison Was Entitled To A Fee**

To recap, Bison is claiming that it is owed fees not only for the September 24, 2004 financing transactions but for all of ATP's other transactions with either CSFB or a related or affiliated entity, including all the transactions that took place after the April 1, 2005 "tail" period up until the present time.  There is no reliable evidence, however, that supports Bison's claim that Paragraph 7 of the Services Agreement is not a commonly used "tail" provision but, instead, a unique "triggering" provision that entitles Bison to a windfall of fees for a mere introduction.[4]

---

[4] The undisputed evidence established that except for the March 29, 2004 transaction, Bison rendered no services and relies solely on the argument that it had "approached" CSFB.

To the contrary, the credible evidence shows that Bison never communicated to ATP – either before or after the Services Agreement was entered into – that it expected to be paid on transactions that took place after the "tail" period and for which Bison performed zero work or other "services." Likewise, there is no language in the Services Agreement that states that Bison would be entitled to such "continuing" and "perpetual" fees. The October 15, 2004 letter, the testimony of CSFB and Bison's years of silence have only confirmed the unreliability of Bison's current interpretation of the Services Agreement.

## ARGUMENT

To prevail on its claim Bison's evidence had to demonstrate (i) that it had complied with its obligations under the Services Agreement, *i.e.*, that Paragraph 2(b) did not require Bison to render a service in connection with the transaction at issue; (ii) that Bison is entitled to fees under Paragraph 2(b), even if the transaction did not involve a cash advance to ATP and the transaction only modified covenants or terms of existing loans; and (iii) that (a) Paragraph 7 contains a trigger that entitles Bison to continuing compensation, or (b) ATP entered into or consummated the agreement or arrangement before the "tail" period expired.

## 1.     The First Issue Is Whether The Agreement Is Ambiguous.

The parties do not agree concerning the obligations encompassed by these contractual provisions, and while this by itself does not create an ambiguity, the threshold issue for the Court is whether any of these provisions are ambiguous, or capable of more than one interpretation. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 443 (2d Cir. 1995); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)). If the Court finds that the any of the provisions are ambiguous, at that point, the Court may properly consider

the circumstances surrounding the making of the agreement to interpret the ambiguous term. *Airco Alloys v. Niagara Corp.*, 76 A.D.2d 68, 70, 430 N.Y.S.2d 179 (4th Dep't 1980).

**A.      Bison Was Required To Provide A Service To Receive A Paragraph 2(B) Fee.**

The Services Agreement was structured so that Bison's compensation under Paragraph 2(b) was dependent upon a lender funding a "Capital Transaction," as defined in Paragraph 1(b). When these two provisions are read in harmony, as they must be, *see Suburban Tool & Die Co., Inc. v. Century Mold Co.*, Inc., 78 A.D.3d 1530, 911 N.Y.S.2d 746, 747 (4th Dep't 2010) (intent ascertained by reading document as a whole), ATP promised to pay the fee if Bison *assisted* ATP to *negotiate* and *structure* the Capital Transaction. If Bison is not required to provide any service, and is only required to approach a firm on Exhibit A of the Services Agreement (as Bison argues) to obtain a fee, the obligation to provide a service for the transaction is rendered meaningless, an unacceptable result. *See UBS Securities LLC v. Red Zone LLC*, 77 A.D.3d 575, 579, 910 N.Y.S.2d 55 (1st Dep't 2010).

If the Services Agreement is ambiguous, the circumstances surrounding the execution of the agreement and the greater weight of the credible testimony demonstrates that Bison was required to advise and assist ATP in connection with the financing transaction on which it claims a fee. At the time that ATP entered into the Services Agreement, the parties recognized that ATP needed a capital infusion as soon as possible (Tr. at 350:2-6; 351:17-352:4; 356:16-357:16; 388:2-6; 466:24-471:19), and that the purpose of Bison's engagement was to provide two months of intensive work to close such a transaction (Tr. at 351:17-352:4; 356:16-357:16; 388:2-6; 466:24-471:19). Thus, when ATP promised to pay a 1% fee on a successful transaction, it intended that Bison would assist ATP with the transaction. (Tr. at 453:6-454:16; 485:11-17.) The purpose of the clause assuring Bison would be paid with respect to firms it approached was solely to prevent someone from stepping in and capitalizing on Bison's work, and was not

intended to relieve Bison of its obligation to assist ATP in connection with the transaction at issue. (Tr. at 295:10-297:4.) A rational business would not pay an advisor $25,000 per month simply to make a few phone calls or send some emails to the firms on Exhibit A. *See* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:11 (4th ed. 1999) (the fact that informed and experienced persons do not customarily bind themselves to unjust and unreasonable obligations must be considered by the court).

