USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/8/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
: 
BISON CAPITAL CORPORATION, :
:
Plaintiff, :
: 10 Civ. 714 (SHS)
-against- :
: FINDINGS OF FACT &
ATP OIL & GAS CORPORATION, : CONCLUSIONS OF LAW
:
Defendant. :
:
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

This breach of contract action was tried to this Court on January 18-21, 2011. Plaintiff Bison Capital Corporation alleges that defendant ATP Oil & Gas Corporation failed to pay Bison fees for services rendered pursuant to their contract. ATP contends that Bison did not provide the requisite services and that the contract also cut off Bison's right to fees after a certain date. The parties further contest how such fees, if any, should be calculated.

After due consideration of the evidence adduced during that trial, the following are the Court's findings of fact and conclusions of law.[1]

I. **FINDINGS OF FACT**

A. The Parties and Their Agreement

In early 2004, ATP—a company that develops and produces oil and gas from offshore properties in the Gulf of Mexico and North Sea—was in financial distress. (Transcript dated January 18-21 ("Tr.") at 36.) ATP had failed to meet various covenants in its loan agreements with Ableco Finance LLC, the lending arm of Cerberus Capital Management. (See, e.g., id. at

---

[1] To the extent that any findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law; to the extent that any conclusions of law may be deemed findings of fact, they shall also be considered as such. See Miller v. Fenton, 474 U.S. 104, 113-14 (1985).

1

389-90; Pl.'s Ex. 90.) Severe financial consequences loomed. (Tr. at 36.) In the short term, ATP needed a capital infusion by March 31, 2004, the end of its first fiscal quarter, to avoid having a "going concern" qualification added to its auditor's opinion on its financial statements. (*Id.* at 348-350.) ATP also sought a new, long-term source of capital to replace Abelco and finance its multi-year development program. (*Id.* at 357, 406, 467-68; *see also* Pl.'s Ex. 30.)

In late January 2004, ATP asked Bison and its president Edwin Wells—an experienced financial advisor in the energy business—to both provide financial advice and help secure a new capital source. (Tr. at 95, 451-52, 467-68.) Bison and ATP entered into an agreement dated February 1, 2004 (Pl.'s Ex. 130 (the "Agreement")), which they executed in mid February. In initial discussions about compensation, Wells and Gerald Schlief, ATP's Senior Vice President, decided that the Agreement would include both fixed monthly advisory fees for advice as well as contingent fees intended to reward Bison for introducing ATP to a source of financing that provided it with funds. (Tr. at 122-25, 456.) Wells first emailed a draft of the Agreement to Schlief on February 11, 2004. (Pl.'s Ex. 127; Tr. at 116.) Two days later, Wells sent Schlief a second and final draft, which incorporated three changes Schlief had requested: Wells replaced the term "financing" with "Capital Transaction," attached an "Exhibit A" with a list of financing sources Bison was authorized to approach on ATP's behalf, and added a provision concerning attorneys' fees. (Tr. at 117-19; Pl.'s Ex. 128.) Before signing the Agreement, Schlief had both ATP's CFO and its general counsel review the document. (Pl.'s Ex. 128.) Wells and Schlief then signed the Agreement within a few days after Feb. 13. (Tr. at 95.)

The Agreement contains the following provisions relevant to this litigation:

1. <u>Services to be Rendered</u>. ATP hereby engages Bison, under the leadership of its President Edwin E. Wells, Jr., as its financial advisor for the purpose of:

(a) advising the Company with respect to potential financing alternatives and assisting the Company in structuring and negotiating the terms of potential financing arrangements ("Capital Transactions");

(b) if requested by the Company, advising the Company with respect to other Transactions (as defined below) that the Company may wish to consider and assisting the Company in negotiations concerning a Transaction or Transactions. . . .