**B.      Paragraph 7 Is A "Tail", Not A Trigger.**

Paragraph 7 of the Services Agreement, in pertinent part, states as follows:

> Notwithstanding the forgoing [termination of the Services Agreement], Bison shall be entitled to the fees set forth in Paragraph 2 above in the event the Company consummates or enters into an agreement or arrangement providing for a Capital Transaction or Transaction at any time within twelve months following termination of this Agreement; and no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided for herein and to indemnify Bison as provided in the Indemnification Agreement.

(Pl. Ex. 190 at ¶ 7.)

Bison contends this clause created a trigger that now entitles Bison to compensation anytime that ATP enters into a lending arrangement with CSFB or its affiliates. To reach this result, Bison reads the two clauses as creating a single obligation, even though the clauses are separated by a semicolon and the conjunction "and." When read plainly, the unambiguous promise that ATP made was to pay a fee under Paragraph 2(b) on any transaction that closed within the 12-month period following termination of the Services Agreement, but only to the extent provided in the Services Agreement.

Further, if Paragraph 7 is ambiguous and reasonably capable of being considered a trigger or a "tail," the preponderance of the evidence establishes that it is a "tail." In ascertaining intent,

a party's unexpressed subjective intent cannot supply the meaning of the contract. *SR Intern.*
*Business Ins. v. World Trade Center*, 467 F.3d 107, 126 (2d Cir. 2006). In this case, the Court is
presented with conflicting testimony. Schlief directly testified that he asked Wells for the "tail"
to limit the time during which Bison could claim a fee under Paragraph 2(b). (Tr. at 453:6-
454:16; 485:11-17.) Wells denies that Schlief made the request. (Tr. at 317:1-2.) Wells claims
that he explained the trigger to Schlief. (Tr. at 284:3-13.) Schlief denies Wells explained this to
him and further denies any substantive discussions with Wells after he received the first draft of
the Services Agreement. (Tr. at 457:15-21; 458:17-21.)

If the Court determines that Schlief presented the more credible testimony concerning the
discussions between him and Wells, then the issue should be resolved in ATP's favor, since
Schlief expressly asked for a "tail" and Paragraph 7 can be interpreted to be a "tail" provision.
Moreover, as detailed below, the other provisions in the Services Agreement, the surrounding
circumstances, and industry practice support ATP's interpretation that Paragraph 7 contained a
"tail" that limited Bison's fees to transaction closing in the 12-month period following
termination of the Services Agreement.

### i.      Paragraph 1 Supports Interpretation That Paragraph 7 Has A "Tail", Not A Trigger.

Bison sought to characterize its services as services to provide a plan and a financing
source and, therefore, a trigger was need for it to be fully compensated. This is wholly
unsupported by the express terms of the Services Agreement. The services are defined in
Paragraph 1(a) and 1(b). Bison only provided services under Paragraph 1(a), which were
described by the parties as follows:

> 1.      <u>Services to be Rendered</u>.   ATP hereby engages
> Bison, under the leadership of its President Edwin E. Wells, Jr., as
> its financial advisor for the purpose of:

> (a)    *advising* the Company with respect to potential
> financing alternatives and *assisting* the Company in
> *structuring* and *negotiating the terms* of potential
> financing arrangements ("Capital Transactions");

(Pl. Ex. 190) (emphasis added).  The Services Agreement did not require Bison to locate a

perpetual financing source or formulate a plan, if that could even be done, that would yield

financing transactions years into the future.  Thus, the Services Agreement itself shows that the

parties planned to focus their efforts on closing transactions, not locating a perpetual financing

source.  Accordingly, the goal was to protect Bison on a late closing of a transaction.

### ii.    The Surrounding Circumstances Indicate That ATP Wanted A "Tail", Not A Trigger.

The undisputed evidence demonstrated that Schlief and Reese understood the nature of a

"tail" and had used "tails" in other advisory contracts to limit fees on financing transactions.  (Tr.