2. Compensation. In connection with this engagement, ATP shall pay to Bison:

(a) monthly advisory fees of $25,000 per month paid in cash on or prior to the 20th calendar day of each month during the term of this agreement; and

(b) for each Capital Transaction through which funds are made available to or for the benefit of ATP, its affiliates or lenders as a result of arrangements made or to be made by investment or commercial banking firms approached by Bison on behalf of ATP, as listed in Exhibit A and additional entities may be added to such Exhibit after the date hereof with the consent of the Company, cash fees equal to one per cent (1%) of the aggregate Value of such funds, such fees in each case to be paid on the date such funds are made available . . . .

7.      Term. This Agreement shall commence on the date hereof and shall terminate, unless extended by Bison and the Company, on April 1, 2004; *provided, however,* that either party may terminate this Agreement with or without cause upon receipt of ten business days' prior written notice to the other party to that effect. Notwithstanding the foregoing, Bison shall be entitled to the fees set forth in Paragraph 2 above in the event the Company consummates or enters into an agreement or arrangement providing for a Capital Transaction or Transaction at any time within twelve months following termination of this Agreement; and no termination of Bison's engagement hereunder shall affect the Company's obligation to pay fees and expenses to the extent provided for herein . . . .

B. Bison's Work with ATP and ATP's Capital Transactions with Credit Suisse[2]

In early February 2004, before the Agreement was executed, Wells began to work from ATP's Houston offices, where he spent a significant amount of time over the next two months. (Tr. at 456, 491, 524.) During this period, he reviewed ATP's financial history and worked on developing potential solutions to its then current problems. (*Id.* at 95-99.) Most importantly, on

---

[2] "Credit Suisse" is also referred to by the parties alternatively as "Credit Suisse First Boston" and "CSFB."

February 6, 2004, Wells contacted Thomas Hassen, the head of the global energy group at Credit Suisse—one of the investment banks listed on Exhibit A of the Agreement—about potential financing for ATP. (*Id.* at 506.) Hassen and other representatives from Credit Suisse then met in person with Wells and ATP in Houston on February 11 and February 13, 2004. (*Id.* at 409.)

On March 29, 2004, Credit Suisse and ATP consummated a $185 million financing, (Pl.'s Ex. 170), pursuant to which $185 million in funds were "made available to or for the benefit of ATP," (Agreement ¶ 2(b)). The parties agree that this financing qualified as a Capital Transaction as defined in the Feb. 1 Agreement. In accordance with Paragraph 2(b) of the Agreement between the parties, ATP paid Bison $1.85 million, which was one percent of the $185 million in funds made available by that Capital Transaction. (Tr. at 158-59.) ATP also paid Bison its advisory fees of $25,000 per month for February and March, and Wells' expenses. (*Id.*) Through this new relationship with Credit Suisse, ATP met its short-term financing needs and developed what proved to a long-term source of capital.

On September 24, 2004, ATP consummated a second Capital Transaction with Credit Suisse in the form of amendments to the first Capital Transaction. This financing arrangement, which had a face value of $220 million, consisted of $35 million in new funds; it also reduced the interest rates and loosened certain covenants on the $185 million Credit Suisse had previously made available to ATP. (*See* Pl.'s Exs. 187, 188; Tr. at 161-64, 412-13.) ATP never told Wells about this second Capital Transaction with Credit Suisse. (Tr. at 166.) However, on September 20, 2004—four days before this second Capital Transaction closed—Schlief forwarded the Feb. 1 Agreement between the parties to Al Reese, ATP's CFO, along with a note that Reese should call Schlief so he could give Reese "my thoughts on this." (Pl.'s Ex. 180; Tr. at 497-98.) Schlief also testified that he "must have" had a discussion with Reese "about whether or not [ATP] owed

4

Mr. Wells any money because of" the second Capital Transaction, although he had no specific recollection of that conversation. (Tr. at 499-500.)