357:17-359:2; 453:17-454:16.)  In addition, the evidence demonstrated that ATP was seeking a

capital infusion for a new source of financing to retire the debt to Ableco, not a new source of

financing for a future on-going relationship.   (Tr. at 350:2-6;  351:17-352:4;  356:16-357:16;

388:2-6; 466:24-471:19.)  When ATP entered the Services Agreement, therefore, its intent was

to secure help from Bison for a financing transaction.   (Tr. at 351:17-352:4;  356:16-357:16;

388:2-6; 466:24-471:19.)  In fact, at the meetings with CSFB that occurred on February 11,

2004, the day that ATP received the first draft, and on February 13, 2004, the day ATP received

the final draft of the Services Agreement, CFSB presented ATP with the proposal that would

result in a single transaction allowing ATP to retire the Ableco debt.  There was no discussion or

indication that CSFB or Bison proposed that CSFB and its affiliates become a long-term source

for repeated financing transactions.  (Tr. at 327:22, Def. Ex. 32 at 93:20-94:17, 95:11-97:9; Tr. at

463:25-464:20; *see also* Tr. at 528:19-25.)  Based on the circumstances, there is no reason to

believe that ATP would have agreed to triggering event, since it was focused on a transaction.

Notably, after ATP closed the first transaction with CSFB, the capital infusion eliminated ATP's financial stress.  It was in the position that it no longer needed to return to CSFB to renew loans or enter new loans.   Consequently, if ATP believed it was obligated to pay Bison continuing compensation, it would have used other investment banks to arrange its senior notes. (Tr. at 376:25-377:25.)

> iii.   **Industry Custom And Usage Demonstrate That Paragraph 7 Was A "Tail".**

If a contract is ambiguous, industry custom and usage may be used to interpret the agreement.  *Merritt Assocs., Inc. v. Scollard*, 161 A.D.2d 502, 555 N.Y.S.2d 771 (1st Dep't 1990).  In this case, Boukouzis (former Vice President, Oil and Gas Group, of Rothschild) and Hassen (former Co-Chairman, Co-Head, Global Energy Group, of CSFB) testified that "tails" are common in the industry to protect an advisor's fee if a transaction closes after the advisory services agreement terminates.  (Tr. at 327:22, Def. Ex. 31 at 15:9-15, 15:24-16:3, 16:5-11, and Def. Ex. 32 at 80:21-83:16, 83:18-20, 80:9-13, 80:17-20.)  Wells testified that he was familiar with "tail" provisions and had not used terms providing for continuing compensation.  (Tr. at 305:25-307:14.)  Accordingly, Schlief's request for a "tail" should have been meaningful to Wells and application of industry custom and usage lends to an interpretation that Paragraph 7 contains a "tail," not a trigger.

> C.   **Fees Under Paragraph 2(B) Are Only Due On New Money.**

Pursuant to Paragraph 2(b), fees were due when funds were made available to ATP, its affiliates or its lenders.  (Pl. Ex. 190.)   Bison contends that transactions that involved modification of covenants or interest rates obligate ATP to pay a fee on the amounts that were subject to amended terms.  Bison's interpretation is contrary to the unambiguous language in Paragraph 2(b) of the Services Agreement.  This paragraph specifically states that fees were to be

paid "when funds are made available to or for the benefit of ATP, its affiliates or lenders." *Id.* Starting with the transaction dated September 24, 2004, ATP modified the terms of the March 29, 2004 transaction. In the case of modified terms, no funds were advanced to ATP or its lenders.

The apparent purpose of Paragraph 2(b), in part, was to provide for a fee when funds were used to payoff a lender and retire a loan. Defendant's Exhibit 29 identifies the transactions where terms to existing loans were modified, or part of the transaction resulted in an advance of "new" money. Bison's claim for damages, however, is for the entire amounts of the transactions, irrespective of whether no additional money was advanced to ATP, its affiliates or its lenders. Bison's argument is a demand for double payment because the funds, in part, were first made available on March 29, 2004, and Bison was paid for those funds on March 31, 2004. To the extent that later transactions involved modification of terms, no funds were made available and, therefore, no additional payment was due Bison, even if the Court were to adopt Bison's trigger interpretation.

D.   **Arrangements Can Only Refer To Lender Commitments Or Lending Agreements.**

The final term at issue in this lawsuit is the meaning of the term "arrangement" in the context of its use in Paragraph 7, *i.e.*, an "arrangement providing for a Capital Transaction." Bison contends that an "arrangement" includes the preparations made in anticipation of presenting a potential financing arrangement to the market. The argument is part of Bison's effort to claim a fee for the April 14, 2005 transaction in the event the Court rules that Paragraph 7 is a "tail," not a trigger.