After Wells saw public reports of the September 24, 2004 Capital Transaction, he contacted Schlief by phone to congratulate him and also to request payment of $2.2 million, which represented one percent of the face value of the $220 million second Capital Transaction. (Tr. at 166.) During this conversation, Schlief professed surprise at Wells' claim for any additional fees and told Wells that he would have to investigate whether Bison was owed any more money. (*Id.* at 477-78, 515.) Schlief then had a second phone conversation with Wells during which Schlief said that he did not believe ATP owed Bison any additional fees; however, he offered Bison $350,000, which represented one percent of the new $35 million made available in the September 24, 2004 financing. (*Id.* at 479.) Wells immediately rejected this offer. (*Id.* at 169.) Three weeks later, on October 15, 2004, Wells sent Schlief a letter and invoice formally requesting payment of $2.2 million in compensation for the second Capital Transaction and explaining why he believed the Agreement entitled him to this fee. (Pl.'s Exs. 189, 190.) ATP has not paid Bison a fee for the September 24, 2004 financing. (Tr. at 178, 180.)

ATP and Credit Suisse then consummated a third Capital Transaction on April 14, 2005. (*See* Pl.'s Ex. 208.) This $350 million financing arrangement made available $130 million in funds on top of the $220 million that Credit Suisse had previously made available. (Def.'s Ex. 29; Tr. at 185.) Although the third Capital Transaction did not close until April 14, 2005, ATP had taken substantial steps toward completing the Capital Transaction in March of that year. Those steps included the creation and completion of a "Time and Responsibility Schedule" dated March 4, 2005, which allocated specific responsibilities among the bankers, lawyers, and ATP officials working on the Capital Transaction and also set a timeline for tasks to be completed

between February 28, 2005 and the closing. (Pl.'s Ex. 200; Tr. at 435-36.) In accordance with this schedule, ATP, Credit Suisse, and their lawyers had begun drafting transactional documents by early March. (*Id.*) On March 18, ATP held a conference call with interested investors during which it disclosed the terms of the upcoming Capital Transaction. (*Id.* 439-40.) Then, on March 29, 2005, Reese signed an agreement authorizing Credit Suisse "to distribute the confidential information memorandum dated March 28, 2005 to potential lenders in connection with the proposed $350 million senior secured term loan facility." (Pl.'s Ex. 206 at 6; *see also* Tr. at 444.) That same day, Reese sent an email to the ATP team that had been actively working with Credit Suisse, saying "thanks to all for your diligence in making this project successful." (Pl.'s Ex. 203; Tr. at 442-43). His email referred to the success of this third Capital Transaction, which, though it had not yet closed, was well under way and set to close. It is undisputed that ATP never paid Bison a fee for this third Capital Transaction.

Following the third Capital Transaction, which closed on April 14, 2005, ATP and Credit Suisse have made eleven additional financial arrangements. (*See* Pl.'s Exs. 249-321). It is undisputed that ATP did not pay Bison any fees on those eleven Capital Transactions.

In January 2010, Bison commenced this action seeking $86,638,468.75 in fees plus interest allegedly due under the parties' Agreement.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction, Venue, and Choice of Law

Plaintiff is a citizen of Connecticut and defendant has its principal place of business in Texas and is incorporated in Delaware. The amount in controversy exceeds $75,000, exclusive of interest and costs. Accordingly, federal subject matter jurisdiction exists based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The parties agree that their contract provides for venue

in the Southern District of New York and that New York state law governs this dispute. (Agreement ¶ 10.)

B. Legal Standard

"In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 09 Civ. 3899, 3900, 2011 WL 37813, at *8 (2d Cir. Jan. 6, 2011). The meaning of an unambiguous contract is a question of law, as is whether a contract is ambiguous. *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 09 Civ. 3899, 3900, 2011 WL 37813, at *7 (2d Cir. Jan. 6, 2011). "An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal citations omitted).

"When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract, including testimony offered by the parties." *Diesel Props*, 2011 WL 37813 at *7 (citing *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915 (1975) ("[T]he court can look to the surrounding facts and circumstances to determine the intent of the parties."). "The meaning of an ambiguous provision, in light of such evidence, is a question of fact for the factfinder." *Diesel Props*, 2011 WL 37813 at *7 (citations omitted). "It is within the province of the district court as

7

the trier of fact to decide whose testimony should be credited." *Id.* at *7 (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

The rule of construction that ambiguous provisions are construed against the drafter does not apply where, as here, both parties are sophisticated business entities. *Metro Funding Corp. v. WestLB AG*, No. 10 Civ. 1382, 2010 WL 1050315, at *21 (S.D.N.Y. Mar. 19, 2010) (citing *Int'l Multifoods Corp. v. Commercial Union Ins.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002)); *DaPuzzo v. Globalvest Management Co., L.P.*, 263 F. Supp. 2d 714, 729 (S.D.N.Y. 2003).