The parties had no meaningful discussion concerning the term "arrangement". Schlief denied any meaningful discussions and considered an arrangement to be essentially the same as

an agreement.  (Tr. at 474:9-11; 475:6-9.)  Wells provided the following relevant testimony,

which can easily be understood in the context of the process leading to closing a transaction:

> Q.  Well, let me be more clear in my question.  Everything that you
> have described to the court about what you understand
> arrangement to be in the context of this agreement, did you go into
> that detail with Jerry Schlief in February of 2004?
>
> A.  No, I didn't go into discussions about confidential information
> memorandum or management presentations or dealing with
> potential financing sources in the questions, all that, no.  What I
> talked to him about was more general.  ***It was a step short of
> reaching an agreement***.
>
> Consummation was the end game, before that you reached an
> agreement, before that you were working seriously on a transaction
> trying to get it done.  So it was a progression.  It was less than that,
> you did serious work on that.

(Tr. at 289:3-16) (emphasis added).

In the context of the circumstances of a transaction, the final steps of the transaction

occurred after the lenders provided a commitment letter to CSFB or its affiliate.  As Reese

explained, until the lenders return commitment letters (*e.g.* Pl. Ex. 206 at p. 7), there is no

arrangement; the lenders are unknown; and the amount that each will lend is unknown.  In fact,

return of the commitment letters is the first definitive step before an agreement is reached.  Upon

return, ATP has 30 days to negotiate the lending agreement and close the transaction.  (Tr. at

371:15-16; 373:5-9; 442:21-443:23.)  Accordingly, the arrangement for the April 14, 2005

transaction was not made until after April 1, 2005.  Accordingly, the April 15, 2005 transaction

occurred after the "tail" expired and does not provide a basis for Bison to claim a fee.

## 2.    Appropriate Relief

Judgment should be entered against Bison denying all of its claims.  It failed to

demonstrate that ATP breached any aspect of the Services Agreement.

The Services Agreement required that Bison *advise* and *assist* ATP in connection with the transaction on which Bison claimed a fee.  Bison, as the evidence established, assisted only with the first (March 29, 2004) transaction and Bison was paid for the transaction.  Thus, it is not entitled to any further compensation.

The Services Agreement incorporated a "tail" in Paragraph 7.  The "tail" expired on March 31, 2005, or 12 months after the Services Agreement terminated.  The only transaction that closed within the "tail" was the September 24, 2004 transaction, and Bison did not *advise* or *assist* ATP in negotiating the transaction.  This transaction involved the advance of $35 million of "new" money.  Thus, if the Court were to determine that Bison did not need to provide a service, Bison would be entitled to a fee of no more than $350,000, which it turned down.

Finally, the April 14, 2005 transaction occurred outside the "tail" period and without the advice or assistance of Bison.  Bison's argument that an "arrangement providing for a Capital Transaction" was made before the "tail" expired is incorrect.  The commitment letters from the lenders were not presented to CSFB or ATP until well after April 1, 2005.  Thus, ATP did not enter into an "arrangement" for this transaction within the "tail" period.

## REQUESTED RELIEF

For the these reasons, ATP requests that the Court enter judgment dismissing all claims of Plaintiff Bison Capital Corporation and awarding ATP Oil & Gas Corporation its costs.

Dated: Houston, Texas
      February 7, 2011

BEIRNE, MAYNARD & PARSONS, LLP


By:    s/ Benjamin A. Escobar, Jr.
       Edward J. Murphy
       Brit T. Brown (admitted *pro hac vice*)
       Benjamin A. Escobar, Jr. (admitted *pro hac vice*)
       David A. Walton (admitted *pro hac vice*)
BEIRNE, MAYNARD & PARSONS, LLP
1300 Post Oak Boulevard, Suite 2500
Houston, Texas 77056
Tel: (713) 623-0887
Fax: (713) 960-1527
Email: emurphy@bmpllp.com
Email: bbrown@bmpllp.com
Email: bescobar@bmpllp.com
Email: dwalton@bmpllp.com

-and-

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
Gerald G. Paul
Lissa C. Gipson
One Liberty Plaza
New York, New York  10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: gpaul@fzwz.com
Email: lgipson@fzwz.com

*Attorneys for Defendant*


TO:   HUNTON & WILLIAMS LLP
      Jeffrey W. Gutchess
      1111 Brickell Avenue
      Miami, Florida  33139
      Tel: (305) 810-2500
      Fax: (305) 810-2460
      Email: jgutchess@hunton.com

      *Attorneys for Plaintiff*