C. Application

### 1. *The Agreement Does Not Require Bison to Provide Services for Each Capital Transaction In Order to Earn Fees on That Capital Transaction*

Plaintiff contends that ATP must pay Bison a one-percent fee for each Capital Transaction ATP arranged, agreed to, or consummated with Credit Suisse, whether or not Bison provided services for that Capital Transaction. ATP counters that Paragraph 1 of the Agreement requires Bison to advise or assist on each Capital Transaction for which Bison claims a fee.

The Agreement sets forth two separate forms of compensation that are relevant here: (a) monthly advisory fees of $25,000 for the two-month term and (b) percentage-based contingency fees for funds that are made available to ATP pursuant to the Agreement. (*See* Agreement ¶ 2.) This compensation structure reflects ATP's dual desire to both obtain financial advice from Bison and to secure new funding sources. Thus, ATP agreed to reward Bison for establishing a relationship with specified investment banking firms—such as Credit Suisse—that produced future Capital Transactions.

Paragraph 1(a) defines Capital Transactions as "financing arrangements." Even though the words "advising" and "assisting" appear in the same paragraph, to graft them onto the definition of Capital Transactions, as ATP proposes when it argues that Bison had to render services for

8

each Capital Transaction in order to be paid a fee, would defy both common syntax and the plain meaning of Paragraph 2(b). Paragraph 2(b) entitles Bison to fees "for *each* Capital Transaction" made with an investment bank "*approached* by Bison on behalf of ATP" (emphasis added). Therefore, what triggers Bison's right to its one-percent fee pursuant to Paragraph 2(b) is merely ATP making an arrangement for a Capital Transaction with a firm listed on Exhibit A to the Agreement that Bison had approached. The requirement that Bison provide advisory services to ATP pertains only to the guaranteed "monthly advisory fees" set forth separately in Paragraph 2(a).

"[F]inancing arrangements" qualify as Capital Transactions whether or not Bison has advised or assisted on the particular "financing arragnement." The Court declines to credit Schlief's interpretation of the Agreement that would require Bison to have rendered services or assistance on a particular Capital Transaction in order to receive his one-percent fee on that Capital Transaction. To agree with Schlief's interpretation at trial would impose on Bison a condition that does not appear in the Agreement.

### 2. *Aggregate Value Means New Funds Made Available in a Capital Transaction*

Bison is entitled to one percent of the "aggregate Value" of the "funds [that] are made available to or for the benefit of ATP" in a Capital Transaction. (Agreement ¶ 2(b).) Paragraph 3 of the Agreement defines "Value" as:

> the aggregate value of all cash, securities, joint venture interests or any contract rights or other property or assets involved in the Transaction . . . . Value shall be deemed to include the face amount of any indebtedness for borrowed money or other financial instruments, including or without limitation, pension liabilities and other obligations assumed, retired or defeased, directly or indirectly, in connection with, or which survive the closing of, a Transaction.

9

(*Id.* ¶ 3.) Bison argues from that language that it is therefore entitled to one percent of the entire face amount of each Capital Transaction and not just to one percent of the new cash infusion to ATP in each Capital Transaction.

However, the Paragraph 3 language on which Bison relies for its expansive definition of "aggregate Value" refers expressly to "Transactions," not Capital Transactions. Indeed, Paragraph 3 specifically and expressly distinguishes "Transactions" from "Capital Transactions" in the following terms: "'Transaction' shall mean any transaction or series or combination of transactions, other than Capital Transactions." It is only Paragraph 2(b) that addresses the "aggregate Value" of "Capital Transactions."

Turning to Paragraph 2(b), which concerns the compensation Bison is to receive for each Capital Transaction, that provision specifically grants Bison fees "for each Capital Transaction through which *funds are made available*" (emphasis added). Those fees are "cash fees equal to one percent (1%) of the aggregate Value of *such funds*" (emphasis added). The term "aggregate Value" appears only in connection with "such funds" from a Capital Transaction. Paragraph 2(b) does not mention any of the other sources of Value—such as "joint venture interests" or "contract rights or other property or assets"—that are "involved in [a] Transaction" contemplated by Paragraph 3.

Under Bison's interpretation of aggregate Value, Bison would receive one percent of the face value of each Capital Transaction, regardless of whether any new funds are actually made available to ATP. Bison argues that a mere change in interest rate—or alteration in loan covenant, for that matter—still entitles Bison to one percent of the original loan amount. To accept Bison's interpretation of aggregate Value would lead to absurd results. *See Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7600, 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009)

10

("A court should not interpret a contract in a manner that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'") (citing *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003)). For example, if a Capital Transaction involved simply altering a loan covenant on a previously issued $185 million loan which would save ATP $50,000, Wells' interpretation of the contract would result in his receiving a fee of $1.85 million. Indeed, if a subsequent Capital Transaction involved simply altering a second loan covenant to save ATP an additional $50,000, Wells' interpretation would result in his receiving yet another fee of $1.85 million.

Obviously, an alteration in a financing arrangement, such as a loosening of loan covenants, would have value to ATP. However, there is no evidence in this record as to how the Court should or could measure such a benefit. Nor is there any evidence in the record that the parties discussed the meaning of aggregate Value during their contract negotiations. The burden here is on plaintiff to prove the aggregate Value of each Capital Transaction by a preponderance of the evidence, and plaintiff has failed to show that "aggregate Value," as used in Paragraph 2(b), equals the total face amount of indebtedness, including both new *and* old funds. Meanwhile, ample evidence exists in this record as to the amount of new funds made available to ATP in each Capital Transaction. (*See* Def.'s Ex. 29; *see also, e.g.*, Tr. at 185, 412.) Accordingly, the Court concludes that for the purposes of compensation pursuant to Paragraph 2(b), "aggregate Value of such funds" means the value of the new funds made available to ATP in a Capital Transaction.

### 3. *The Agreement Cuts Off Bison's Right to Fees After March 31, 2005*

Paragraph 7—which establishes the term of the Agreement—is reasonably susceptible to different interpretations. This paragraph provides that although the Agreement "shall terminate

11

. . . on April 1, 2004," Bison "shall be entitled to the fees set forth in Paragraph 2 above in the event [ATP] consummates or enters into an agreement or arrangement providing for a Capital Transaction . . . at any time within twelve months following termination of the Agreement." (Agreement ¶ 7.) The parties here dispute the significance of the twelve-month time frame following termination (i.e., the period between April 1, 2004 and March 31, 2005).

Wells' in-court testimony that March 31, 2005 marks a cut-off for triggering Bison's right to perpetual fees, rather than a cut-off for Bison's right to fees altogether, contradicts his own prior interpretation of the Agreement. Wells acknowledges that the first Capital Transaction on March 29, 2004 triggered Bison's right to future compensation; no additional condition had to be met. (*See* Tr. at 140.) Yet in Wells' October 15, 2004 letter to Schlief seeking the payment of fees on ATP's second Capital Transaction, Wells noted that this second Capital Transaction closed on September 24, 2004, and that "[t]hus, this [Capital Transaction] is within the applicable time frame under the Engagement Agreement." (Pl.'s Ex. 190.) Wells went on to write that "since ATP's new financial arrangements were made by Credit Suisse prior to April 1, 2005, Bison is entitled to be paid by ATP the additional 1% fee that is referred to in the enclosed invoice." (*Id.*) Thus, Wells' stated position in his October 15, 2004 letter reflects his understanding that in order to receive a fee for "financial arrangements" (i.e., a Capital Transaction), these arrangements must be made "within the applicable time frame" (i.e., prior to April 1, 2005). *See Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir. 1965) ("Where ambiguity is present in a contract, the subsequent conduct of the parties may be used to indicate their intent."); *Peter J. Solomon Co., L.P. v. Oneida Ltd.*, No. 09 Civ. 2229, 2010 WL 234827, at *3 (S.D.N.Y. Jan. 22, 2010) (considering parties' course of conduct in construing ambiguous

terms in an engagement agreement for a financial advisor) (citing *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006)).

ATP's interpretation of Paragraph 7 of Agreement is consistent with Wells' letter. The Court credits the testimony of Schlief and Reese; it declines to adopt Wells' litigation posture that the Agreement imposes on ATP a continuing, perpetual obligation to pay Bison one percent of any Capital Transaction entered into between ATP and Credit Suisse until the end of time simply because they entered into a Capital Transaction prior to April 1, 2005. At trial, Schlief and Reese both unequivocally testified that they intended Paragraph 7's twelve-month time frame to serve the purpose of a commonly used "tail provision." This provision ensured that Bison received compensation for Capital Transactions that may have been delayed beyond the two-month term of the Agreement, yet also placed a time limit on ATP's obligation to pay fees into the future. (Tr. at 357, 453-54.) As such, Paragraph 7 of the Agreement only entitles Bison to fees if ATP "consummates or enters into an agreement or arrangement providing for a Capital Transaction" prior to April 1, 2005. (*See* Agreement ¶ 7.)

### 4. *ATP Breached the Agreement with Respect to the Second and Third Capital Transactions*

ATP breached the Agreement with respect to the second and third Capital Transactions. As set forth above, it is of no consequence that Bison did not provide any services to ATP after April 1, 2004. The Agreement only requires that Bison approach a specified funding source, which the parties agree Bison did. When ATP consummated a second Capital Transaction with Credit Suisse on September 24, 2004—prior to the March 31, 2005 cut-off for fees—ATP owed Bison one percent of the aggregate Value of that Capital Transaction pursuant to Paragraphs 2(b) and 7 of the Agreement. Aggregate Value means new funds made available to ATP, and $35

million in new funds were made available. As a result, ATP owed Bison a fee of $350,000, which ATP never paid.

Plaintiff has also demonstrated by a preponderance of the evidence that prior to April 1, 2005, ATP entered into a "financing arrangement" that constitutes a third Capital Transaction. The Court credits Wells' largely unrefuted testimony that the term "arrangements" refers to efforts "far enough along that both sides were jointly working toward it with the hope and expectation that they would be able to reach the agreement and consummation stage if things went well." (Tr. at 208; *see also* 186-87.) In the six weeks leading up to consummation of this third Capital Transaction with Credit Suisse on April 14, 2005, ATP made significant preparations, as reflected in the drafting of documents, planning for and conducting of investor conference calls, distribution of the confidential information memorandum, and Reese's communications about the project's success. (*See* Tr. at 435-36, 439-40, 442-44; Pl.'s Exs. 200, 203, 206.) ATP and Credit Suisse's conduct prior to April 1, 2005, in regard to the Capital Transaction which closed on April 14, 2005, was sufficient to constitute an "arrangement" and thus trigger Bison's right to fees on this third Capital Transaction. Accordingly, ATP owed Bison one percent of the $130 million in funds made available—a fee of $1.3 million—which ATP never paid. (*See* Agreement ¶¶ 2(b), 7.)

Because the eleven Capital Transactions that followed the third Capital Transaction consummated on April 14, 2005 were all unquestionably "arranged," "agreed to," or "consummated" after April 1, 2005 and therefore outside the time frame provided for in the Agreement, Bison's claims for fees on those eleven Capital Transactions are denied. (*See* Agreement ¶ 7.)

## III. CONCLUSION

The Court enters judgment in favor of plaintiff and against defendant in the amount of $1,650,000, plus prejudgment interest pursuant to N.Y. C.P.L.R. § 5001. Bison may make an application to this Court for reasonable attorneys' fees pursuant to the parties' contract.

Dated: New York, New York
       March 8, 2011

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

15